**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, IL 60040
Telephone: (312) 358-8225
Email: scott@drurylegal.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—EASTERN DIVISION

| | |
|---|---|
| ROBERT PERKINS, individually and on behalf of all other persons similarly situated,<br><br>                    Plaintiff,<br><br>      v.<br><br>ACCOLADE, INC., d/b/a PLUSHCARE,<br><br>              Defendant. | Case No.   5:25-cv-3162<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................. 1

JURISDICTION AND VENUE ............................................................ 2

THE PARTIES ...................................................................................... 3

FACTUAL ALLEGATIONS ................................................................ 5

     I.     The California Invasion of Privacy Act ................................. 5

     II.    The California Confidentiality of Medical Information Act ................. 6

     III.   The Federal Wiretap Act ....................................................... 8

     IV.   Defendant's Website, iOS App, and Android App ............................... 9

     V.    Overview of the Third Parties' Tracking Technologies ...................... 28

     VI.   Defendant Aids, Agrees With, Employs, and Otherwise Enables The Third Parties to Wiretap Users' Communications ................................................................. 36

     VII.  Defendant Enables the Third Parties to Pair the Above Data with Users' Identities ............................................... 52

     VIII. Tolling ................................................................................. 60

CLASS ALLEGATIONS .................................................................... 61

CAUSES OF ACTION ....................................................................... 64

PRAYER FOR RELIEF ..................................................................... 80

DEMAND FOR JURY TRIAL ........................................................... 81

Plaintiff Robert Perkins ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Accolade, Inc., d/b/a PlushCare ("PlushCare" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of a class and subclass of all persons in the United States and residents of California, respectively, who, during the class period, had their personally identifiable information ("PII") and/or protected health information ("PHI") improperly intercepted by or otherwise disclosed to third-parties, including Twilio, Inc. d/b/a Twilio Segment ("Segment")[1] and Criteo Corp. ("Criteo"), as a result of using the PlushCare Website (available at plushcare.com, hereinafter, the "Website"), the PlushCare iOS App (available at https://apps.apple.com/us/app/plushcare-online-doctor/id955183607, hereinafter, the "iOS App"), and the PlushCare Android App (available at https://play.google.com/store/apps/details?id=com.plushcare.plushcare.prod, hereinafter, the "Android App"), which are owned, operated, and controlled by Defendant.

2.    Defendant procured, aids, employs, agrees with, and otherwise enables Segment and Criteo to intercept Plaintiff's and Class Members' communications while using the Website, iOS App, and/or iOS App, including communications containing PII and/or PHI. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

///

---

[1] Segment, Inc. was acquired by Twilio, Inc. *See, e.g.*, Twilio, *Twilio Completes Acquisition of Segment, the Market-leading Customer Data Platform* (Nov. 2, 2020), https://www.twilio.com/en-us/press/releases/twilio-completes-acquisition-segment-market-leading-customer-data-platform; Twilio, *Twilio Inc. Acquisition Tax Info*, https://investors.twilio.com/ir-resources/twilio-inc-acquisition-tax-info.

## JURISDICTION AND VENUE

3.　　The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).　The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class, and there is minimal diversity.

4.　　The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities.　Plaintiff accessed and navigated the Website while in California, and Defendant assisted Segment and Criteo with intercepting Plaintiff's communications in this District.

5.　　As detailed below, Defendant purposefully, systematically, and repeatedly reached into and targeted California in connection with marketing, promoting and otherwise making available the health services specifically offered to California residents, including Plaintiff, via the Website, iOS App, and Android App.

6.　　As a threshold matter, the Court has specific personal jurisdiction over Defendant because Defendant "obtain[ed] valuable personal data about California consumers for its own commercial gain." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 756 (9th Cir. 2025) (*en banc*).　Through those business activities, Defendant tortiously violated Plaintiff's and Class Members' privacy by collecting, maintaining, and/or selling the valuable personal data of California consumers.　*Id.*

7.　　Moreover, Defendant purposefully directed its activities at California by operating and designing its Website, iOS App, and Android App with the intent to cultivate an audience and obtain patients in California, as evidenced by its content with a California-specific focus.　For instance, when a patient uses Defendant's Website, and goes through the process of booking an appointment, the patient must choose which state they are located in.　*See infra* ¶ 42.　One of the states for which Defendant provides as an option is California.　*See id.*

8.    Because Defendant has chosen to provide California as an option, Defendant makes it possible for California residents to obtain health services via Defendant. Without Defendant's actions, California residents, such as Plaintiff, would be unable to use Defendant's services.

9.    This is because, under California law, California patients using online medical services—such as those Defendant provides and that Plaintiff used via the Website—cannot obtain care from providers not licensed in California.[2]  Defendant admits as much.  *See, e.g.*, *infra* ¶ 42 Screen 3C ("You must be physically in California during your visit ….").

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## THE PARTIES

### *Plaintiff Robert Perkins*

11.    Plaintiff Robert Perkins is an adult citizen of the state of California and is domiciled in Corona, California.

12.    Several times, including in or around December 2024, February 2025, and August 2025, Plaintiff accessed the Android App and/or Website to schedule doctor appointments in the manner described in greater detail below.   Plaintiff Perkins was in California when he accessed the Android App and/or Website.

13.    Because Plaintiff accessed the Android App and Website to schedule doctor appointments, and because of Defendant's actions as alleged herein, Plaintiff's use of the Android App and Website has led to the unlawful interception of his medical

---

[2]  *See, e.g.*, MEDICAL BOARD OF CALIFORNIA, PRACTICING MEDICINE THROUGH TELEHEALTH TECHNOLOGY, https://www.mbc.ca.gov/Resources/Medical-Resources/telehealth.aspx ("Physicians using telehealth technologies to provide care to patients located in California must be licensed in California. Physicians are held to the same standard of care, and retain the same responsibilities of providing informed consent, ensuring the privacy of medical information, and any other duties associated with practicing medicine regardless of whether they are practicing via telehealth or face-to-face, in-person visits.").

---

information, including information about the particular appointments he booked.

14.     Specifically, as a result of Defendant's unlawful conduct as alleged herein, third-parties Segment and Criteo intercepted information about the medical appointments that Plaintiff scheduled on the Android App and Website.  This includes the location of Plaintiff's appointments, the time of day of Plaintiff's appointments, the name of Plaintiff's particular health care providers, the price of Plaintiff's appointments, whether Plaintiff used insurance, whether Plaintiff paid with a credit card, and/or the fact that Plaintiff completed the appointment booking process.

15.     Pursuant to the systematic process described herein, Defendant both procured third-parties Segment and Criteo to intercept Plaintiff's communications and assisted those third-parties with intercepting Plaintiff's communications.  The intercepted communications included those that contained PII, PHI, and related confidential information. Defendant procured and assisted with the interceptions without Plaintiff's knowledge, consent, or express written authorization.

16.     By failing to receive the requisite consent, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff's PII and PHI.

### *Defendant Accolade, Inc.*

17.     Accolade, Inc. d/b/a PlushCare ("PlushCare" or "Defendant") is incorporated in Delaware and has its principal place of business at 1201 3rd Avenue, Suite 1700, Seattle, WA 98101.  Defendant facilitates a variety of health care services for its patients, such as online prescriptions, online urgent care, mental health, and weight loss.[3]  Patients can book online appointments with medical practitioners to access medical care and manage their treatment or diagnosis of medical conditions through the Website, iOS App, and/or Android App.

---

[3] *See* PLUSHCARE, *Trusted care from top doctors, just a tap away*, https://plushcare.com/ (last accessed September 24, 2025).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **FACTUAL ALLEGATIONS**

### I.     **The California Invasion of Privacy Act**

18.     The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

19.     The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

20.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted).

21.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing]

to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

22.    CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

23.    As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

24.    A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

25.    Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so, here, against Defendant.

## II.    The California Confidentiality of Medical Information Act

26.    Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), "[a] provider of health care … shall not disclose medical information regarding a patient of the provider of health care … without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a).[4] "An authorization for the release of medical information … shall be valid

---

[4] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical information in situations where a government investigation or lawsuit is taking place. For example, Defendant could bypass the authorization requirement if

---

if it meets the following conditions:"

> (1) Is handwritten or is in a typeface no smaller than 14-point type.
>
> (2) Is clearly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization.
>
> (3) Is signed … and dated …
>
> (4) States the specific uses and limitations on the types of medical information to be disclosed.
>
> (5) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.
>
> (6) States the name or functions of the persons or entities authorized to receive the medical information.
>
> (7) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.
>
> (8) States an expiration date or event. The expiration date or event shall limit the duration of the authorization to one year or less, unless the person signing the authorization requests a specific date beyond a year or unless the authorization is related to an approved clinical trial[.]
>
> (9) Advises the person signing the authorization of the right to receive a copy of the authorization.

Cal. Civ. Code § 56.11.

27.    Additionally, "a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally

---

patient medical information was requested pursuant to a lawful court order or by a party to a proceeding before a court or administrative agency pursuant to a subpoena. *See* Cal. Civ. Code §§ 56.10(b)(3) and 56.10(b)(6).

share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient." Cal. Civ. Code § 56.10(d).

28.    Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and protected health information. Cal. Civ. Code § 56.36(c).[5] Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

29.    "In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: (1) ... nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. (2) The amount of actual damages, if any, sustained by the patient." Cal. Civ. Code § 56.36(b).

**III.    The Federal Wiretap Act**

30.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, makes it unlawful for a person to intentionally intercept, endeavor to intercept or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication. 18 U.S.C. § 2511(a).

31.    Under the Federal Wiretap Act, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation

---

[5] "Every provider of health care ... who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101(a).

of [the Federal Wiretap Act] may in a civil action recover from the person or entity … which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

32.    Persons who have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

## IV.    Defendant's Website, iOS App, and Android App

33.    Defendant facilitates a variety of online health care services for its patients such as online prescriptions, online urgent care, mental health, and weight loss.[6]

34.    Defendant's online health care services are also known as "telehealth" services.  Through its telehealth services, users can "[b]ook a virtual care visit, chat via video on your smartphone, and pick up your prescription from your pharmacy."[7]

35.    Defendant goes on to explain that its "primary care doctors and therapists provide a wide range of healthcare services, including weight management, urgent care, pediatric care, chronic disease treatment and online therapy," and that users may "[a]ccess comprehensive care … in [Defendant's] convenient app."[8]

36.    Patients can book online appointments with medical practitioners to access medical care and manage their treatment or diagnosis of medical conditions through Defendant's Website, iOS App, and Android App, without ever leaving home.

---

[6] *See* PLUSHCARE, https://plushcare.com/ (last accessed September 24, 2025).

[7] *Id.*

[8] *Id.*

37.     Unbeknownst to Plaintiff and Class Members, however, Defendant procured, aids, agrees with, employs, and otherwise enables Segment and Criteo to eavesdrop on and intercept those confidential communications using Segment's and Criteo's wiretaps, as set out *infra*.

38.     Defendant has integrated both Segment's and Criteo's wiretaps into the Website and has integrated Segment's wiretaps into the Website, iOS App, and Android App. Through the integration of Segment's and Criteo's tracking technologies,[9] Defendant assisted Segment and Criteo with intercepting and otherwise obtaining the identities and online activity of Defendant's patients, including information related to the medical appointments that patients were seeking and for which they actually booked.

39.     Website, iOS App, and Android App users' confidential communications are the product of users affirmatively entering, and interacting with, information on the Website, iOS App, and Android App (*i.e.*, the confidential communications are not procedurally or automatically generated).   As set out below, the confidential communications stem from users conveying responses to questions and prompts, and actively making other selections.  All of the foregoing is information created through the intent of Website, iOS App, and Android App users, *e.g.*: (1) information created by and in response to users' communicative inputs; (2) information created by and in response to users' intended messages to the Website, iOS App, Android App, and Defendant; and (3) information created by the Website, iOS App, and Android App in response to users' having conveyed and expressed their respective desires that the Website, iOS App, and Android App would supply them with certain, highly

---

[9] *See, e.g.*, SEGMENT, ANALYTICS.JS SOURCE, ("Use the Analytics.js QuickStart Guide to learn how to add Analytics.js to your site. *Once you've installed the library*, read on for the detailed API reference.") (emphasis added); CRITEO, INTRODUCTION TO THE CRITEO ONETAG, https://help.criteo.com/kb/guide/en/introduction-to-the-criteo-onetag-8fjCDwCENw/Steps/775595 ("OneTag implementation requires website management access ... You must be able to edit website code or access configuration tools[.]").

personalized, types of information and/or responses.  Segment and Criteo, as installed and integrated by Defendant, contemporaneously intercept Website, iOS App, and Android App users' button clicks and taps selecting such services.

### Booking Process on the Website

40.    When a patient enters the Website pluschare.com they are prompted to "[b]ook [an] appointment." *See* Screen 1.



"Screen 1"

41.    Next, patients are prompted to select whether they are paying "with insurance" or "without insurance." *See* Screen 2.



"Screen 2"

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                          11

42.    Afterwards, patients are required to "[c]onfirm where you'll be for your appointment."  PlushCare explains that "[o]ur doctors are licensed by state, so we need to know your physical location during the visit."  *See* Screen 3A.  Users may click one of the "[s]uggested [s]tates" or click "[v]iew all states" to choose a different state from a drop-down list.  Once users select a particular state, users may click "Continue" to continue booking their appointment.  *See* Screens 3A-3C.



"Screen 3A"

"Screen 3B"

"Screen 3C"

43.    Afterwards, users are presented with a list of doctors and are encouraged to "[v]isit with a doctor now. Get diagnosed and prescribed Rx." *See* Screen 4A.  To visit with a doctor, users may search for appointments and/or providers that best meet their needs.  For example, users can "[f]ilter" by date, doctor, patient, and language. *See id.*  Users may click "[d]ate" and select a particular date and time from a calendar. *See* Screens 4A and 4B.  Users may also, for example, select "Spanish speaking" or "[n]o preference" as to language.  *See* Screen 4C.



"Screen 4A"

"Screen 4B"

"Screen 4C"

44.    Users on this page can also click the "[v]iew by time" or "[v]iew by doctor" buttons.  *See* Screens 5A and 5B.  Under each doctor is the option to "[v]iew profile &…reviews."  *See* Screen 5A.  Clicking "[v]iew profile & reviews" opens a pop-up screen providing a particular doctor's "[b]ackground" and "[w]hat patients are saying" about a doctor in the form of reviews.  *See* Screens 5A-5C.  To close the pop-up and continue booking, the user clicks the "x" in the top right corner.  *See* Screens

5C-5D.



"Screen 5A"                                                                                    "Screen 5B"

View profile & 95 reviews



"Screen 5C"



"Screen 5D"

45.    Users click "Book" to continue booking their appointment. *See* Screen 6.



**"Screen 6"**

46.    At this stage of the booking process, users are asked to "[c]reate[ a] profile." *See* Screen 7A.  At the very top of the page, a five-minute countdown timer begins.  *See id.* ("We're holding your appointment…").  As the timer runs, users are required to provide their: (1) first name; (2) last name; (3) date of birth; (4) email; and (5) phone number.  Users may but are not required to enter their (6) "[p]referred name" and (7) "[b]iological sex."  *See id.* ("Female," "Male," or "Prefer not to say").  Once the five-minute timer runs out, "[t]he appointment is no longer being held," but users can "still try to book" an appointment.  *See* Screen 7B.  Users are also prompted click on a checkbox and "Continue" to the final stages of the appointment booking process.

///

///

///

///

///

"Screen 7A"

"Screen 7B"

47.    To  complete  booking  their  appointment,  users  must  "[r]eview membership and booking."  *See* Screen 8A.  Once again, users select whether they are paying with insurance. *See id.* After users make their selection they are to "[s]elect a payment method" and enter their payment information (*see* Screen 8C).  Users must also enter a "[r]eason for [their] visit."  *See id.*  Finally, users click "Book appointment and enroll" to book their appointment.  *See id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Screen 8A"



"Screen 8B"

"Screen 8C"

48.    Once users book an appointment, users are presented with a confirmation screen that says "[a]ppointment booked and enrolled in membership."  *See* Screen 9.



**"Screen 9"**

***Booking Process on the iOS App and Android App***

49.    The appointment booking process on a mobile iOS or Android device is substantially similar as that depicted in *supra* ¶¶ 40-48.[10]

50.    When users open the PlushCare iOS App, they are asked to "[s]ign in" or "[g]et started."  *See* Screen 10.

///

///

///

///

///

///

///

///

---

[10] The following screenshots (Screens 10-25) are taken from Defendant's iOS App unless otherwise noted.  Android App users would have viewed substantially similar screens.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



**"Screen 10"**

19    51.    Users may tap "Book a doctor's visit" or "Book a therapy session" to

20  book a new appointment.  *See* Screen 12.  Next, users select whether the appointment

21  is for "[m]e[,]" or "[m]y child[,]" or "[s]omeone else."  *See* Screen 13A.  However,

22  PlushCare requires that when a user is "booking for another person," that individual

23  must nonetheless "create his/her own profile."  *See id.*  And if a user has selected a

24  therapy session, they are required to "[v]erify that you are 18 years or older and

25  seeking individual mental health therapy."  *See* Screen 13B.

26  ///

27  ///

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**"Screen 12"**



**"Screen 13A"**



**"Screen 13B" (Android App)**

52.    Patients are prompted to select whether they are paying "[u]s[ing] ... insurance" or may "[c]ontinue without insurance[.]" *See* Screen 14.  Defendant also asks users to "tell us your location[.]"  *See* Screen 15A.  Defendant explains that "[PlushCare] need[s] to know your location to show appointments in your state." *See id.*  When users click "[c]ontinue[,]" a pop-up screen asks users to "[a]llow 'PlushCare' to use your location" "to determine where your appointment should be." *See* Screen 15B.  Users must tap one of three options: (1) "Allow Once"; (2) "Allow While Using App"; or "Don't Allow[.]"  *See id.*  On the Android App, users must actually "[s]elect your current location" from a list of states.  *See* Screen 15C.



**"Screen 14"**



**"Screen 15A"**

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13




**"Screen 15B"**          **"Screen 15C" (Android App)**

14     53.    Afterwards, users are presented with a list of providers and are

15     encouraged to "[s]elect an appointment for yourself." *See* Screen 16A. On this screen,

16     users can search for appointments that best meet their needs.  Users can also tap

17     "[d]ate" and "[t]ime" to filter available appointments by date and time of day. *See id.*

18     Clicking "[v]iew profile" opens a screen providing a particular provider's

19     "[b]iography" and "[r]eviews." *See* Screen 16B. Users click "[b]ook" to continue

20     booking their appointment. *See* Screen 16A.

21     ///

22     ///

23     ///

24     ///

25     ///

26     ///

27     ///

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    22





**"Screen 16A"**                    **"Screen 16B" (Android App)**

54.    Tapping "[b]ook" on a particular provider opens a pop-up screen indicating that PlushCare is "holding your appointment for up to 5 minutes while you complete your booking[.]" *See* Screen 16B. A five-minute countdown timer begins. ("Appointment held…"). *See id.* As the timer counts down, users are required to provide (1) first name; (2); last name; (3) date of birth; (4) biological sex; (5) reason for visit; and (6) create a password. *See* Screens 17-21. Once the five-minute timer runs out, the appointment is no longer being held, but users can still try to book an appointment if it is available. *See, e.g.*, Screen 21 ("Appointment held … Expired").

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    23





**"Screen 16B"**



**"Screen 17"**



**"Screen 18"**



"Screen 19"

"Screen 20"



"Screen 21"

55.    Users are then asked to review their booking information. *See* Screens 22A-22B. Users may "Add [a] Payment Method[,]" enter their payment information,[11] and tap "[c]ontinue." *See* Screens 22C-22D.

///

///

///

///

///

_____

[11] Credit card information on Screen 22D has been redacted.



"Screen 22A"



"Screen 22B"



"Screen 22C"



"Screen 22D"

56.    However, users must enter their information quickly to book their desired appointment.   If a user takes longer than five minutes to book an appointment, that user may get a notification stating: "The hold on your appointment was expired. ***Please select a new appointment*** to continue booking." *See* Screen 23A (emphasis added). Users may be required to book a different appointment altogether, and/or repeat particular aspects of the booking process described *supra*.



**"Screen 23A" (Android App)**

57.    Once users have selected an available appointment, users tap "[b]ook appointment and enroll" to book their appointment.   *See* Screen 24.   Users are

presented with a confirmation screen stating: "Appointment booked and enrolled[.]"
*See* Screen 25.  Users may tap "[s]elect your pharmacy," or tap the home button to
return to the home screen.  *See id.*




"Screen 24"                                        "Screen 25"

## V.    Overview of the Third Parties' Tracking Technologies

58.    Segment and Criteo each wiretap the Website with their respective
tracking technologies, which Defendant purposefully installed on the Website.
Segment additionally wiretaps the iOS App and Android App with its respective
tracking technologies, which Defendant purposefully installed on the iOS App and
Android App.

59.    The Third Parties' tracking technologies send secret instructions to a
Website, iOS App, or Android App user's browser or application, without alerting the
individual that this is happening.  The tracker then causes the browser or application

to secretly and simultaneously duplicate the user's Website, iOS App, or Android App communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website, iOS App, or Android App user's identity. This entire process occurs within milliseconds. In other words, when a user communicates with Defendant's Website, iOS App, or Android App, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant. Thus, the Third Parties' interception of these communications occurs "in transit." *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 961 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

**A.    Segment**

60.    Segment wiretaps the Website, iOS App, and Android App with trackers associated with the Segment "customer data platform, powered by AI [(artificial intelligence),]"[12] which Defendant purposefully installed on the Website, iOS App, and Android App.

61.    Segment states that "Segment's tracking libraries"—*inter alia*, "Analytics.js, the Segment JavaScript source, is the most powerful way to track customer data from a website[]"; "[t]he Segment Mobile SDKs are the best way to simplify tracking in [] iOS, Android, and Xamarin apps[]"; and "[s]erver-side sources let [Segment clients] send analytics data directly from [their] servers when client-side tracking doesn't work[.]"[13]

---

[12] SEGMENT, TWILIO SEGMENT, https://segment.com.

[13] SEGMENT, HOW SEGMENT WORKS, https://segment.com/docs/getting-started/01-what-is-segment/.

62.     Once integrated into a website or mobile application, "Segment … generate[s] messages about activity in [a] site or app, … then translates the content of those messages into different formats for use by other tools ([which Segment] call[s Destinations), and sends the translated messages to those tools. The Segment servers also archive a copy of the data, and can send data to [] storage systems (such as databases, warehouses, or bulk-storage buckets)."[14]

63.     "There are several tracking API methods, that [] can [be] call[ed] to generate messages."[15]  These include: (i) "[t]rack," which "lets you record the actions your users perform[,]"[16] (ii) "[i]dentify[,]" which "lets you tie a user to their actions and record traits about them"[17] and "includes a unique user ID and any optional traits you know about them like their email, name, or address[,]"[18] (iii) "[s]creen[,]" which "lets you record whenever a user sees a screen in your mobile app,"[19] or "[p]age," which "lets you record page views on your website, along with optional extra

---

[14] *Id.*

[15] *Id.*

[16] SEGMENT, ANALYTICS-SWIFT IMPLEMENTATION GUIDE, https://segment.com/docs/connections/sources/catalog/libraries/mobile/apple/implementation/; *see also* SEGMENT, ANALYTICS.JS SOURCE, https://segment.com/docs/connections/sources/catalog/libraries/website/javascript/ ("The Track call has the following fields: ... event[:] … The name of the event you're tracking.").

[17] SEGMENT, ANALYTICS-SWIFT IMPLEMENTATION GUIDE, https://segment.com/docs/connections/sources/catalog/libraries/mobile/apple/implementation/.

[18] *Id*; *see also* SEGMENT, ANALYTICS.JS SOURCE, https://segment.com/docs/connections/sources/catalog/libraries/website/javascript/ ("Use the Identify method to link your users and their actions to a recognizable userId and traits.").

[19] SEGMENT, ANALYTICS-SWIFT IMPLEMENTATION GUIDE, https://segment.com/docs/connections/sources/catalog/libraries/mobile/apple/implementation/.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    30

information about the page viewed by the user[;]"[20] (iv) "[g]roup[,]" which "lets you associate an individual user with a group[;]"[21] and (v) "[a]lias[,]" which "is used to merge two user identities, effectively connecting two sets of user data as one."[22]

64.    One of Segment's signature features is called "Engage."  Engage "uses Segment Identity Resolution to take event data from across devices and channels and intelligently merge it into complete user- or account-level profiles."[23]  This allows Segment and Defendant to "understand a user's interaction across web, mobile, server, and third-party partner touch-points in real time, using an online and offline ID graph with support for cookie IDs, device IDs, emails, and custom external IDs," which are all "matched to one persistent ID"[24]

65.    Once Segment has built these comprehensive user profiles, Segment can then "group customers based on commonly used methods: demographic,

---

[20] SEGMENT, ANALYTICS.JS SOURCE, https://segment.com/docs/connections/sources/catalog/libraries/website/javascript/.

[21] SEGMENT, ANALYTICS-SWIFT IMPLEMENTATION GUIDE, https://segment.com/docs/connections/sources/catalog/libraries/mobile/apple/implementation/; *see also* SEGMENT, ANALYTICS.JS SOURCE, https://segment.com/docs/connections/sources/catalog/libraries/website/javascript/ ("The Group method associates an identified user with a company, organization, project, workspace, team, tribe, platoon, assemblage, cluster, troop, gang, party, society, or any other collective noun you come up with for the same concept.").

[22] SEGMENT, ANALYTICS-SWIFT IMPLEMENTATION GUIDE, https://segment.com/docs/connections/sources/catalog/libraries/mobile/apple/implementation/.

[23] SEGMENT, ENGAGE INTRODUCTION, https://segment.com/docs/engage/.

[24] SEGMENT, IDENTITY RESOLUTION OVERVIEW, https://segment.com/docs/unify/identity-resolution/.

---

psychographic, and geographic"[25] and "based on event behavior and traits that Segment tracks"[26]

66.    Segment leverages this data to help website operators and app developers, like Defendant, "[p]ower personalized marketing campaigns[.]"[27]  Segment does so by "integrat[ing ] websites & mobile apps data to over 300 analytics and growth tools"[28] which Segment calls "Destinations."[29]  Segment's Destinations are used for, *inter alia*, "Advertising"; "Analytics"; "Attribution"; "Enrichment"; "Marketing Automation"; "Performance Monitoring"; and/or "Personalization"[30]—in short, "to personalize messages across channels[ and] optimize ad spend[.]"[31]  For instance, Segment can help developers "run advertising campaigns without having to manually update the list of users to target"[32] by sending data to the Google Ads Remarketing Lists destination.

67.    Thus, Segment provides Defendant with the ability to further optimize and monetize its Website, iOS App, and Android App.

---

[25] SEGMENT, CUSTOMER SEGMENTATION TOOLS, https://web.archive.org/web/20241105234845/ https://segment.com/growth-center/customer-segmentation/tools-software/.

[26] SEGMENT, ENGAGE AUDIENCE OVERVIEW, https://segment.com/docs/engage/audiences/.

[27] SEGMENT, PROFILE API, https://segment.com/docs/unify/profile-api/.

[28] SEGMENT, HOW SEGMENT WORKS, https://segment.com/docs/getting-started/01-what-is-segment/.

[29] SEGMENT, AN INTRODUCTION TO SEGMENT, https://segment.com/docs/guides/.

[30] SEGMENT, DESTINATION CATALOG, https://segment.com/docs/connections/destinations/ catalog/. *See also* SEGMENT, DESTINATION LIST, https://segment.com/docs/connections/ destinations/catalog/index-all/.

[31] SEGMENT, USING YOUR ENGAGE DATA, https://segment.com/docs/personas/using-personas-data/.

[32] SEGMENT, GOOGLE ADS REMARKETING LISTS DESTINATION, https://segment.com/docs/ connections/destinations/catalog/adwords-remarketing-lists/.

---

68.     When Segment uses its wiretaps on Website, iOS App, and Android App users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.  Instead, Segment—a separate and distinct entity from the parties to the conversations—uses the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which it is not a party.  Segment, itself, collects the contents of said conversations.  That data is then analyzed by Segment before being provided to any entity that was a party to the conversations (like Defendant).

**B.     Criteo**

69.     Criteo wiretaps the Website with trackers associated with the Criteo OneTag,[33] which Defendant purposefully installed on the Website.

70.     According to Criteo, the "Criteo OneTag is a single JavaScript snippet that enables Criteo to collect information about user activity on [a] website (such as product views, add-to-cart actions, and purchases).  It powers campaign optimization, product recommendations, audience building, and performance measurement."[34]

71.     Defendant chose to integrate the Criteo OneTag into the Website by intentionally placing the Criteo OneTag code therein.  Criteo explains that "[b]efore getting started[,]" Criteo "OneTag implementation requires website management access" and the "ab[ility] to edit website code or access configuration tools[.]"[35]

72.     The Criteo OneTag tracks various "events and parameters."[36]  Such events and parameters include, *inter alia*:

---

[33] CRITEO, INTRODUCTION TO THE CRITEO ONETAG, https://help.criteo.com/kb/guide/en/introduction-to-the-criteo-onetag-8fjCDwCENw/Steps/775595.

[34] *Id.*

[35] *Id.*

[36] CRITEO, ALL CRITEO ONETAG EVENTS AND PARAMETERS, https://help.criteo.com/kb/guide/en/all-criteo-onetag-events-and-parameters-vZbzbEeY86/Steps/775825 ("This guide outlines all the available OneTag events and parameters you can use on a website.").

---

- **Loader script**: "The loader script tag is required to enable the rest of the Criteo OneTag events" and includes a "Partner Id."[37]  The Partner ID is "a unique ID that can be found in [a] Commerce Growth Url[.]"[38]

- **Visit tag**: "The visit tag helps to capture real landing and bounce rates on [a] site" and includes various "[f]ields."[39] Fields include "[e]mail [a]ddress" and "[p]hone number." Fields also include "Customer ID" which is a "value that can identify a unique user[,]"[40] and a "Visitor ID" which is "[a] unique Id that is consistent across multiple sessions for an unauthenticated user."[41]  Although many of these fields can be "hashed" and/or "encrypted" in "MD5 or SHA256,"[42] the reality is, that, even in hashed and/or encrypted form, they are traceable to individuals.[43]

---

[37] CRITEO, LOADER SCRIPT, https://help.criteo.com/kb/guide/en/all-criteo-onetag-events-and-parameters-vZbzbEeY86/Steps/775825,868657.

[38] *Id.*

[39] CRITEO, VISIT TAG, https://help.criteo.com/kb/guide/en/all-criteo-onetag-events-and-parameters-vZbzbEeY86/Steps/775825,868659.

[40] CRITEO, VISIT TAG, https://help.criteo.com/kb/guide/en/all-criteo-onetag-events-and-parameters-vZbzbEeY86/Steps/775825,868659.

[41] *Id.*

[42] *Id.*

[43] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); Steven Englehardt et al., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, at 122, available at https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be

---

- **Category/keyword search/listing tag**: The category/keyword search/listing tag includes various "[f]ields[.]"[44] Fields include "[e]mail [a]ddress," "[p]hone number," "[c]ustomer," and "[v]isitor ID."[45]  Fields also include "[c]ategory" which is "[t]he category of the page that the user is browsing[;]" "[s]earch keyword" which is "[t]he keyword entered by the user[;]" and "[p]roduct ID" which is the "[u]nique ID of [a] product[.]"[46]

- **Product tag**: "The 'product tag' gives Criteo's algorithm a clear flag for the product a user is looking at."[47]  In addition to "Email Address," "Phone number," "Customer ID," and "Visitor ID," this tag also may include "Zip Code[,]" which is a "[u]ser's shipping address zip code[;]" a "Product ID[,]" which is a "[u]nique ID of the product[;]" and a "Price," which is the "[u]nit price of the product[.]"[48]

73.    Using "first-party data, or Criteo's shopping intent data[,]" Criteo can "[b]uild customized segments[.]"[49]  Specifically, Criteo notes that it can: "[s]egment users based on their website or app path to purchase actions, such as visiting site sections to purchasing frequency like reaching one-time buyers[;] … [r]each people based in specific geographical locations relevant to [a] client's business[;] … [and

---

employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[44] CRITEO, CATEGORY/KEYWORD SEARCH/LISTING TAG, https://help.criteo.com/kb/guide/en/all-criteo-onetag-events-and-parameters-vZbzbEeY86/Steps/775825,868660.

[45] Id.

[46] Id.

[47] CRITEO, PRODUCT TAG, https://help.criteo.com/kb/guide/en/all-criteo-onetag-events-and-parameters-vZbzbEeY86/Steps/775825,868658.

[48] Id.

[49] CRITEO, SELECT YOUR AUDIENCE, https://help.criteo.com/kb/guide/en/introducing-campaigns-STIhrxL081/Steps/899671,899779,930795,899673,899681,899678.

---

r]each people who look like, behave like, or are interested in things similar to a list [a client] provide[s], such as [] existing contacts[.]"[50]

74.    Criteo goes on to explain that it can "[b]uild audiences through segments, which group people based on specific characteristics, interests, or shopping behaviors."[51]  Criteo can then implement "[a]udience targeting [which] shows [] ads to the most relevant audiences[.]"[52]

75.    Thus, Criteo provides Defendant with the ability to further optimize and monetize its Website, iOS App, and Android App.

76.    When Criteo uses its wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. Instead, Criteo—a separate and distinct entity from the parties to the conversations— uses the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which it is not a party.  Criteo, itself, collects the contents of said conversations.  That data is then analyzed by Criteo before being provided to any entity that was a party to the conversations (like Defendant).

## VI.    Defendant Aids, Agrees With, Employs, and Otherwise Enables The Third Parties to Wiretap Users' Communications

### A.    Segment

77.    Segment, as enabled by Defendant, contemporaneously intercepts and/or otherwise obtains the following communications of users of Defendant's Website, iOS App, and Android App. The yellow highlights in the below transmissions show communications on the Website. The blue highlights show communications on the iOS App.  The red highlights show communications on the Android App.

---

[50] CRITEO, ABOUT AUDIENCES, https://help.criteo.com/kb/guide/en/introducing-campaigns-STIhrxL081/Steps/899671,899779,930795,899673,899681,899678,899786,842036.

[51] CRITEO, SELECT YOUR AUDIENCE, https://help.criteo.com/kb/guide/en/introducing-campaigns-STIhrxL081/Steps/899671,899779,930795,899673,899681,899678.

[52] *Id.*

---

78.     As shown by the yellow highlights in the below screenshots of Website transmissions, Segment intercepts and/or otherwise obtains the fact that Website users clicked "Pay without insurance" (here, "primary-care/method" and "Web - Method - Click – Paying for myself Btn").  Also as shown by the below highlights, Segment intercepts and/or otherwise obtains the fact that Website users have proceeded to the booking stage where users must select their visit location (here, "Talk to a doctor on your phone | Plushcare"; "booking/primary-care-/select-state").  These communications are the product of button clicks on Screens 1-2.



79.     As shown by the highlights in the below screenshots of iOS App and Android App transmissions, Segment intercepts and/or otherwise obtains the fact that iOS App and Android App users tapped to open the mobile application (here, "Application Opened") that users are seeking to book a visit (here, "Dashboard - Tap - Book a doctor visit"; "View New Booking Screen").  Also as shown by the below highlights, Segment intercepts and/or otherwise obtains who the appointment is for

(here, "Select patient - tap - Me"), and whether users are paying with or without insurance (here, "Select payment option - tap - without insurance"; "Without Insurance Selected"). These communications are the product of taps on Screens 10-13.

▸ context: {screen: {width: 375, height: 667}, instanceId: "1C2A1604-913A-4AEB-A3A5-6E9E0D74FE32",…}
event: "Application Opened"
▸ integrations: {AppsFlyer: false}
messageId: "0223E2E6-499B-4563-84B2-44097871FB3D"

▸ context: {,…}
event: "Application Opened"
▸ integrations: {AppsFlyer: false}
messageId: "6b30df54-d963-498e-8114-f4a12463f15a"

anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
▸ context: {screen: {width: 375, height: 667}, instanceId: "8DE77D9A-6833-4619-B52B-5CFE06054D42",…}
event: "Dashboard - Tap - Book a doctor visit"
▸ integrations: {AppsFlyer: false}

▸ context: {,…}
event: "Dashboard - View New Booking Screen"
▸ integrations: {AppsFlyer: false}
messageId: "813e90b3-3f70-42de-ad1c-f607e437ea16"

anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
▸ context: {screen: {width: 375, height: 667}, instanceId: "8DE77D9A-6833-4619-B52B-5CFE06054D42",…}
event: "Select patient - tap - Me"
▸ integrations: {AppsFlyer: false}

anonymousId: "25b528c0-2d34-4917-9a08-9c11fba32483"
channel: "mobile"
▸ context: {,…}
event: "Booking - Select Patient"
▸ integrations: {AppsFlyer: false}

anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
▸ context: {screen: {width: 375, height: 667}, instanceId: "8DE77D9A-6833-4619-B52B-5CFE06054D42",…}
event: "Select payment option - tap - without insurance"
▸ integrations: {AppsFlyer: false}

channel: "mobile"
▸ context: {,…}
event: "Booking - Without Insurance Selected"
▸ integrations: {AppsFlyer: false}
messageId: "3e3aeccb-7bf0-41a9-ada5-6b1453bbf19e"

80.    As shown by the highlights in the below screenshots of iOS App and Android App transmissions, Segment intercepts and/or otherwise obtains the fact that iOS App and Android App users are searching to book a therapy appointment, as distinguished from a regular doctor's appointment (here, "Therapy Booking - Select Patient"; "Therapy - Check in - Page View - Mental Health"). These communications are the product of taps on Screens 12, 13A, and 13B.

```
▼ {batch: [{messageId: "4672A033-036B-472B-B71E-DDCDE3C34840",…}],…}
  ▼ batch: [{messageId: "4672A033-036B-472B-B71E-DDCDE3C34840",…}]
    ▼ 0: {messageId: "4672A033-036B-472B-B71E-DDCDE3C34840",…}
        anonymousId: "C3E9A8BB-B83B-4709-A92E-8A42640D06AD"
      ▶ context: {screen: {width: 375, height: 667}, instanceId: "868C9DC1-1DAB-461C-BA34-AB
        event: "Therapy - Check in - Page view - Mental Health - Flow Intro"
      ▶ integrations: {AppsFlyer: false}
        messageId: "4672A033-036B-472B-B71E-DDCDE3C34840"
      ▶ properties: {application_viewed: "ios"}
        timestamp: "2025-10-24T20:31:04.923Z"
        type: "track"
```
```
    ▼ 0: {channel: "mobile", type: "track", messageId: "2f92b7bd-9f04-41a5-8dbb-ff5e79a1492f",…}
        anonymousId: "d1f6444f-3a76-48dd-a576-291b8f002d7e"
        channel: "mobile"
      ▶ context: {,…}
        event: "Therapy Booking - Select Patient"
      ▶ integrations: {AppsFlyer: false}
        messageId: "2f92b7bd-9f04-41a5-8dbb-ff5e79a1492f"
        properties: {}
        timestamp: "2025-10-24T20:10:35.733Z"
```

81. As shown by the highlights in the below screenshots of Website transmissions, Segment intercepts and/or otherwise obtains the fact that users click "View all states" (here, "Click - State Select Field") and the particular state users will be located for their appointment (here, "selectedState: 'CA'" as in the user will be in California). Segment further intercepts and/or otherwise obtains when users click to continue booking their appointment (here, "Web - State Selection - Click - Continue Button"). These communications are the product of button clicks on Screens 3A-3C.

```
    anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"
  ▼ context: {,…}
    ▶ library: {name: "analytics.js", version: "next-1.81.0"}
      locale: "en-US"
    ▼ page: {path: "/booking/primary-care/select-state/", referrer: "https://plushcare.com/", search: "",…}
        path: "/booking/primary-care/select-state/"
        referrer: "https://plushcare.com/"
        search: ""
        title: "Talk to a doctor on your phone | PlushCare"
        url: "https://my.plushcare.com/booking/primary-care/select-state/"
      timezone: "America/New_York"
      userAgent: "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/141.
    ▶ userAgentData: {brands: [{brand: "Google Chrome", version: "141"}, {brand: "Not?A_Brand", version: "8"}
    event: "Web - State Selection - Click - State Select Field"
    integrations: {}
    messageId: "ajs-next-1759845504480-75616cf4-f153-4cb4-8917-b81e06cae9a7"
  ▶ properties: {experimentID: "improved_state_selection", variantID: "plushcare", clientId: "",…}
```
```
    event: "Web - State Selection - Click - Suggested State"
    integrations: {}
    messageId: "ajs-next-1759845656424-6cf4f153-ccb4-4917-b81e-06cae9a768fe"
  ▼ properties: {selectedState: "CA", experimentID: "improved_state_selection", variantID: "plushcare",
      application_viewed: "web"
      clientId: ""
      experimentID: "improved_state_selection"
      selectedState: "CA"
      variantID: "plushcare"
```

82.    As shown by the red highlights in the below screenshots of Android App transmissions, Segment intercepts and/or otherwise obtains the fact that users click to select a particular state (here, "Booking - View Location States"; "Change State"). As shown by the blue highlight in the below screenshot of an iOS App transmission, Segment intercepts and/or otherwise obtains the fact that iOS App users have enabled their location. These communications are the product of taps on Screens 15A-15C.



83.    As shown by the highlights in the below screenshots of Website transmissions, Segment intercepts and/or otherwise obtains the fact that Website users clicked on the filter by date button (here, "Click - Date Filter") and the particular date and time selected by a user (here, "date=2025-11-20" and "T14," as in 14:00 hours). These communications are the product of button clicks on Screens 4A and 4B.

1

2

```
anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"
▶ context: {personId: null,…}
  integrations: {}
  messageId: "ajs-next-1759846186567-9fd7742f-3132-4751-bc5d-55cef1c4457f"
▼ properties: {path: "/booking/primary-care/appointments/", referrer: "https://plushcare.com/",…}
    application_viewed: "web"
    clientId: ""
    path: "/booking/primary-care/appointments/"
  ▶ pc_campaign: {document_referrer: "plushcare.com", utm_term: "", utm_adgroup: "", utm_source: "google",…}
    referrer: "https://plushcare.com/"
    search: "?state=CA&doctor_type=0&date=2025-11-20T14%3A00%3A00-05%3A00"
    title: "Talk to a doctor on your phone | PlushCare"
    url: "https://my.plushcare.com/booking/primary-care/appointments/?state=CA&doctor_type=0&date=2025-11-20T14%3
```

3

4

5

6

7

8    84.    As shown by the below screenshots of iOS App and Android App

9  transmissions, Segment intercepts and/or otherwise obtains the fact that users have

10  proceeded to the screen where users view available appointments (here, "View

11  appointments").  Also as shown by the highlights in the below screenshots of iOS App

12  and Android App transmissions, Segment intercepts and/or otherwise obtains the fact

13  that users tapped on the filter by time and/or date buttons (here, "Change Date"; "TOD

14  filter"), and the particular time of day selected (here, "afternoon"; "morning"). These

15  communications are the product of taps on Screen 16A.

```
anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
▶ context: {screen: {width: 375, height: 667}, instanceId:
  event: "View appointments"
▶ integrations: {AppsFlyer: false}
```
```
▶ context: {screen: {width: 375, height: 667}, instanceId: "
  event: "TOD filter - click - afternoon"
▶ integrations: {AppsFlyer: false}
  messageId: "F2D03437-B09A-4EA0-A44B-DC871B160CE5"
```
```
  ▶ context: {,…}
    event: "Booking - View Appointments - View Filter"
  ▶ integrations: {AppsFlyer: false}
    messageId: "efc5fa6f-29a6-4baf-b128-d8aaea3a2d3f"
```
```
  ▶ context: {,…}
    event: "Booking - Change Date"
  ▶ integrations: {AppsFlyer: false}
    messageId: "cb89da16-7bbf-491e-99f9-86764d4424f3"
```
```
  channel: "mobile"
  ▶ context: {,…}
    event: "TOD filter - click - filter"
  ▶ integrations: {AppsFlyer: false}
    messageId: "1751b9f5-b0a4-455e-b373-7bdbde9a3764"
```

16

17

18

19

20

21

22

23

24

25

26

27

28

▸ context: {,…}
  event: "OO filter - click - morning"
▸ integrations: {AppsFlyer: false}
  messageId: "d4f3e207-3762-4266-a826-9f71ce47c8fe"
  properties: {}

85.    As shown by the highlights in the below screenshots of Website transmissions, Segment intercepts and/or otherwise obtains the fact that Website users click on the "View by doctor" button (here, "Click - View by Doctor Tab") and that users clicked on a doctor's profile (here, "Click - View doctor profile").  These communications are the product of button clicks on Screens 5A and 5B.

  event: "Appointments - Click - View by Doctor Tab"
  integrations: {}
  messageId: "ajs-next-1759847751642-31326751-3c5d-45ce-b1c4-457f6444c724"
▸ properties: {clientId: "", application_viewed: "web"}

  event: "Web - Find Appointment - Click - View doctor profile"
  integrations: {}
  messageId: "ajs-next-1759846712544-742f3132-6751-4c5d-95ce-f1c4457f6444"

86.    As shown by the highlights in the below screenshots of Android App transmissions, Segment intercepts and/or otherwise obtains the fact that Android App users click on a doctor's profile (here, "View doctor profile").  These communications are the product of taps on Screen 16A.

  event: "Booking - View Doctor Profile"
▸ integrations: {AppsFlyer: false}
  messageId: "8ebf84f3-25fd-4051-9c67-cf1f75c8921c"
  properties: {}
  timestamp: "2025-10-18T00:28:05.817Z"

87.    As shown by the highlights in the below screenshots of Website and Android App transmissions, Segment intercepts and/or otherwise obtains the fact that users clicked and tapped on "Book" to continue booking an appointment with a particular doctor (here, "Appointment selected"). These communications are the product of button clicks on Screen 6 and Screen 16A.

  event: "Appointment selected"
  integrations: {}
  messageId: "ajs-next-1759847829080-67513c5d-55ce-41c4-857f-6444c72425bc"
▸ properties: {appointment_list_position: 1, clientId: "", application_viewed: "web"}
  sentAt: "2025-10-07T14:37:09.120Z"
  timestamp: "2025-10-07T14:37:09.080Z"

```
  ▸ context: {,…}
    event [ "Appointment Selected" ]
  ▸ integrations: {AppsFlyer: false}
    messageId: "15dbb489-7e94-4bbb-9a80-f5388d0d035c"
  ▸ properties: {appointment_list_position: 1}
```

88.  As shown by the highlights in the below screenshots of Website and iOS App transmissions, Segment intercepts and/or otherwise obtains the fact that users click on various fields on the Website and iOS App[53] in order to enter their first and last name, date of birth, email, and phone number (here, *e.g.*, "Booking - Register - Click - First Name"; "Last Name"; "DOB"; "Phone Number"; "Email").  Segment also intercepts and/or otherwise obtains the biological sex selected by Website users (here, "Biological Sex (M)," as in male).  These communications are the product of button clicks on Screen 7A, and taps on Screens 17-21.

```
▾ {timestamp: "2025-10-07T14:40:50.563Z", integrations: {},        anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C760
  anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"            ▸ context: {screen: {width: 375, height: 667}
  ▸ context: {page: {path: "/booking/primary-care/register/"      event: [ "Enter email address" ]
    event: [ "Web - Booking - Register - Click - First Name" ]   ▸ integrations: {AppsFlyer: false}
    integrations: {}

▸ context: {page: {path: "/booking/primary-care/register/      ▸ context: {page: {path: "/booking/primary-care/reg
  event: [ "Web - Booking - Register - Click - Last Name" ]      event: [ "Web - Booking - Register - Click - DOB" ]
  integrations: {}

▸ context: {page: {path: "/booking/primary-care/register/", r     anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"
  event: [ "Web - Booking - Register - Click - Phone Number" ]   ▸ context: {page: {path: "/booking/primary-care/regist
  integrations: {}                                                 event: [ "Web - Booking - Register - Click - Email" ]
  messageId: "ajs-next-1759848236445-1526b059-062e-42c0-9ae3-3

        anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"
      ▸ context: {page: {path: "/booking/primary-care/register/", referrer: "https://plushcare.com/",…},…}
        event: [ "Web - Booking - Register - Click - Biological Sex (M)" ]

  anonymousId: "EC70F7F7-7E4D-4D6D-B281         ▸ context: {screen: {wid        ▸ context: {screen: {width:…
▸ context: {screen: {width: 375, heigh          event: [ "Enter DOB" ]          event: [ "Select gender" ]
  event: [ "Enter name" ]                      ▸ integrations: {AppsFl         ▸ integrations: {AppsFlyer: f
▸ integrations: {AppsFlyer: false}                                            messageId: "0C7E6A44-FDC0-4E

  anonymousId: "EC70F7F7-7E4D-4D6D-B281         ▸ context: {screen: {width: 375, h    ▸ context: {screen: {width: 375, h
▸ context: {screen: {width: 375,    context: {screen: {width: 375, h           event: [ "Enter reason for visit" ]
  event: [ "Create a password" ]    ent: [ "Enter phone number" ]             ▸ integrations: {AppsFlyer: false}
▸ integrations: {AppsFlyer: fal    ntegrations: {AppsFlyer: false}           messageId: "8DBD8746-9C63-41D2-88
  messageId: "357DCAF9-FB16-4770    sageId: "05B2F9CA-DB8F-4DAC-A16
```

89.  As shown by the highlights in the below screenshots of Website, iOS App, and Android App transmissions, Segment intercepts and/or otherwise obtains the fact that users clicked and/or tapped to continue booking their appointment and enter

---

[53] These transmissions were substantially similar for Android App users.

their payment information (here, "Payment page loaded"; "Membership - Payment -
View"). Segment also intercepts and/or otherwise obtains the particular name of the
provider with whom Website users schedule an appointment with (here,
"doctorFirstName: 'Chad', doctorLastName: 'Shaffer'"). These communications are
the product of button clicks on Screen 7A and taps on Screens 21.

```
▼ {timestamp: "2025-10-07T15:52:16.518Z", integrations: {}, event: "Payment page loaded", type: "track",…}
    anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"
  ▼ context: {page: {path: "/booking/primary-care/payment/", referrer: "https://plushcare.com/",…},…}
      campaign: {}
    ▶ library: {name: "analytics.js", version: "next-1.81.0"}
      locale: "en-US"
    ▶ page: {path: "/booking/primary-care/payment/", referrer: "https://plushcare.com/",…}
      timezone: "America/New_York"
      userAgent: "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/141
    ▶ userAgentData: {brands: [{brand: "Google Chrome", version: "141"}, {brand: "Not?A_Brand", version: "8"
    event: "Payment page loaded"
    integrations: {}
    messageId: "ajs-next-1759852336518-5c25e01a-285e-435c-a2ae-74b0cc57c0b0e"
  ▼ properties: {doctorFirstName: "Chad", doctorLastName: "Shaffer",…}
      application_viewed: "web"
      appointmentState: "NY"
      appointmentTime: "2025-11-20T19:00:00Z"
      appointmentType: "primary_care"
      appointmentUUID: "11d8dec7-ab32-46d1-a7ed-8e7e52091cc7"
      clientId: ""
      doctorFirstName: "Chad"
      doctorImageUrl: "https://static.plushcare.com/doctors/prod/chadshaffer.jpg"
      doctorLastName: "Shaffer"
      doctorRating: "4.8"
      doctorType: "internal"
    sentAt: "2025-10-07T15:52:16.534Z"
    timestamp: "2025-10-07T15:52:16.518Z"
    type: "track"
    userId: "0eddf433-040d-41c1-96f3-ea4d82164864"
```
```
    anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
  ▶ context: {screen: {width: 375, height: 667}, instanceId: "8DE77D9A-6833-4619-B52B-5CFE06054D42",…}
    event: "Membership - Payment - View"
  ▶ integrations: {AppsFlyer: false}
    messageId: "D3782628-B8D4-45E9-86FB-E5778E00CF4F"
  ▶ properties: {membership_type: "PlushCare", application_viewed: "ios",…}
    timestamp: "2025-10-17T14:39:39.775Z"
    type: "track"
    userId: "4b6db7e5-4902-43e0-8d8e-a4c355d7928a"
```
```
  ▶ context: {,…}
    event: "Membership - Payment - View"
  ▶ integrations: {AppsFlyer: false}
    messageId: "e230c479-a04c-4387-9d88-24c432f51f7b"
  ▶ properties: {membership_uuid: "76add8e7-205c-4dfe-a3b6-bf49e6984e96", membership_type: "PlushCare"}
    timestamp: "2025-10-22T23:24:54.039Z"
    type: "track"
    userId: "47980288-53f3-4d92-ac83-7c4ca343826c"
  ▶ 4: {channel: "mobile", type: "track", messageId: "c32dc0cc-eda1-46f9-918e-f68f2f372fe9",…}
  ▼ 5: {channel: "mobile", type: "track", messageId: "a949e6b6-3db6-4765-bf03-4251cbe26ef2",…}
    anonymousId: "d1f6444f-3a76-48dd-a576-291b8f002d7e"
```

90.    As shown by the highlights in the below screenshots of Website
transmissions, Segment also intercepts and/or otherwise obtains whether or not

Website users pay with insurance (here, "Click - Without insurance btn").  Segment also intercepts and/or otherwise obtains the fact that Website, iOS App, and Android App users click to select a particular payment method (here, "Web - Payment Elements - Select Input"; "Enter credit card"; "Add credit card").  These communications are the product of button clicks on Screens 8A-8C and taps on Screens 22C and 22D.

{timestamp: "2025-10-07T15:52:38.827Z", integrations: {},…}
  anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"
  ▶ context: {page: {path: "/booking/primary-care/payment/", referrer: "https://plushcare.com/"
  event: "Web - Payment - Click - Without insurance btn"
  integrations: {}
  messageId: "ajs-next-1759852358827-285eb35c-a2ae-44b0-8c57-cb0e4879434c"
  ▶ properties: {clientId: "", application_viewed: "web"}
  sentAt: "2025-10-07T15:52:38.874Z"
  timestamp: "2025-10-07T15:52:38.827Z"
  type: "track"
  userId: "0eddf433-040d-41c1-96f3-ea4d82164864"

{timestamp: "2025-10-07T15:52:58.874Z", integrations: {},…}
  anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"
  ▶ context: {page: {path: "/booking/primary-care/payment/", referrer: "https://plushca
  event: "Web - Payment Elements - Select Input"
  integrations: {}
  messageId: "ajs-next-1759852378874-74b0cc57-cb0e-4879-834c-bc63a4539a9b"
  ▶ properties: {clientId: "", application_viewed: "web"}
  sentAt: "2025-10-07T15:52:58.877Z"
  timestamp: "2025-10-07T15:52:58.874Z"
  type: "track"
  userId: "0eddf433-040d-41c1-96f3-ea4d82164864"

  anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
  ▶ context: {screen: {width: 375, height: 667}, instanceId: "8DE77D9A-68
  event: "Enter credit card"
  ▶ integrations: {AppsFlyer: false}
  messageId: "85EAFF86-EF42-42D0-A7D2-DE850372AB53"

  anonymousId: "25b528c0-2d34-4917-9a08-9c11fba32483"
  channel: "mobile"
  ▶ context: {,…}
  event: "Billing issue - Select - Add credit card"
  ▶ integrations: {AppsFlyer: false}
  messageId: "77203c9c-5192-4645-a362-b9725a47b1db"

91.    As shown by the highlights in the below screenshots of Website, iOS App, and Android App transmissions, Segment intercepts and/or otherwise obtains the fact that users clicked and/or tapped to book their appointment (here, "Click - Book appointment btn"; "Booking - Book Internal Appointment - New"; "Booking - Success

modal"; "Appointment Booked"). As shown by the red highlights in the below screenshot, Segment also intercepts and/or otherwise obtains the state for which the Android App user booked (here, "Booked state: 'CA'"). These communications are the product of button clicks on Screen 8C and taps on Screen 24.



92. Finally, Segment intercepts and/or otherwise obtains Website users' first name, last name, date of birth, email, phone number, and state.[54] These communications are the product of typing and button clicks on Screens 7A and 8C. Although these personal details are "hashed,"[55] the reality is that, even in hashed form,

---

[54] This hashed PII can also be paired with iOS App and Android App users. *See infra* ¶¶ 106-22.

[55] *See, e.g.*, SEGMENT, DESTINATIONS OVERVIEW, https://segment.com/docs/connections/destinations/ ("Segment automatically hashes personally identifiable information (PII).").

they are traceable to individuals.[56]  Indeed, the original and hashed versions of Website users' personal details are as follows:

anonymousId: "35018f85-0b01-46c2-8d66-c9d9742f760b"
▸ context: {page: {path: "/booking/primary-care/payment/",...},...}
event: "New Appointment"
integrations: {}
messageId: "ajs-next-1760366011365-a46f7459-1b38-4a7c-bdb9-55b97e...
▾ properties: {appointment_id: "f5f560d1-638c-400b-acf2-d2b7baf91...
   application_viewed: "web"
   appointment_id: "f5f560d1-638c-400b-acf2-d2b7baf917e8"
   booked_state: "NY"
   clientId: ""
   coverage_group_id: null
   coverage_used: false
   currency: "USD"
   db: "d5342aeb5a10f11c9576cefb340d2dc654004ab6f363bc69a56f3a6172fa1af"
   em: "d809292904c6eff1ac3b6eb6edd6b87a2f71762265f3ae1606b7c921c037118a"
   expired_appointment: false
   fn: "78a1a1dae4e56fb0aba67dadc5ab5ab808f505137efedecfb7c2f12a4195c58b"
   is_enterprise: false
   ln: "8360721f93d2e7e21a8f4201f3515ec089bb2a95148d8a1aca453442c98484ca"
   patient_group_id: null
   payer_id: null
   ▸ pc_campaign: {document_referrer: "plushcare.com", utm_term: "", utm_adgroup: "", utm_source: "google",...}
   ph: "79ead1f2467ede6e64bd022228ece2e646349557e7fb216eae17d3e8a662c19d"
   ▾ products: [,...]
      ▸ 0: {appointment_id: "f5f560d1-638c-400b-acf2-d2b7baf917e8", value: 147.21, currency: "USD", quantity: 1}
   reservation_uuid: "033df32c-7c9d-46fd-a228-98699fe6852c"
   st: "124e0b7201b0388d7c07f43194b9645d162b77005b66fef7283c689a69ff7c56"
   subscription_program_id: "membership_1999_month_12900_12900"
   value: 147.21
   sentAt: "2025-10-13T14:33:31.372Z"
   timestamp: "2025-10-13T14:33:31.365Z"
   type: "track"
   userId: "5c646187-85a0-4fd6-b8de-39205a5d4e52"

**Website User PII**

| Email: | jo3s3phst3v3n1@gmail.com |
| First Name: | Joseph |
| Last Name: | Steven |
| Phone: | 646[-]906[-]1486 |
| State: | NY |

**Website User PII (SHA-256)**

[56] *See, e.g.*, FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

93.     Thus, Segment intercepts and/or otherwise obtains Website users' full name (here, "Joseph Steven"); email (here, "jo3s3phst3v3n1@gmail.com"), phone number (here, "646[-]906[-]1486"), and state (here, "NY").

94.     Segment further intercepts and/or otherwise obtains whether the Website users are new or repeat patients (here, "New" as in a new patient), the price paid by users (here, "appointment_price: 129" as in $129), and the fact that users have enrolled in a membership of $19.99 per month (here, "membership_1999_month"):

```
▼ {timestamp: "2025-10-13T14:33:32.652Z", integrations: {}, event: "EXP: Appointment Booked",…}
    anonymousId: "35018f85-0b01-46c2-8d66-c9d9742f760b"
  ▶ context: {page: {path: "/profile/pharmacy/",…},…}
    event: "EXP: Appointment Booked"
    integrations: {}
    messageId: "ajs-next-1760366012652-2a7c3db9-55b9-4c51-b652-d1a8bcd384af"
  ▼ properties: {appointments_with_doctor: 0, system_assigned_pcp: false,…}
      application_viewed: "web"
      appointment_id: "f5f560d1-638c-400b-acf2-d2b7baf917e8"
      appointment_price: 129
      appointments_with_doctor: 0
      booked_state: "NY"
      clientId: ""
      coverage: "None"
      coverage_group_id: null
      coverage_used: false
      enrolled_patient_to_subscription: true
      is_enterprise: false
      new_or_repeat: "New"
      patient_group_id: null
      payer_id: null
      reservation_uuid: "033df32c-7c9d-46fd-a228-98699fe6852c"
      segment_event_name: "New Appointment"
    ▼ segment_hashed_context: {email: "d809292904c6eff1ac3b6eb6edd6b87a2f71762265f3ae1606b7c921c037118a",…}
      ▶ address: {state: "124e0b7201b0388d7c07f43194b9645d162b77005b66fef7283c689a69ff7c56"}
        birthday: "d53442aeb5a10f11c9576cefb3402dc654b004ab6f363bc69a56f3a8172fa1af"
        email: "d809292904c6eff1ac3b6eb6edd6b87a2f71762265f3ae1606b7c921c037118a"
        firstName: "78a1a1dae4e56fb0aba67dadc5ab5ab808f505137efedecfb7c2f12a4195c58b"
        lastName: "8360721f93d2e7e21a8f4201f3515ec089bb2a95148d8a1aca453442c98484ca"
        phone: "79ead1f2467ede6e64bd022228ece2e646349557e7fb216eae17d3e8a662c19d"
        subscription_program_id: "membership_1999_month_12900_12900"
      system_assigned_pcp: false
      sentAt: "2025-10-13T14:33:32.657Z"
      timestamp: "2025-10-13T14:33:32.652Z"
      type: "track"
      userId: "5c646187-85a0-4fd6-b8de-39205a5d4e52"
```

95.     Segment also has the ability to identify iOS App and Android App users, and pair wiretapped data with iOS App and Android App users' identities, as explained in detail *infra* ¶¶ 106-22.

**B.      Criteo**

96.     Criteo, as enabled by Defendant, contemporaneously intercepts and/or otherwise obtains the following communications of users of Defendant's Website. The yellow highlights in the below transmissions show communications on the Website.

97.     As shown by the highlights in the below screenshots of Website transmissions, Criteo intercepts and/or otherwise obtains the fact that users clicked "Book Appointment" (here, "plushcare_appointment") and that users have clicked to proceed to the page where users must select whether or not they are paying with insurance (here, "method" as in method of payment).  These communications are the product of button clicks on Screen 1.

| p0 | e=ce&m=%5B%5D&h=sha256 |
| --- | --- |
| p1 | e=exd&site_type=d&ref=https%3A%2F%2Fplushcare.com |
| p2 | e=vp&p=plushcare_appointment |
| p3 | e=dis |
| bundle | MQtkOV96T0sIMkl2d1BVR1IWMUpDRE5JbjFzanFlZGkIMkJDSTk2amVWOVg3ejU1QVkyMVIxSIhJWkE0Z0RuY1M4UkRjeXY0d2VHUktuZU1yOFQlMkY4JTJGZERieGpLdWNicVVWOEJKbyUyRktuNDVzU3A5QWI4RjhZT0JCZ2MwcjdkS1IBbGwIMkZhbFB6RCUyQnFRZWRWRREQ3ZXpHU05WZEImYjYzNGpoMCUyQkFHTkITSDNNTUJUZDhpNHNreWhyJTJGSFIuTVRUeFBsbE9SRng5SSUyRjJMNz5vuTzZLSnFQaHVET2pwVklibkEIM0QIM0Q |
| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fmethod%2F |
| pu | https%3A%2F%2Fplushcare.com%2F |
| ceid | d262b55f-6a0d-43c1-a794-b91ad8d3f304 |

98.     As shown by the highlights in the below screenshots of Website transmissions, Criteo intercepts and/or otherwise obtains the fact that users clicked to proceed to the page where users select their visit location (here, "primary-care…select-state").  These communications are the product of button clicks on Screen 2.

///

///

///

///

///

| p0 | e=ce&m=%5B%5D&h=sha256 |
| p1 | e=exd&site_type=d&ref=https%3A%2F%2Fplushcare.com |
| p2 | e=vp&p=plushcare_appointment |
| p3 | e=dis |
| bundle | MvImM196T0sIMkl2d1BVR1IWMUpDRE5JbjFzanFjMTZwNnJEd2l1elBpcVJUVkl1MXJUWjVoUkl3RDQ5TnJqT2Zqend0VFR1N3lPMVo1bVRGWHRqZjUlMkllMkZZUnNDN0NQWXA5WUNlQUw0ZCUyQkxUendhQ0UzQWRuVEZnMvh3cDd6aHZaVaEtvb1YxSzZwYyUyQjdNa3pPNWlhOXhlZ2vaHJyam1obGY2cEpkeTFJN3pjbHV1HV1RERKNDRGTk12SE9ENzdZU050dTJjOGVyaaVFaMXMIMkJOYzJPU0FYWEVrcTFBTmtLNXR3R3JTNEJTNE |
| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2F[primary-care%2Fselect-state%]2F |

99.  As shown by the highlights in the below screenshots of Website transmissions, Criteo intercepts and/or otherwise obtains the fact that users clicked to select a particular state (here, "state…CA"), and clicked to proceed to the screen where users must select a particular doctor (here, "doctor_type"). These communications are the product of button clicks on Screens 3A-3C.

| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fappointments%2F%3f[state%3DCA] |
| pu | https%3A%2F%2Fplushcare.com%2F |
| ceid | 361f4e77-5ced-4dc5-b231-a9fce37416f0 |

| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fappointments%2F%3Fstate%3DCA%2[doctor_type]%3D0%26date%3D2025-11-20T14%253A00%253A00-05%253A00 |
| pu | https%3A%2F%2Fplushcare.com%2F |

100.  As shown by the highlights in the below screenshots of Website transmissions, Criteo intercepts and/or otherwise obtains the fact that users selected a particular date and time for their appointment (here, "date…2025-11-20" and "T14" as in 14:00 hours or 2:00 PM).  As shown by the highlights in the below screenshots of Website transmissions, Criteo also intercepts and/or otherwise obtains the fact that users selected that they are looking for a Spanish speaking provider (here, "language...spanish").  These communications are the product of button clicks on Screens 4A through 4C.

| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fregister%2F%3Fstate%3DCA%26doctor_type%3D0%2Fdate%3D2025-11-20T14%253A00%253A00-05%253A00 |
| pu | https%3A%2F%2Fplushcare.com%2F |
| ceid | e7462cef-6ddb-42d0-93ed-d07a09a63fb8 |

| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fappointments%2F%3Fstate%3DCA%26doctor_type%3D0%26date%3D2025-11-20T14%253A00%253A00-05%253A00%26language%3Dspanish |
| pu | https%3A%2F%2Fplushcare.com%2F |

101.   As shown by the highlights in the below screenshots of Website transmissions, Criteo intercepts and/or otherwise obtains the fact that users have proceeded to the stage of booking their appointment where they must create a profile (here, "register"). These communications are the product of button clicks on Screen 6.

| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fregister%2F%3Fstate%3DPA%26doctor_type%3D0%26date%3D2025-10-23T00%253A00%253A00-04%253A00 |
| pu | https%3A%2F%2Fplushcare.com%2Fp%2Fhome%3Futm_source%3Dgoogle%26utm_medium%3Dcpc%26utm_campaign%3DLS_Brand_PlushCare%26gad_source%3D1%26gad_campaignid%3D20400198198%26gbraid%3D0AAAAAADsNIAEIA86zSSXptXmKsJgv_WE8S%26gclid%3D3DCjwKCAjwpOfHBhAxEiwAm1SwEno5Ru84mv6f9ZMeg-SNHb5fc-SdpGZG66awDWJaMQdSDRJcO6M3LxoCHRUQAvD_BwE |
| ceid | bdd9a0c-7fbb-4ef7-92c6-366d6f5f610a |

102.   As shown by the highlights in the below screenshots of Website transmissions, Criteo intercepts and/or otherwise obtains the fact that users have proceeded to the payment stage of booking their appointment (here, "payment"). These communications are the product of button clicks on Screen 7A.

| p0 | e=ce&m=%5B092a31fc460c59785cc1dae5a3d0bc52be687177c288df9efed30c365592c006%5D&h=sha256 |
| p1 | e=exd&site_type=d&ref=https%3A%2F%2Fplushcare.com |
| p2 | e=vb&p=%5Bi%253Dappointment%2526pr%253D100%2526q%253D1%5D |
| p3 | e=dis |
| bundle | UhMba196T0sIMkl2d1BVR1IWMUpDRE5JbjFzam1xeHVpOVVuV1J3WVIrWEtBaTRtazlaWG1DN1pBT2wxNmxmVjdLVXNmV6U21DNEdJZEVLZU81c2k3V2VZOWtrOUpzJTJGaGl1dFFNCJTJGT294d1FJaFZxdjJPeVZRUmhMNNIRCeXM4S2xXJjWIN1SkhIZndVdmhYWDB6eFdqZHJUN3R2NVBDeXFrcFZOVVvwb1ZxUnY0dm5acTdpSlEyWVddJeHNnQmclIM0QIl |
| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fpayment%2F%3Fstate%3DNY%26doctor_typ%1-20T14%253A00%253A00-05%253A00 |
| pu | https%3A%2F%2Fplushcare.com%2Fp%2Fhome%3Futm_source%3Dgoogle%26utm_medium%3Dcpc%26utm_can are%2Futm_adgroup%3DPlushCare%26gad_source%3D1%26gad_campaignid%3D20400198198%26gbraid%3D0A _Vd-e9Dx5%26gclid%3D3DCjwKCAjwxrLHBhA2EiwAu9EdMwa351EgZfvHcgB1C0XWaEIfGwAGng9EzE_Lm_qWMTxDf9 |
| ceid | 7e518e6a-48fc-497d-b880-8e2dcf571d7a |
| external_advids | [{"type":"Id5","value":"ID5*53i55J3GFycrmzu5VKLjznw4oZmIaqCv8NEHLOjJyr__2jtCaJaAAEBCmjZR6AAVcbhiOyXul |

103.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his PII, PHI, and/or other communications.  Moreover, Plaintiff was never provided with the required notice that Defendant disclosed the PHI of users of the Website or Android App, nor was he provided any means of opting out of such disclosures.  Defendant nonetheless knowingly disclosed Plaintiff's PHI to Segment and Criteo.

104.    By law, Plaintiff is entitled to privacy in his PHI and confidential communications.  Defendant deprived Plaintiff of his privacy rights when it: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications, PII, and PHI; (2) disclosed patients' PHI to Segment and Criteo—unauthorized third-party eavesdroppers; and (3) undertook this pattern of conduct without notifying Plaintiff and without obtaining his express written consent.

**VII.    Defendant Enables the Third Parties to Pair the Above Data with Users' Identities**

105.    As discussed *supra*, § V, the Segment and Criteo tracking technologies at issue pair wiretapped data (including medical information) with Website, iOS App, and Android App users' identities.

**A.    Segment**

106.    Segment pairs Website users' wiretapped data with Website users' hashed PII. *See supra* ¶¶ 91-93.

107.    Segment can also pair wiretapped data (including medical information) with particular iOS App and Android App users, by intercepting and/or otherwise obtaining unique identifiers—including a "userId" and an "anonymousId"—for each iOS App and Android App user.

108.    The highlighted lines below show that Segment has intercepted and/or otherwise obtained a unique "userID" as well as a unique "anonymousId" for a user

of both the iOS App and the Android App.

```
▼ 0: {messageId: "F5672A8B-9A77-47CB-9E6C-E0F3922876A0",…}
  anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
  ▶ context: {screen: {width: 375, height: 667}, instanceId: "8DE77D9A-6833-4619-B52B-5CFE06054D42",…}
  ▶ integrations: {AppsFlyer: false}
    messageId: "F5672A8B-9A77-47CB-9E6C-E0F3922876A0"
    timestamp: "2025-10-17T14:39:36.495Z"
  ▼ traits: {anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD", userId: "4b6db7e5-4902-43e0-8d8e-a4c355d7928a"}
    anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
    userId: "4b6db7e5-4902-43e0-8d8e-a4c355d7928a"
    type: "identify"
    userId: "4b6db7e5-4902-43e0-8d8e-a4c355d7928a"
```

```
▼ 0: {channel: "mobile", type: "identify", messageId: "f33fd4b1-6f0d-421e-b1ca-8083a4a659f0",…}
  anonymousId: "25b528c0-2d34-4917-9a08-9c11fba32483"
  channel: "mobile"
  ▶ context: {,…}
  ▶ integrations: {AppsFlyer: false}
    messageId: "f33fd4b1-6f0d-421e-b1ca-8083a4a659f0"
    timestamp: "2025-10-18T00:32:32.136Z"
  ▶ traits: {anonymousId: "25b528c0-2d34-4917-9a08-9c11fba32483", userId: "d675f2db-c72f-49da-824b-997a7b51343b"}
    type: "identify"
    userId: "d675f2db-c72f-49da-824b-997a7b51343b"
  sentAt: "2025-10-18T00:32:32.243Z"
  writeKey: "kUfgLk9OhDgwqvSzwEk5lpHQNrNSIYei"
```

109. That Segment pairs iOS App and Android App userIds and anonymousIds with iOS App and Android App users' medical information is evinced by the following transmissions.

```
    anonymousId: "EC70F7F7-7E4D-4D6D-B281-17C7607060BD"
  ▶ context: {screen: {width: 375, height: 667}, instanceId: "8DE77D9A-6833-4619-B52B-5CFE06054D42",…}
    event: "Booking - Book Internal Appointment - New"
  ▶ integrations: {AppsFlyer: false}
    messageId: "A0429OD4-098A-4877-8562-DF8CC2832DBD"
  ▶ properties: {Expired appointment recovery: "false", Payment Method: "Credit Card", Booked state: "NY",…}
    timestamp: "2025-10-17T14:50:42.647Z"
    type: "track"
    userId: "4b6db7e5-4902-43e0-8d8e-a4c355d7928a"
  ▶ 2: {messageId: "B3736CCB-BE17-4396-BCF0-54D3CDCA3B19",…}
  ▶ 3: {messageId: "79EBFF40-D757-4441-9680-C7F4C6D07238",…}
  sentAt: "2025-10-17T14:50:56.342Z"
  writeKey: "aHflfnGb1qvDCR6MKDmInXHDxGzas5ba"
```

```
    anonymousId: "25b528c0-2d34-4917-9a08-9c11fba32483"
    channel: "mobile"
  ▶ context: {,…}
    event: "Appointment Selected"
  ▶ integrations: {AppsFlyer: false}
    messageId: "da8281f9-edbb-4d01-96cc-c8535dab0569"
  ▶ properties: {appointment_list_position: 3}
    timestamp: "2025-10-18T00:35:01.225Z"
    type: "track"
    userId: "d675f2db-c72f-49da-824b-997a7b51343b"
  ▶ 9: {channel: "mobile", type: "track", messageId: "9f5e4bbe-9502-4aa0-940d-b8dd16f2bddc",…}
  sentAt: "2025-10-18T00:35:01.807Z"
  writeKey: "kUfgLk9OhDgwqvSzwEk5lpHQNrNSIYei"
```

110.   These userIds are in the form of UUIDs, which enable identification of individual users of Defendant's platform.  Indeed, "Segment recommends that you use a unique user identifier (UUID)" like those intercepted and/or otherwise obtained here[.]"[57]

111.   Segment goes on to explain that "[a] userId should be a robust, static, unique identifier …. We do **not** recommend using simple email addresses or usernames as a user ID, as these can change over time. We recommend that you use static IDs instead, so the IDs *never* change."[58]

112.   Moreover, even anonymous IDs can be linked with users' PII:

> An example of [where you want to record information about a user that isn't already known to you] … might be, a user [] visits your site and … give[s] you their email address …. In this instance, ***you would record that email address*** as a trait, and for the identifier (ID), ***you would use an anonymous ID***.[59]

113.   Segment can further pair Website, iOS App, and Android App users' wiretapped data with users' identities through Segment's "Identify" call.   The transmissions *supra* ¶¶ 108-109 show that Segment's "Identify call" has been fired, because "the payload now has both a userId *and* an anonymousId attributed to the user."[60]

114.   Segment explains that "[t]he ***Identify call specifies a customer identity*** that you can reference ***across the customer's lifetime***" and, together with other Segment tracking features, can help "gain a better understanding of [a customer's] activities, identity, and use patterns over time."[61]

---

[57] SEGMENT, BEST PRACTICES FOR IDENTIFYING USERS, https://segment.com/docs/connections/spec/best-practices-identify.

[58] *Id.*

[59] *Id.* (emphasis added).

[60] *Id.* (emphasis added).

[61] *Id.*

115.    The highlighted lines below further show that Defendant has enabled the Identify call on the Website, iOS App and Android App, (here, "identify: … enabled: true").



116.    Additionally, Segment userIds appear in transmissions by other tracking technologies.  This is evinced by the below highlights of iOS App and Android App transmissions to "api...sendbird.com"—i.e., the API (application programming interface, which "enables software applications to communicate with each other to exchange data, features and functionality")[62] of "Sendbird," a developer of artificial

[62] Michael Goodwin, *What is an API (application programming interface)?*, IBM (Apr. 9, 2024), https://www.ibm.com/think/topics/api.

intelligence technologies.[63]  In the below transmissions to Sendbird, patients' Segment userIds are seen in conjunction with users' first and last names (here, "Jane Christopher"; "Bob Williams").



117.   Finally, Segment can pair Website users' wiretapped data with users' identifies through the "Facebook browser ID value [] stored in the _fbp browser cookie."[64]

118.   According to Meta, browser ID values are formatted as "fb.${subdomain_index}.${creation_time}.${random_number}."[65]

119.   Per the Meta "Cookies Policy," the "'_fbp' cookie *identifies browsers* for the purposes of providing advertising and site analytics services[.]"[66] Specifically, the browser ID value, along with other "customer information parameters[,]" is ultimately "matched to Meta accounts."[67]

---

[63] *See* https://sendbird.com/ai-agent/omnipresent ("AI support that's always present, … Always aware, never intrusive. …").

[64] META, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com /docs/marketing-api/conversions-api/parameters/customer-information-parameters/; *see also* META, CLICKID AND THE FBP AND FBC PARAMETERS, https://developers.facebook.com/docs/ marketing-api/conversions-pi/parameters/fbp-and-fbc.

[65] META, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com/docs/ marketing-api/conversions-api/parameters/customer-information-parameters/.

[66] META, COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies (emphasis added).

[67] FACEBOOK, ABOUT EVENT MATCH QUALITY, https://www.facebook.com/business/help/765081237991954.

---

120.    Thus, through the Facebook browser ID value, Segment can easily identify a specific user, as well as their appointment information.  An example of the Facebook browser ID value being passed along with a user's appointment booking communications is shown below:



121.    Segment's pairing of wiretapped data with users' identities is important to Defendant's optimization and monetization of its platform.  This is evinced by the following images of "api.plushcare.com" transmissions.  Here, "api.plushcare.com" obtains hashed iOS App user PII, which it calls "*segment*_hashed_context" (emphasis added).  Although these personal details of iOS App users are "hashed," the reality is that, even in hashed form, they are traceable to individuals.[68]

///

///

///

///

///

///

///

---

[68] *See supra* ¶¶ 72, 92.

122. "Api.plushcare.com" also obtains an Android App user's Segment userId, in conjunction with that user's (1) full name (here, "Bob Williams"); (2) email (here, "bwilliams197212@gmail.com"); and (3) date of birth (here, "1972-02-02").



**B.    Criteo**

123.    Criteo, just like Segment, can pair users' wiretapped data with users' identities through the user's "Facebook browser ID value [] stored in the _fbp browser cookie."[69]  *See supra* ¶¶ 117-18.

124.    Thus, through the Facebook browser ID value, Criteo can easily identify a specific user, as well as their appointment information.  An example of the Facebook

---

[69] *See supra* n.64.

browser ID value being passed along with a user's appointment booking communications is shown below:

| a | 78722 |
|---|---|
| v | 5.41.2 |
| p0 | e=ce&m=%5B%5D&h=sha256 |
| p1 | e=exd&site_type=d&ref=https%3A%2F%2Fplushcare.com |
| p2 | e=vp&p=plushcare_appointment |
| p3 | e=dis |
| bundle | MvlmM196T0slMkl2d1BVR1lWMUpDRE5JbjFzanFjMTZwNnJEd2l1elBpcVJUVkl1MXJUWJVoUkl3RDQ5TnJqT2Zqend0VFR1N3lPMVo1bVRGWHRqZjUlMklIMkZZUnNDN0NQWXA5WUNIQUw0ZCUyQkxUendhQ0UzQWRuVEZhMVh3cDd6aHZVaEtvb1YxYxSzZwYyUyQjdNa3pPNWlhOXhOMEZvaHJyam1obGZ2cEpkeTFJN3pjbHV1RERKNDRGTk12SE9YZU50dTJijOGYyaVFaMXMIMkJOYzJPU0FYWEVVrcTFBTmtLNXR3JTNEJTNE |
| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fselect-state%2F |
| pu | https%3A%2F%2Fplushcare.com%2F |

125.   Criteo can further pair users' wiretapped data with users' identities through its proprietary identity graph called the "Criteo Shopper Graph."

126.   The "Criteo Shopper Graph is the world's largest open shopper data set. It represents a massive amount of granular shopper data as it is based on over 120 shopping intent signals and 35B [(35 billion)] daily historic browsing and transaction events from 72% of all online shoppers."[70]  Criteo boasts that "[w]ith 2+ billion global IDs matched across 150+ shopper intent signals on 35 million daily shopping and browsing events, Criteo knows your customers[.]"[71]

127.   Criteo says that is able to identify users through "machine learning."[72] Specifically, "Criteo collects user identifiers," "[g]oing from multiple identifiers to a single, unified user identity[.]"[73]

---

[70] https://help.criteo.com/kb/guide/en/criteo-shopper-graph-Zs89VJfkr6/Steps/775738.

[71] *Id.*

[72] *See* CRITEO, ONLINE IDENTIFICATION AT CRITEO (May 2020), available at https://criteo.investorroom.com/download/Criteo_Online_Identification_May2020.pdf.

[73] *See id.*

128.   Then, Criteo's "Identity Graph matches UUIDs[,]"[74] or, "universal users identifiers." Criteo UUIDs are comprised of, *inter alia*, third party and first party cookies, device IDs, and hashed emails.[75]

129.   Thus, Criteo can pair wiretapped data (including medical information) with Website users' identities. This is evinced by the below Website transmission, where the "m" value represents a SHA256 hashed UUID identifier (here, "m=...=sha256").

| a | 78722 |
|---|---|
| v | 5.41.2 |
| p0 | e=ce&m=%58092a31fc460c59785cc1dae5a3d0bc52be687177c288df9efed30c365592c006%5D&h=sha256 |
| p1 | e=exd&site_type=d&ref=https%3A%2F%2Fplushcare.com |
| p2 | e=vb&p=%5B%253Dappointment%2526pr%253D100%2526q%253D1%5D |
| p3 | e=dis |
| bundle | UhMba196T0slMkI2d1BVR1IWMUpDRE5IbjFzam1xeHVpOVVuV1Z3WVlrWEtBaTRtazlaWG1DN1pBT2wxNmxmVjdLWnR1RTVJdUp4ZUhoYllwUEVXNmV6U2I0DNEdJZEVLZU81c2k3V2VZOWtrOUpzJ7UGaGl1dFNC/TJGT294d1FJaFZxdjJPeVZRUmhhMNlRCeXM4S2xGSVV6b08lMkZheUZXcVdCZXJjWlN1SkhlZndVdmhhYWDB6eFdqZHJUN3R2NVBDeXFrcFZ0VVVvwb1ZxUnY0dm5acTdpSlEyWVVdJeHNnQmclM0QJM0Q |
| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |

130.   Indeed, this hashed UUID value (here, "m=…=sha256") is intercepted and/or otherwise obtained by Criteo *after* a user enters their PII in Screen 7A,[76] indicating that the UUID is comprised of PII and can identify an individual.

## VIII. Tolling

131.   Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Segment and Criteo tracking technologies into its Website, iOS App, and Android App.

132.   Segment and Criteo tracking technologies on Defendant's website were entirely invisible to a Website, iOS App, or Android App user. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and/or ignorant to information essential to pursue their claims, and thus could not reasonably discover Defendant's deception and/or unlawful conduct.

133.   Defendant had exclusive knowledge that its Website, iOS App, and

---

[74] *See id*.

[75] *See id*.

[76] *Compare* ¶¶ 83-86 (images of website transmissions evincing an empty "m=" value) *with* ¶ 87 (showing a completed "m=" value).

Android App incorporated the Segment and Criteo tracking technologies yet failed to disclose to users, including Plaintiff and Class Members, that by scheduling a doctor's appointment, Plaintiff's and Class Members' personal information would be disclosed or released to Segment and Criteo.

134.   Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users' personal information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their personal information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

135.   Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

136.   The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

137.   Plaintiff first discovered that Defendant had collected and shared his personal information without his consent on or around August 2025 after contacting undersigned counsel and discussing potential claims against Defendant.

## CLASS ALLEGATIONS

138.   Plaintiff seeks certification of the following class: all persons in the United States who, during the class period, had their PII and/or PHI improperly intercepted by or otherwise disclosed to Segment or Criteo, as a result of using the Website, iOS App, or the Android App (the "Class" or "Nationwide Class").

139.   Plaintiff also seeks to represent a subclass consisting of all California residents who, during the class period, had their PII and/or PHI improperly intercepted by or otherwise disclosed to Segment or Criteo, as a result of using the Website, iOS App, or Android App (the "Subclass" or "California Subclass") (the Class and

Subclass collectively, the "Classes").

140.    Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

141.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

142.    The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

143.    **Numerosity/Ascertainability:**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Google.

144.    **Typicality:**  The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, booked a consultation on the Website,  and had their confidential electronic communications intercepted and/or disclosed to Segment or Criteo.

145. **Adequate Representation:**  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

146. **Commonality and Predominance:**  There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632, Cal. Civ. Code § 56.10, and Plaintiff's and Class Members' privacy rights as provided by the California Constitution and common law, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, prejudgment interest and costs of this suit.

147. **Superiority:**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

# CAUSES OF ACTION

## COUNT I
### Violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*
### (On Behalf of the Nationwide Class and California Subclass)

148.  Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Classes.

149.  The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, makes it unlawful for a person to intentionally intercept, endeavor to intercept or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication.  18 U.S.C. § 2511(a).

150.  Further, the Federal Wiretap Act makes it unlawful for a person to intentionally disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of the Federal Wiretap Act. 18 U.S.C. § 2511(1)(c).

151.  Further, the Federal Wiretap Act makes it unlawful for a person to intentionally use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of the Federal Wiretap Act. 18 U.S.C. § 2511(1)(d).

152.  The Federal Wiretap Act protects both the sending and receiving of communications.

153.  Among other ways, a violation of the Federal Wiretap Act occurs if a person:

    (a)    intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; [or]

(b)    intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication[.]

18 U.S.C. § 2511.

154. Under the Federal Wiretap Act, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [the Federal Wiretap Act] may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

155. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a), Defendant intentionally procured third-parties Segment and Criteo, to intercept and endeavor to intercept the electronic communications of Plaintiff and Class Members, namely the transmissions of the confidential and sensitive PII and PHI of Plaintiff and Class Members via the Website, iOS App, and Android App. At relevant times, Defendant knew that by integrating and embedding Segment's and Criteo's tracking technologies, Segment and Criteo would intercept the electronic communications of users of the Website, iOS App, and/or Android App.

156. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a), Defendant intentionally intercepted, and endeavored to intercept, the electronic communications of Plaintiff and Class Members, namely the transmissions of the confidential and sensitive PII and PHI of Plaintiff and Class Members via the Website, iOS App, and Android App.

157. In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(c), Defendant disclosed, and endeavored to disclose, the contents of the electronic communications of Plaintiff and Class Members to generate profits and increase revenues by, *inter alia*, building marketing campaigns and improving advertisement targeting, knowing and having reason to know that the information was obtained

through the unlawful interception of the electronic communications of Plaintiff and Class Members, in violation of the Federal Wiretap Act, as alleged herein. Indeed, Defendant procured Segment and Criteo to surreptitiously intercept the communications of Plaintiff and Class Members without their consent, thereby knowing that the information from those communications was obtained in violation of the Federal Wiretap Act.

158.   In violation of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(d), Defendant used, and endeavored to use, the contents of the electronic communications of Plaintiff and Class Members to generate profits and increase revenues by, *inter alia*, building marketing campaigns and improving advertisement targeting, knowing and having reason to know that the information was obtained through the unlawful interception of the electronic communications of Plaintiff and Class Members, in violation of the Federal Wiretap Act, as alleged herein.  Indeed, Defendant procured Segment and Criteo to surreptitiously intercept the communications of Plaintiff and Class Members without their consent, thereby knowing that the information from those communications was obtained in violation of the Federal Wiretap Act.

159.   The following items constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.   The codes and programs Segment and Criteo used to track Plaintiff's and Class Members' communications while they were navigating the Website, iOS App, and Android App;

    b.   Plaintiff's and Class Members' browsers and mobile applications;

    c.   Plaintiff's and Class Members' computing and mobile devices;

    d.   The codes and programs used by Segment and Criteo to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a browser or application to visit Defendant's Website, iOS App, and Android App; and

e. The plan Segment and Criteo carried out to effectuate their tracking and interception of the Plaintiff's and Class Members' communications while they were using Defendant's Website, iOS App, and Android App.

160. The patient communication information that Defendant permitted Segment to intercept, and that Defendant otherwise disclosed to Segment, via Defendant's integration of the Segment tracking technology on the Website, iOS App, and Android App—including but not limited to: whether users seek to pay using insurance, the time of day patients wish to book an appointment, the location of the appointment, how users pay for their appointment, that users actually booked an appointment, and, in the case of the Website, the name of the doctor and the appointment price—constitutes the contents of electronic communication because it includes detailed URL requests, button clicks, and taps that contain information Plaintiff and the Classes actively inputted into the Website, iOS App, and Android App.

161. The patient communication information that Defendant permitted Criteo to intercept, and that Defendant otherwise disclosed to Criteo, via Defendant's integration of the Criteo tracking technology on the Website—including but not limited to: namely, the date and time that users seek to book an appointment, language preferences as to a provider, the location of the appointment, and that users register and seek to pay for their appointment—constitutes the contents of electronic communication because it includes detailed URL requests and button clicks that contain information Plaintiff and the Classes actively inputted into the Website.

162. The transmissions described above were "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

163.    Segment and Criteo were not authorized parties to the communications between Plaintiff and Class Members, on the one hand, and Defendant, on the other, because Plaintiff and Class Members did not know that these third parties were surreptitiously intercepting the data at issue and did not knowingly send any communications to Segment or Criteo.

164.    Plaintiff and Class Members did not consent to Defendant's conduct of: (1) procuring Segment and/or Criteo to intercept their confidential communications; (2) intercepting their confidential communications; (3) disclosing their confidential communications under circumstances that violated the Federal Wiretap Act; and (4) using their confidential communications under circumstances that violated the Federal Wiretap Act.

165.    Defendant intentionally intercepted and endeavored to intercept Plaintiff's and Class Members' communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, violation of the CIPA, the CMIA, and the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6(a)(3), among others.

166.    HIPAA imposes a criminal penalty for knowingly disclosing individually identifiable health information to a third party.  *See* 42 U.S.C. § 1320d-6.  HIPAA defines IIHI as:

> [A]ny information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6).

167. Defendant was not acting under color of law in intercepting and endeavoring to intercept Plaintiff's and Class Members' communications.

168. Defendant, Segment, and Criteo intercepted and endeavored to intercept the communications of Plaintiff and Class Members made via the Website, iOS App, and Android App while those communications were in transit, as opposed to being in storage. Indeed, Defendant, Segment, and Criteo intercepted and endeavored to intercept the communications of Plaintiff and Class Members in real time and contemporaneously with Plaintiff and Class Members engaging in those communications.

169. After intercepting the communications, Segment and Criteo used the contents of the communications to provide Defendant with analytics and marketing services, as well as for its own business purposes.

170. As a result of the above actions, Plaintiff and Class Members have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiff and Class Members are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred.

## COUNT II
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 631

171. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

172. Plaintiff brings this Count individually and on behalf of the members of the Subclass.

173.   CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

174.   CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a)

applies to Internet communications.").

175.   Segment's and Criteo's tracking technologies are each an "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

176.   Segment and Criteo are each a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Segment and Criteo have the capability to use the wiretapped information for their own purposes.  Accordingly, Segment and Criteo have been a third party to any communications between Plaintiff and Subclass Members, on the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

177.   At all relevant times, through its tracking technology, Segment and Criteo willfully and without the consent of all parties to the communication, and/or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Subclass Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

178.   At all relevant times, Segment and Criteo used or attempted to use the communications intercepted by its tracking technologies for their own purposes.

179.   At all relevant times, Defendant aided, agreed with, employed, permitted, and otherwise enabled Segment and Criteo to wiretap Plaintiff and Subclass Members using Segment's and Criteo's tracking technologies and to accomplish the wrongful conduct at issue here.

180.   Plaintiff and Subclass Members did not provide their prior consent to Segment's and Criteo's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Subclass Members' electronic communications.  Nor did Plaintiff and Subclass Members provide their prior consent

to Defendant aiding, agreeing with, employing, permitting, and otherwise enabling Segment's and Criteo's conduct.

181. The wiretapping of Plaintiff and Subclass Members occurred in California, where Plaintiff and Subclass Members accessed the Website, iOS App, and Android App, and where Segment and Criteo—as enabled by Defendant—routed Plaintiff's and Subclass Members' electronic communications to Segment's and Criteo's servers.

182. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 632

183. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

184. Plaintiff brings this Count individually and on behalf of the members of the Subclass.

185. CIPA § 632(a) provides for liability where an entity:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

186. Segment's and Criteo's tracking technologies are "electronic amplifying or recording device[s]." *Id.*

187. Cal. Civ. Code § 56.05(j) states:

> "Medical information" means any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care ... regarding a patient's

medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment.

188.  Per Cal. Civil Code § 56.10(a):

A provider of health care, … shall not disclose medical information regarding a patient of the provider of health care … without first obtaining an authorization, except as provided in subdivision (b) or (c).

189.  Per Cal. Civ. Code § 56.10(d):

Except to the extent expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient.

190.  Here, Website, iOS App, and Android App users' communications with Defendant—made while browsing and booking consultations via the Website, iOS App, and Android App—contain sensitive and confidential "[m]edical information," as defined by Cal. Civil Code § 56.05.

191.  First, the communications include "individually identifiable information[.]" Cal. Civil Code § 56.05. Defendant enables Segment to identify individual Website, iOS App, and Android App users with a combination of one or more of (1) unique user identifiers, userIds and anonymousIds, (2) Segment's "Identify call," (3) hashed PII, and/or (4) Facebook browser IDs, which, "alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05. Defendant enables Criteo to identify individual Website users with (1) Facebook browser IDs, (2) hashed UUID identifier, and (3) Criteo's proprietary Identity Graph, which, "alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civil Code § 56.05.

192.    Second, Website, iOS App, and Android App users' communications with Defendant relate to "a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05. Segment intercepts and/or otherwise obtains Website, iOS App, and Android App users' button clicks and taps selecting whether users seek to pay using insurance, the time of day patients wish to book an appointment, the location of the appointment, how users pay for their appointment, that users actually booked an appointment, and, in the case of the Website, the name of the doctor and the appointment price. Criteo intercepts and/or otherwise obtains Website users' button clicks and taps selecting the date and time that users seek to book an appointment, language preferences as to a provider, the location of the appointment, and that users register and seek to pay for their appointment.

193.    Thus, Segment and Criteo—as aided by Defendant—intercepted "medical information," which is confidential, under Cal. Civil Code § 56.10.

194.    When communicating with Defendant, Plaintiff and Subclass Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 56.10. Thus, Plaintiff and Subclass Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other third-party entities like Segment and Criteo would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Subclass Members.

195.    Plaintiff and Subclass Members did not consent to Segment's nor Criteo's actions. Nor have Plaintiff or Subclass Members consented to Segment's and Criteo's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Subclass Members.

196.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Subclass Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks

statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## COUNT IV

**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56.10**

197.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

198.   Plaintiff brings this Count individually and on behalf of the members of the Subclass.

199.   Under the CMIA, providers of health care are prohibited from disclosing medical information relating to their patients, without a patient's authorization.

200.   Additionally, "[e]xcept to the extent expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care, health care service plan, contractor, or corporation and its subsidiaries and affiliates shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient." Cal. Civ. Code § 56.10(d).

201.   Medical information means "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care ... regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment."   Cal. Civ. Code § 56.05(j).   "'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id.*

202.   Cal. Civ. Code § 56.06(a) defines a provider of health care as "[a]ny business organized for the purpose of maintaining medical information in order to

make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage the individual's information, or for the diagnosis and treatment of the individual[.]"

203.   Cal. Civ. Code § 56.06(d) says that "[a]ny business that offers a mental health digital service to a consumer for the purpose of allowing the individual to manage the individual's information, or for the diagnosis, treatment, or management of a medical condition of the individual, shall be deemed to be a provider of health care subject to the requirements of this part."

204.   Plaintiff and Subclass Members are patients under the definition of the CMIA because Plaintiff and Subclass Members received "health care services from a provider of health care," and the information Defendant disclosed and/or shared to Google was "medical information pertain[ing]" to Plaintiff and Subclass Members. Cal. Civ. Code § 56.05(m).

205.   Defendant is a provider of health care under Cal. Civ. Code § 56.06(a) because it is an organization designed to provide patients with access to health care and provides a Website, iOS App, and Android App from which patients can manage their diagnosis or treatment of their medical conditions.  Because Defendant is deemed a provider of health care, it has an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

206.   As set forth hereinabove, Defendant enables Segment to identify individual Website, iOS App, and Android App users with a combination of one or more of (1) unique user identifiers, userIds and anonymousIds, (2) Segment's "Identify call," (3) hashed PII, and/or (4) Facebook browser IDs. Also as set forth hereinabove, Defendant enables Criteo to identify individual Website users with (1) Facebook browser IDs, (2) hashed UUID identifier, and (3) Criteo's proprietary Identity Graph.   These are all identifiers sufficient to allow identification of an

individual. Along with these identifiers, Defendant disclosed and/or shared to Segment and Criteo several pieces of information regarding its patients' use of its Website, iOS App, and Android App, which, on information and belief, included, but is not limited to: whether users seek to pay using insurance, the time of day patients wish to book an appointment, the location of the appointment, how users pay for their appointment, that users actually booked an appointment, and, in the case of the Website, the name of the doctor, the appointment price, the date and time that users seek to book an appointment, language preferences as to a provider.

207. This patient information is derived from a provider of health care regarding patients' medical treatment. Accordingly, it constitutes medical information pursuant to the CMIA.

208. However, as demonstrated hereinabove, Defendant fails to obtain its patients' authorization for the disclosure of medical information to Segment and Criteo, which is done for marketing and analytics purposes.

209. Pursuant to CMIA § 56.11, a valid authorization for disclosure of medical information must: (1) be "[c]learly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization"; (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Privacy Policy does not qualify as a valid authorization.

210. Based on the above, Defendant violated the CMIA by disclosing and sharing its patients' medical information to Segment and Criteo, along with unique user identifiers, userIds and anonymousIds, hashed PII, Facebook browser IDs, and hashed UUID identifiers, while failing to obtain patients' valid authorizations for the disclosure of medical information.

211.   Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information.  Cal. Civ. Code § 56.35.  Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information.  Cal. Civ. Code § 56.36.

## COUNT V
### Invasion of Privacy Under California's Constitution

212.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

213.   Plaintiff brings this Count individually and on behalf of the members of the Subclass.

214.   Plaintiff and Subclass Members have an interested in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites and mobile applications without being subjected to wiretaps without Plaintiff's and Subclass Members' knowledge or consent.

215.   At all relevant times, by installing and embedding Segment and Criteo tracking technologies into the Website, iOS App, and Android App, so that Segment and Criteo could intercept and/or otherwise obtain users' private communications with Defendant regarding their health conditions and treatment, Defendant intentionally invaded Plaintiff's and Subclass Members' privacy rights under the California Constitution.

216.   Plaintiff and Subclass Members had a reasonable expectation that their communications about their health conditions and treatment, and other private information, would remain confidential and that Defendant would not enable

Segment's and Criteo's interception of this sensitive information given that Defendant did not provide Plaintiff and Subclass Members with the required notice of its practice of disclosures.

217.   Plaintiff and Subclass Members did not authorize Defendant to record and transmit Plaintiff's and Subclass Members' private medical communications alongside their personally identifiable health information.

218.   This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

219.   Accordingly, Plaintiff and Subclass Members seek all relief available for invasion of privacy claims under California's Constitution.

## COUNT VI
### Intrusion Upon Seclusion
### (On Behalf of the Nationwide Class and California Subclass)

220.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

221.   Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their health conditions and treatment; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites and applications without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

222.   At all relevant times, by installing and embedding the Segment and Criteo tracking technologies into the Website, iOS App, and Android App, so that Segment and Criteo could intercept users' private communications with Defendant regarding their health conditions and treatment, Defendant intentionally invaded Plaintiff's and

Class Members' privacy rights by intruding into their private place, conversation or matter.  Defendant's actions amount to an intrusion upon Plaintiff's and Class Members' privacy because Plaintiff and Class Members did not consent to the particular conduct that Defendant engaged in—allowing Segment and Criteo to intercept their sensitive conversations related to their health concerns and treatment.

223.  Plaintiff and Class Members had a reasonable expectation that their communications about their health conditions and treatment, and other private information, would remain confidential and that Defendant would not enable third party interception of this sensitive information given that Defendant did not provide Plaintiff and Class Members with the required notice of its practice of disclosures.

224.  Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable health information.

225.  This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private health condition and treatment communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

226.  Accordingly, Plaintiff and Class Members seek all relief available for Defendant's intrusion upon their seclusion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    a.  For a determination that this action is a proper class action;

    b.  For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

    c.  For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff, the Class, and Subclass on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiff, Class, and Subclass Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiff, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiff, Class, and Subclass Members such further relief as the Court deems appropriate.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: November 24, 2025            Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, IL 60040
Telephone: (312) 358-8225
Email: scott@drurylegal.com

*Attorneys for Plaintiff*

---