**KJC LAW GROUP, A.P.C.**
Kevin J. Cole (SBN 321555)
*kevin@kjclawgroup.com*
9701 Wilshire Blvd., Suite 1000
Beverly Hills, CA 90212
Tel: 310.861.7797

**CIPRIANI & WERNER, P.C.**
Jill H. Fertel (*pro hac vice* application forthcoming)
*jfertel@c-wlaw.com*
Conor J. Hafertepe (*pro hac vice* application forthcoming)
*chafertepe@c-wlaw.com*
Three Valley Square, Suite 305
512 E. Township Line Road
Blue Bell, PA 19422
Tel: (610) 567-0700

*Attorneys for Defendant*
*Accolade, Inc. d/b/a PlushCare*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT PERKINS, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ACCOLADE, INC. d/b/a PLUSHCARE,<br><br>Defendant. | Case No. 5:25-cv-03162<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**<br><br>Complaint Filed: 11/24/25<br>Trial Date: None Set |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 17, 2026 at 2:00 p.m. PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Central District of California, George E. Brown, Jr. Federal Building and United States

Courthouse, Riverside, Courtroom 2, Second Floor, before the Honorable Sunshine S. Sykes, Defendant Accolade, Inc. d/b/a PlushCare (hereinafter "PlushCare") will move the Court for an Order to dismiss Plaintiff Robert Perkins's (hereinafter "Plaintiff") Class Action Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. This Motion is based on this Notice of Motion to Dismiss, the Memorandum of Points and Authorities, the Request for Judicial Notice and exhibits thereto, all other pleadings and papers on file in this action, any other such matters upon which the Court may take judicial notice, the arguments of counsel, and any other matter the Court may properly consider.

This Motion was filed after counsel for the Parties met and conferred on March 2, 2026 about the issues in the accompanying Memorandum of Law.

Dated: March 4, 2026

Respectfully submitted,

By: */s/ Jill H. Fertel*

Jill H. Fertel
Conor Hafertepe
*Attorneys for Accolade, Inc. d/b/a PlushCare*

# TABLE OF CONTENTS


I. INTRODUCTION……………………………………………………...1

II. FACTUAL ALLEGATIONS……………………………………………..4

A. The Parties……………………………………….……………….4

B. PlushCare's Terms of Use and Legal Privacy Policy…………………....5

C. Segment & Criteo……………………….………………………10

D. Plaintiff's PlushCare Experience………………………………………10

III. LEGAL ARGUMENT……………………………….………….....12

A. Standard of Review………………………………….………………12

B. Request for Judicial Notice…………………….……………………13

C. Plaintiff's Claims Fail Because He Consented to the Collection of His Data……………………………………………………………..15

D. Plaintiff has Failed to State a Claim under the Federal Wiretap Act…………………………………………………..……......23

E. Plaintiff has Failed to State a Claim under CIPA § 631(a) and §632(a)………………………………………….……………26

F. Plaintiff has Failed to State a Claim for Violation of the CMIA……….31

1. The Information Purportedly Utilized by Segment and Criteo is not Substantive Medical Information………………………….31

2. Segment and Criteo Provide Administrative Services for PlushCare as Permitted by the CMIA…………………………33

G. Plaintiff has Failed to State a Claim for Invasion of Privacy Under California's Constitution and Common Law Intrusion on Seclusion….36

IV. CONCLUSION………………………………………………….37

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,

556 U.S. 662 (2009)……………………………………………………...12

*Bell Atl. Corp. v. Twombly,*

550 U.S. 544 (2007)……………………………………………………...12

*Caldwell v. Caldwell,*

No. 05-cv-04166-PJH, 2006 WL 618511 (N.D. Cal. Mar. 13, 2006)………....14

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,

824 F.3d 1156 (9th Cir. 2016)…………………………………..………...12

*Clausing v. San Francisco Unified Sch. Dist.,*

221 Cal. App. 3d 1224 (Ct. App. 1990)…………………………….……….37

*Complisson v. Adidas Am., Inc.*,

No. 25-cv-603-GPC-KSC, 2025 WL 3228949 (S.D. Cal. Nov. 18, 2025)……14

*Doe v. Talkiatry Mgmt. Servs., LLC*,

Case No. 5:25-cv-00781-SSS-DTBx, 2025 WL 3190813 (C.D. Cal. Oct 1, 2025)…………………………………………………………………….25, 26, 28

*Doe v. Tenet Healthcare Corp.*,

789 F. Supp. 3d 814 (E.D. Cal. 2025)……………………………...…….34

*Doe v. United States*,

419 F.3d 1058 (9th Cir. 2005)……………………………...……….............12

*Eisenhower Medical Center v. Superior Court*, 226

Cal. Rptr. 3d 430 (Cal. Ct. App., 4th Dist. 2014)……………………….........32

*Garcia v. Enterprise Holdings, Inc.*,

78 F. Supp. 3d 1125 (N.D. Cal. 2015)………………………………………16

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021)……………………………………..28, 30

*Gray v. Luxottica of America, Inc.*,
Case No. 8:24-cv-00160-MRA-DFM, 2024 WL 5689566 (C.D. Cal. Dec. 16, 2024)……………………………………………………………………..……...32

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009)……………………………………………………..36

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)……………………………...………………36

*In re Google Assistant Privacy Litig.,*
457 F. Supp. 3d 797 (N.D. Cal. 2020)……………………………………....22

*In re Google Inc.*,
No. 13-MD-2430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013)……...16

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
806 F.3d 125 (3d Cir. 2015)…………………………………………..23, 24

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014)……………………………………..24

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023)……………………………………25

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025)……………………13, 21, 22, 24, 27, 37

*Lee v. Ticketmaster LLC*,
817 F. App'x 393 (9th Cir. 2020)……………………………………………20

*Licea v. Old Navy*,
669 F.Supp.3d 941 (C.D. Cal. 2023)……………………...…....................28, 29

*Moledina v. Marriott Int'l Inc.*,

635 F. Supp. 3d 941 (C.D. Cal. 2022)……………………………….............16

*Moore v. Rodriguez,*

No. 20-cv-01481-BAS-BGS, 2021 WL 2222590 (S.D. Cal. June 2, 2021)…...37

*Moretti v. Hertz Corp.*,

No. C 13-02792-JSW, 2014 WL 1410432 (N.D. Cal. 2014)…………………..20

*Navarrow v. Block*,

250 F.3d 729 (9th Cir. 2001)…………………………………………..……12

*Oddei v. Optum, Inc.*,

No. 2:21-cv-03974-SB-MRW, 2021 WL 6333467 (C.D. Cal. Dec. 3, 2021) …………..……………………………………………………………………….…36

*Papasan v. Allain*,

478 U.S. 265 (1986)………………………………………………………...12

*Pena v. Gamestop, Inc.*,

670 F.Supp.3d 1112 (S.D. Cal. 2023)………………………………………….26

*Perkins v. LinkedIn Corporation,*

53 F. Supp. 3d 1190 (N.D. Cal. 2014)……………………………..……..16

*R.C. v. Sussex Publishers, LLC*,

No. 24-cv-02609-JSC, 2025 WL 948060 (N.D. Cal. March 28, 2025)………..35

*R.C. v. Walgreen Co.*,

733 F. Supp. 3d 876 (C.D. Cal. 2024)…………………………………....14

*Rodriguez v. Google, LLC*,

No. 20-cv-04688, 2021 WL 2026726, (N.D. Cal. May 21, 2021)…………….25

*R.S. v. Prime Healthcare Servs.*,

No. 5:24-cv-00330, 2024 WL 3730609 (C.D. Cal. Aug. 7, 2024)…….………24

*Silver v. Stripe Inc.*,
No. 4:20-CV-08196-YGR, 2021 WL 3191752 (N.D. Cal. July 28, 2021)....................16, 20

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd,* 745 F. App'x 8 (9th Cir. 2018)....................37

*United States v. Corinthian Colls.*,
655 F.3d 984 (9th Cir. 2011)....................13

*Washington v. Flixbus, Inc.*,
Case No. 3:25-cv-00212-H-MSB, 2025 WL 1592961 (S.D. Cal. June 5, 2025)....................21, 22, 27 37

*Williams v. What If Holdings, LLC*,
No. C 22-03780, 2022 WL 17869275 (N.D. Cal. Dec. 22, 2022)....................28, 29, 36

*Wilson v. Rater8, LLC*,
Case No. 20-cv-1515-DMS-LL, 2021 WL 4865930 (S.D. Cal. Oct. 18, 2021)....................32

*Yale v. ClickTale, Inc.*,
Case No. 20-cv-07575-LB, 2021 WL 1428400 (N.D. Cal. April 15, 2021)....................30

**Statutes, Rules & Regulations**

18 U.S.C.A. § 2511....................15, 23

Cal. Civ. Code § 56.10....................31, 33, 34, 35, 36

Cal. Civ. Code § 56.05....................32, 34

Cal. Pen. Code § 631....................16, 26, 27

Cal. Pen. Code § 632....................26, 27

Fed. R. Civ. Pro. 12(b)(6)....................12

Fed. R. Evid. 201(b)....................13

## I. INTRODUCTION

Telehealth services have revolutionized medical care. By increasing access to medical providers and reducing costs, stress, and travel, telehealth can improve patient satisfaction and treatment outcomes.[1] PlushCare is an online telehealth service connecting patients with board-certified physicians for same-day telehealth appointments. PlushCare is, as advertised, *Trusted Care from top doctors, just a tap away.*




**PlushCare Exhibit A-1**

Like all businesses in the healthcare space, PlushCare relies on third-party administrative services to maximize services and improve their business model. Because PlushCare's business is conducted entirely online, these services look different

[1] "Gajarawala, S. and Pelkowski, J, "Telehealth Benefits and Barriers" available at https://pmc.ncbi.nlm.nih.gov/articles/PMC7577680/ (last accessed February 25, 2026).

than brick-and-mortar business models. PlushCare uses software developed by third-party providers to help conduct its business and improve its site's functionality, service, and appeal—a fact immediately disclosed by PlushCare to its users:




**PlushCare Exhibit A-2**

Among these tools are Segment and Criteo, assisting PlushCare in data collection and analysis, allowing PlushCare to improve its platform, more effectively market its services to patients, and maintain consistent service. PlushCare's use of these third-party service providers is clearly outlined in its website's Terms of Use and Privacy Policy, which all patients are required to agree to before scheduling an appointment. A fact evidenced throughout Plaintiff's Complaint[2]:

[2] *See* CAC at ¶¶ 47, "Screen 8C"; 55, "Screen 22C".




"Screen 8C"




"Screen 22C"

Plaintiff, a patient of PlushCare, now brings this suit alleging that PlushCare's use of third-party administrative services providers for the purposes of "building marketing campaigns and improving advertisement targeting," violates his privacy. *See* CAC at ¶ 157. Relying on a strained, tortured interpretation of statutes governing "wiretaps" and "eavesdropping devices," Plaintiff alleges that the use of third-party administrative vendors is akin to "eavesdropping" on his communications with PlushCare. This action attempts to conflate an everyday online occurrence—consensual collection and analysis of user data—with criminal snooping from statutes written last century. Plaintiff had actual or constructive knowledge that PlushCare collected his data because he agreed to PlushCare's Terms and Conditions and Privacy Policy. PlushCare's use of third-party service providers to collect and analyze data is an ordinary business practice to which Plaintiff agreed, not a scheme to invade

Plaintiff's privacy. Though this practice is repeatedly disclosed in plain terms throughout PlushCare's website and mobile application, Plaintiff contends that their use is wrongful simply because PlushCare, along with its users, derives a benefit from the practice. Such a theory goes too far and is inconsistent with both the letter and the spirit of the law. As such, Plaintiff's claims should be dismissed with prejudice.

## II. FACTUAL ALLEGATIONS

### A. The Parties

PlushCare is an online healthcare provider offering comprehensive telehealth healthcare services. *See* CAC at ¶17. PlushCare offers its services through a website ("plushcare.com") as well as Android and iOS apps. *Id.* at ¶ 36. Plaintiff Robert Perkins alleges that he is a patient of PlushCare and has used PlushCare's website and Android app while domiciled in California to schedule doctors' appointments in December 2024, February 2025, and August 2025. *Id.* at ¶¶ 11, 12.

### B. PlushCare's Terms of Use and Legal & Privacy Policy

To create a profile and book appointments through PlushCare's website and/or mobile app, users must go through a multi-step process and enter various information about themselves (name, address, email, etc.). *See Id.* at ¶¶ 40–57. On the mobile app, the very first step in this process brings the user to a screen titled "Consent Policy" which features links to PlushCare's Terms of Use and Privacy Policy, and requests the user accept permissions for the App to access different device features. *See* Exhibit A-

3. The user is required to click a button stating "I agree" before continuing the process. At the final step in the process on the mobile app, the user is presented with a screen that states "By clicking "Book your appointment and enroll . . . You agree to PlushCare's Privacy Policy and Terms of Use." *See* CAC at ¶55, "Screen 22 C". This screen includes hyperlinks to PlushCare's Privacy Policy and Terms of Use. *Id.* The user is required to click a button stating "Book your appointment and Enroll" before the user can complete the booking process.




**PlushCare Exhibit A-3**




**"Screen 22C"**

At the time Plaintiff made his appointments on PlushCare's website, all new visitors were greeted with a pop-up on the bottom of the screen that states "This website uses cookies to enhance user experience and to analyze performance and traffic on our website, record sessions and improve our sites and services. We also share information about your use of our site with our social media, advertising and analytics partners. By continuing to use this site, you agree to the use of these technologies as further described

in our Privacy Policy. *See* Exhibit A-4. The pop-up allows the user to click buttons labeled "Manage Cookies," or "Accept Cookies." *Id.* The pop-up will continue to appear on every page of the website until the user clicks "Accept Cookies." If the user clicks "Manage Cookies" another pop-up with hyperlinks to PlushCare's Privacy Policy and Terms of Use appears and allows users to opt-out of specific cookie collection for targeted advertising. *See* Exhibit A-5.




**PlushCare Exhibit A-4**




**PlushCare Exhibit A-5**

Part of the booking process on the PlushCare website involves creating an account profile. When creating a profile, the user must affirmatively click a box stating "By clicking 'Continue' you are agreeing to the PlushCare Terms of Use, Privacy Policy, & Telehealth Consent Policy" and then click a button stating "Continue" before continuing with the booking process. *See* CAC at ¶46, "Screen 7A". Similarly, the final step in the booking process on the website states "By clicking 'Book appointment and enroll', you are booking your appointment and enrolling in PlushCare's monthly membership. You agree to Plushcare's Privacy Policy and Terms of Use." CAC at ¶47, "Screen 8C". The user is then required to click a button stating "Book appointment and enroll" before completing the booking process. *Id.* Both of these pages feature hyperlinks to the Privacy Policy and Terms of Use.




"Screen 7A"




"Screen 8C"

PlushCare's Privacy Policy states "The PlushCare Privacy Policy applies to any registered users ('Members') of our site, as well as any visitors ('non-members')." *See* PlushCare Privacy Policy, attached hereto as Exhibit B. At the time Plaintiff made his appointments with PlushCare, PlushCare's Privacy Policy stated: "PlushCare uses cookies and other similar technologies (such as pixels and advertising tags) to ensure the quality of your visit. In particular, PlushCare uses cookies to recognize users and their behaviors across our Services, streamline the login process, maintain a Member's state while using our Services, and remember user-specific preferences." *Id.* It also stated: "PlushCare may also share this Personal Information to outside contractors, advisors, auditors, vendors, consultants, or others engaged by PlushCare to assist in providing financial or operational activities on PlushCare's behalf, including technical

and processing services and analysis of the Sites' performance. Additionally, we reserve the right to disclose to third parties non-personally identifiable information collected for any lawful purpose, including but not limited to, aggregate or de-identified data." *Id.*

| | |
|---|---|
| Disclosure to Contractors and Consultants | PlushCare also may share this Personal Information to outside contractors, advisors, auditors, vendors, consultants, or others engaged by PlushCare to assist in providing financial or operational activities on PlushCare's behalf, including technical and processing services and analysis of the Sites' performance. Additionally, we reserve the right to disclose to third parties non-personally identifiable information collected for any lawful purpose, including but not limited to, aggregate or de-identified data. |

PlushCare's Terms of Use states: "By accessing and using the Platform or anything associated with the Platform, including its content . . . you are agreeing to the following Terms. *See* PlushCare Terms of Use, attached hereto as Exhibit C. At the time Plaintiff made his appointments with PlushCare, PlushCare's Terms of Use stated: "By accessing and/or utilizing the Service, you agree that [PlushCare][3] may disclose any information as may be collected from you by [PlushCare] or any third-party providing services to [PlushCare]." *Id.*

Accolade may monitor your usage of the Service. By accessing and/or utilizing the Service, you agree that Accolade may disclose any information as may be collected from you by Accolade or any third party providing services to Accolade. Accolade will comply with all laws and

[3] The Terms of Use reference "Accolade" rather than PlushCare. Accolade, Inc. is the parent company of PlushCare and operates multiple telehealth websites, including accolade.com, 2nd.md and plushcare.com. The Terms of Use are written to apply to users of any of these services, including PlushCare.com and the PlushCare App. *See* Exhibit C.

**C. Segment & Criteo**

Segment is a "customer data platform" that collects information about website actions performed by users and "translates the contents" of that information "into different formats for use by other tools." CAC at ¶¶ 60, 62–63. Segment "simplifies the process of collecting data and connecting new tools, allowing [clients] to spend more time using [their] data and less time trying to collect, process, and share it with business tools."[4]

Criteo's software "collect[s] information about user activity on a website" and analyzes that information to power "campaign optimization, product recommendations, audience building, and performance measurement." *Id.* at ¶ 70.

To make use of Segment's and Criteo's data collection, processing and analysis capabilities, PlushCare installed Segment's and Criteo's "tracking technologies" onto its website and mobile app. CAC at ¶ 58. These tracking technologies collect information from a user's web browser while he navigates the site, collecting data about "the actions . . . users perform" on the website. *See*, *Id.* at ¶¶ 59, 63.

**D. Plaintiff's PlushCare Experience**

Plaintiff alleges that PlushCare installed and/or embedded tracking technologies from third-parties Segment and Criteo onto its website and mobile apps so that PlushCare could share Plaintiff's information with these third parties without Plaintiff's

[4] https://www.twilio.com/docs/segment/getting-started

knowledge or consent. *Id.* at ¶¶ 15, 58. Plaintiff alleges that Segment and Criteo secretly intercepted Plaintiff's communications with PlushCare through the tracking technologies that PlushCare installed on its website. *Id.* ¶ 59. Plaintiff specifically alleges that PlushCare disclosed the following information about Plaintiff to Segment and Criteo via these tracking technologies: "the location of Plaintiff's appointments, the time of day of Plaintiff's appointments, the name of Plaintiff's particular healthcare providers, the price of Plaintiff's appointments, whether Plaintiff's used insurance, whether Plaintiff paid with a credit card, and/or the fact that Plaintiff completed the appointment booking process." *Id.* at ¶14. Plaintiff further alleges that Segment and Criteo collect "communications" about PlushCare users including information users manually input into the website/app when making an appointment—name, date of birth, email address, phone number, sex assigned at birth, and reason for making an appointment. *Id.* at ¶¶ 46, 54. Plaintiff alleges PlushCare disclosed this information to Segment and Criteo so PlushCare could "generate profits and increase revenues by, *inter alia*, building marketing campaigns and improving advertisement targeting." *Id.* at 157. Notably, Plaintiff does not allege that he was ever targeted with advertisements from PlushCare, Segment or Criteo, or any other entities, based on information PlushCare allegedly disclosed to Segment and Criteo.

Plaintiff alleges that PlushCare "aided, agreed with, employed, permitted and otherwise enabled" Segment and Criteo's "interception" of Plaintiff's communications with PlushCare in violation of the Electronic Communications Privacy Act ("ECPA")

and the California Invasion of Privacy Act ("CIPA"). *Id.* at ¶148–196. Plaintiff further alleges that PlushCare's disclosure of his information to Segment and Criteo violates the California Confidentiality of Medical Information Act ("CMIA"); and violates his privacy under the California Constitution and common law. *Id.* at ¶¶ 197–226.

## III. LEGAL ARGUMENT

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss when the claims made in the complaint are legally insufficient. *Navarrow v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal under Rule 12(b)(6) should be granted when the plaintiff's complaint either (1) "fails to state a cognizable legal theory" or (2) "fails to allege sufficient factual support for its legal theories." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). Simply put, a plaintiff must allege sufficient facts to show that "a claim to relief is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

To analyze a motion to dismiss, the Court must accept as true all material factual allegations and draw all reasonable inferences in the non-moving party's favor. *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). The Court should not accept "a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

**B. <u>Request for Judicial Notice</u>**

PlushCare requests that this Court take judicial notice of the attached Exhibit A, containing relevant screenshots of PlushCare's website and app, Exhibit B, containing PlushCare website's archival Terms of Use and Exhibit C, containing PlushCare's archival Legal & Privacy Policy. Exhibits B and C were effective at all times Plaintiff made his appointments with PlushCare—December 2024, February 2025 and August 2025. *See* CAC ¶ 12.

A court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Alternatively, a court may consider "materials that are submitted with and attached to the Complaint. [The court] may also consider unattached evidence on which the complaint "necessarily relies" if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011). "As a general matter, websites and their contents may be proper subjects for judicial notice provided that the party submits a copy of the relevant webpage to the court." *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d

1047, 1053 (N.D. Cal. 2025) (*quoting Caldwell v. Caldwell,* No. 05-cv-04166-PJH, 2006 WL 618511, at *4 (N.D. Cal. Mar. 13, 2006)) (internal quotation marks omitted).

Here, Plaintiff references and relies on the PlushCare Website and Android App throughout his Complaint, even sharing screenshots of relevant pages. *See* CAC at ¶¶ 40–57, Screens 1–25. These screenshots contain links to the Terms of Use and Privacy Policy. *See, Id.* at ¶ 46 Screen 7A; ¶ 55 Screen 22C. Plaintiff also specifically references the Privacy Policy in the text of his Complaint. *See Id.* at ¶209 ("the information set forth in Defendant's Privacy Policy does not qualify as a valid authorization."). Thus, the Terms of Use and Privacy Policy are specifically incorporated by reference and are central to the Plaintiff's claims and these policies should be judicially noticed. Courts analyzing consent in similar data privacy matters routinely take judicial notice of relevant privacy policies and terms of use agreements. *See, e.g., R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 884 n.2 (C.D. Cal. 2024) (taking judicial notice of privacy policy where it is incorporated by reference to the plaintiff's complaint); *Complisson v. Adidas Am., Inc.*, No. 25-cv-603-GPC-KSC, 2025 WL 3228949, at *3 (S.D. Cal. Nov. 18, 2025) ("Defendant's archival versions of its Terms and Conditions and Privacy Policy are incorporated by reference doctrine because the complaint references the details of those two exhibits."). Further, the archival versions of the Terms of Use and Privacy Policy can be independently verified online through the Wayback Machine.[5]

[5] *See, e.g.,* https://web.archive.org/web/20241207053701/https://plushcare.com/terms/ (last visited March 4, 2026); https://web.archive.org/web/20241207103909/https://plushcare.com/privacy/ (last visited March 4, 2026).

Accordingly, PlushCare requests that the Court take judicial notice of the attached Exhibits A, B and C, screenshots of PlushCare's website and PlushCare's archival Terms of Use and Privacy Policy.

### C. Plaintiff's Claims Fail Because He Consented to the Collection of His Data

Lack of consent is a key element of Plaintiff's claims pursuant to ECPA, CIPA, common law invasion of privacy and invasion of privacy under the California Constitution. Though the Complaint is replete with conclusory assertions of a lack of consent, the Complaint is flooded with evidence that Plaintiff, like all PlushCare users, consented to PlushCare's Privacy Policy and Terms of Use and thus, consented to the use of cookies and tracking devices on PlushCare's website and mobile application. *See e.g.* CAC at ¶¶ 46 ("Screen 7A"), 47 ("Screen 8C"), 55 ("Screen 22C"), 57 ("Screen 24"). Informed consent is obtained on PlushCare repeatedly during the user experience and that consent defeats Plaintiff's claims. Accordingly, Counts I, II, III, V, and VI should be dismissed with prejudice.

The plain language of ECPA and CIPA demonstrate that consent is fatal to either claim. ECPA explicitly states that "it shall not be unlawful. . . .to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception[.]"[6] 18 U.S.C.A. § 2511(2)(d). Similarly, CIPA's regulation of conduct is

[6] The remainder of this subsection will be addressed in Section III.D herein.

limited to undertaken "without the consent of all parties to the communication[.]" Cal. Pen. Code § 631(a). The same principle applies to the remainder of Plaintiff's claims.

Consideration of consent "is appropriate on a motion to dismiss where lack of consent is an element of the claim." *Silver v. Stripe Inc.,* No. 4:20-CV-08196-YGR, 2021 WL 3191752, at *2 (N.D. Cal. July 28, 2021). Lack of consent is an essential element of Plaintiff's claims and therefore this Court is empowered to consider consent at this stage. *See Garcia v. Enterprise Holdings, Inc.*, 78 F. Supp. 3d 1125 (N.D. Cal. 2015) (finding that lack of consent is an essential element of a CIPA claim and can be considered on a motion to dismiss); *see also Moledina v. Marriott Int'l Inc.*, 635 F. Supp. 3d 941, 952 (C.D. Cal. 2022) (same). Consent can be "explicit or implied, but any consent must be actual." *In re Google Inc.*, No. 13-MD-2430-LHK, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013). For consent to be actual, the disclosures must explicitly notify users of the practice at issue. *Id.* at *13. Though the doctrines of consent vary slightly amongst the various causes of action, courts have generally held that the inquiry is functionally equivalent: would a reasonable user, having been exposed to PlushCare's Terms of Use and Privacy Policy, understand that data was being collected by PlushCare's third-party affiliates for legitimate business purposes. *See Perkins v. LinkedIn Corporation,* 53 F. Supp. 3d 1190 (N.D. Cal. 2014). The answer in this case is a resounding *yes*.

Upon first entering PlushCare's website, the user encounters a consent banner. At the time Plaintiff made his appointments with PlushCare, the consent banner was the following:




**PlushCare Exhibit A-4**

The user is immediately notified that:

> This website uses cookies to enhance the user experience and to analyze performance and traffic on our website, record sessions and improve our sites and services. We also share information about your use of our site with our social media, advertising, and analytics partners. By continuing to use this site, you agree to the use of these technologies as further described in our Privacy Policy.

*See* Exhibit A-4. Plaintiff's continued use of the website manifested his consent to the use of embedded technologies, including those offered by Segment and Criteo, as outlined by the Privacy Policy.

Plaintiff further explicitly assented to the terms set forth in the Privacy Policy and Terms of Use when booking an appointment. As demonstrated in Plaintiff's Complaint, he, like any user, was required to affirmatively check a box stating: "By clicking 'Continue', you are agreeing to the PlushCare Terms of Use, Privacy Policy & Telehealth Consent Policy." *See* CAC at ¶ 46, "Screen 7A". Similarly, in order to book an appointment on PlushCare's app, Plaintiff was presented with text stating "By clicking 'Book your appointment and enroll' you are booking your appointment and enrolling in PlushCare's monthly membership. You agree to PlushCare's Privacy Policy and Terms of Use." *Id.* at ¶ 57, "Screen 24". Plaintiff explicitly acknowledges as much in his Complaint. *Id.* ¶ ¶ 46, 57.




"Screen 7A"




"Screen 8C"

These screens featured hyperlinks to the relevant policies. *See Id.* When a user downloads and opens the PlushCare App, they are shown a welcome screen allowing them to click a button stating "Existing patient? Sign in" or a button stating "Get started." *See Id.* at ¶50, "Screen 10". If the user clicks "Get started," the user is immediately taken to a page entitled "Consent Policy." *See* Exhibit A-3. The Consent Policy page features hyperlinks to PlushCare's Terms of Use, Privacy Policy and Telehealth Consent Policy and an explanation of permissions needed to use the PlushCare App. *Id.* At the bottom of the page is a blue button stating, "I agree." *Id.* The user cannot continue to account profile creation and appointment booking until they click "I agree." *Id.*



"Screen 10"



**PlushCare Exhibit A-3**

Courts in this Circuit routinely find policies and terms of use to be enforceable agreements when they are presented in this way. *See, e.g., Lee v. Ticketmaster LLC*, 817 F. App'x 393, 394 (9th Cir. 2020) (finding that plaintiff agreed to the website Terms of Use where that website required "affirmative acknowledgement of the agreement before proceeding"); *Silver*, 2021 WL 3191752 at *3 (finding that plaintiffs consented to the privacy policy where the policy was presented in the form of a "sign-in wrap" agreement that provided the plaintiff with an opportunity to review the terms of the policy before taking the affirmative step of clicking a "Place Order" button); *Moretti v. Hertz Corp.*, No. C 13-02792-JSW, 2014 WL 1410432, at *2 (N.D. Cal. 2014) (enforcing forum selection clause in Terms of Use where plaintiff was presented with the opportunity to review the terms of service in the form of a hyperlink next to an "I accept" button and plaintiff admittedly clicked that button.). Here, Plaintiff admits he took the affirmative step of scheduling his appointments after clearly being presented with the Terms of Use and Privacy Policy. *See* CAC at ¶ 12. Thus, Plaintiff admits that he accepted PlushCare's Privacy Policy and Terms of Use and consented to the terms therein.

Plaintiff's actions constitute "actual consent" because PlushCare's Privacy Policy and Terms of Use explicitly notified Plaintiff of its practices and Plaintiff consented to those terms when he made his appointments. At the time Plaintiff made his appointments with PlushCare, PlushCare's Privacy Policy clearly stated: "PlushCare

uses cookies and other similar technologies (such as pixels and advertising tags) to ensure the quality of your visit. In particular, PlushCare uses cookies to recognize users and their behaviors across our Services, streamline the login process, maintain a Member's state while using our Services, and remember user-specific preferences." *See* Exhibit B. The Policy also explicitly states: "PlushCare may also share this Personal Information to outside contractors, advisors, auditors, vendors, consultants, or others engaged by PlushCare to assist in providing financial or operational activities on PlushCare's behalf, including technical and processing services and analysis of the Sites' performance. Additionally, we reserve the right to disclose to third parties non-personally identifiable information collected for any lawful purpose, including but not limited to, aggregate or de-identified data." *Id.* Similarly, PlushCare's Terms of Use stated: "By accessing and/or utilizing the Service, you agree that [PlushCare] may disclose any information as may be collected from you by [PlushCare] or any third-party providing services to [PlushCare]." *See* Exhibit C. Third-parties Criteo and Segment provide analytics and marketing services to PlushCare, and their collection of Plaintiff's information on PlushCare's behalf is clearly covered by the Privacy Policy and Terms of Use. *See* CAC at ¶ 38. Courts in this Circuit have found similar terms provide actual notice of third-party pixel or cookie data collection practices. *See, e.g., Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1052 (N.D. Cal. 2025) (finding plaintiffs consented to pixel tracking where defendant's Privacy Policy "informs users that their information will be shared with third parties"); *Washington v. Flixbus, Inc.*, Case No.

3:25-cv-00212-H-MSB, 2025 WL 1592961, at *4 (S.D. Cal. June 5, 2025) (finding plaintiffs consented to pixel tracking when agreeing to Terms and Conditions that stated that he authorized defendant "to collect, process, retain and use, and transfer to third parties, including but not limited to marketing partners, any and all personal data [plaintiffs] provide, as [defendant] deem[s] necessary to carry out any and all business purposes.") (citation modified). Accordingly, by accepting PlushCare's Terms of Use and Privacy Policy, Plaintiff consented to PlushCare's disclosure of his information to Segment and Criteo. Plaintiff's allegations to the contrary, despite ***the evidence upon which he relies***, are simply conclusory assertions in support of a formulaic restatement of the elements of his claims. *See In re Google Assistant Privacy Litig.,* 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020). This does not negate the clear showing of consent in Plaintiff's own Complaint. *See* CAC at ¶¶ 46, 57. Plaintiff's obvious consent is fatal to each of his claims and his Complaint must be dismissed with prejudice. *See Lakes*, 777 F. Supp. 3d at 1054–1059 (dismissing with prejudice plaintiffs' ECPA, CIPA and invasion of privacy claims because plaintiff consented to defendant's collection and disclosure of his information); *Flixbus*, 2025 WL 1592961 at *3–4 (dismissing with prejudice plaintiff's CIPA and invasion of privacy claims because plaintiff consented to defendant's collection and disclosure of his information).

**D. Plaintiff has Failed to State a Claim under the Federal Wiretap Act**

Plaintiff alleges that PlushCare intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiff in violation of 18 U.S.C. § 2511(1)(a) by using tracking technology to track, store and unlawfully disclose Plaintiff's information to third parties. *See* CAC ¶ 156. Plaintiff further alleges that PlushCare violated U.S.C. § 2511(1)(c) and (d) when it intentionally disclosed or used or endeavored to disclose or use Plaintiff's communications while knowing or having reason to know that the information was obtained through unlawful interception. CAC at ¶¶ 157–158. Plaintiff's claims fail for two reasons: first, as set forth in detail *supra*, Plaintiff consented to the conduct in question and second, because PlushCare is a party to the subject communications.

Plaintiff's ECPA claim fails because PlushCare is a party to the purported communications. ECPA explicitly allows for lawful interception of a communication when such interceptions are made by a party to the communication. *See* 18 U.S.C. § 2511(2)(d) ("[i]t shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."); *see also In re Google Inc. Cookie*

*Placement Consumer Privacy Litig.*, 806 F.3d 125 (3d Cir. 2015); *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016 (N.D. Cal. 2014) (since the Wiretap Act concerns the *unauthorized* interception of electronic communication, the consent of one party is a complete defense to a Wiretap Act claim) (citations omitted) (emphasis in original). The information that Plaintiff alleges was "intercepted" was communicated directly to PlushCare through Plaintiff's use of PlushCare's website and app to make an appointment directly with PlushCare. Courts have consistently held that where a healthcare provider uses a pixel to track website activity, the healthcare provider is considered a party to the communications under ECPA. *See R.S. v. Prime Healthcare Servs.*, No. 5:24-cv-00330, 2024 WL 3730609, at *3 (C.D. Cal. Aug. 7, 2024) (collecting cases).

Further, Plaintiff's ECPA claim fails because he consented to the collection of his information. As described in Section III.C *supra*, Plaintiff consented to Segment and Criteo's collection of his information. Such consent falls under the consent exception to ECPA and is fatal to Plaintiff's ECPA claim. *See, e.g., Lakes*, 777 F. 3d at 1056–58 (dismissing ECPA claim where defendant established that plaintiff consented to data collection and could not show that the crime-tort exception applied).

Plaintiff attempts to circumvent the party and consent exceptions by arguing they do not apply due to the "crime-tort" exception—that PlushCare "intercepted" the communications for the purpose of committing a tortious or illegal act, namely violating Plaintiff's privacy and violating CIPA, the CMIA and HIPAA. CAC at ¶ 165. However,

the crime-tort exception does not apply because PlushCare's intent was not to injure Plaintiff's tortiously and the allegedly tortious or illegal act was not independent from the recording itself.

First, to establish the crime-tort exception a plaintiff must plead facts sufficient to show "that the primary motivation or a determining factor in the interceptor's actions has been to injure the [Plaintiff] tortiously." *See Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023). Where a defendant's primary motivation is "not to perpetuate torts on millions of Internet users, but to make money," a Plaintiff cannot establish the crime-tort exception. *Rodriguez v. Google, LLC*, No. 20-cv-04688, 2021 WL 2026726, at *6 n.8 (N.D. Cal. May 21, 2021). Here, Plaintiff alleges that PlushCare installed Segment and Criteo trackers to "generate profits and increase revenues by, *inter alia*, building marketing campaigns and improving advertisement targeting." CAC at ¶ 157. This is simply a business motivation and not an intent to commit tort. Thus, Plaintiff has not established tortious intent as a primary motivation and cannot establish the crime-tort exception.

Further, "various courts have held that a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording or interception itself." *Doe v. Talkiatry Mgmt. Servs., LLC*, Case No. 5:25-cv-00781-SSS-DTBx, 2025 WL 3190813, at *4 (C.D. Cal. Oct 1, 2025). Thus, for the crime-tort exception to apply, the plaintiff must allege that the illegal/tortious purpose "constitutes

independently illegal or actionable conduct." *Id.* at *5. *See also*, *Pena v. Gamestop, Inc.*, 670 F.Supp.3d 1112, 1120 (S.D. Cal. 2023) (finding the crime-tort exception did not apply where the alleged crime/tort was not an act "secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits."). Here, Plaintiff alleges that PlushCare violated HIPAA by "knowingly disclosing individually identifiable health information to a third party." *See* CAC at ¶¶165–67. This "illegal conduct" is not independent from the recording/acquisition of the information itself. *See Talkiatry*, 2025 WL 3190813 at *5 (finding the crime-tort exception did not apply because plaintiffs did not allege that the alleged illegal/tortious purpose (illegal disclosure under HIPAA) constituted independently illegal or actionable conduct from the "interception."). Accordingly, the crime-tort exception does not apply, and Plaintiff fails to state a claim under ECPA because PlushCare is a party to the communications and Plaintiff consented to the disclosure.

### E. <u>Plaintiff has Failed to State a Claim under CIPA § 631(a) and § 632(a)</u>[7]

Plaintiff alleges that Segment and Criteo "willfully and without the consent of all parties to the communication, and/or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff . . . while the electronic communications were in transit" and that PlushCare "aided,

[7] PlushCare does not concede the applicability of CIPA to technologies such as Segment and Criteo. Unlike CIPA, the California Consumer Privacy Act ("CCPA") and California Privacy Rights Act ("CPRA"), were enacted *after* the creation of pixel tracking technology. These statutes specifically address, and allow, the use of such devices. Indeed, the California Attorney General has recognized that the CCPA and CPRA filled a void, regulating these technologies *where no prior statute had done so*. *See People v. Sephora United States*, (Ca. Super. Ct. Aug. 23, 2022) No. CHC-22-601380.

agreed with, employed, permitted, and otherwise enabled Segment and Criteo to wiretap Plaintiff . . . using Segment's and Criteo's tracking technologies" in violation of CIPA § 631(a). CAC at ¶¶ 177, 179. Plaintiff further alleges that Segment and Criteo utilized "electronic amplifying or recording devices" to eavesdrop upon or record a confidential communication in violation of CIPA § 632(a) and that PlushCare "aided" Segment and Criteo in doing so. CAC at ¶¶ 186–193. Plaintiff's CIPA claims fail because he consented to the use of pixel trackers and has failed to allege sufficient factual allegations to support derivative liability.

Initially, Plaintiff consented to the use of pixel trackers by third parties to collect his information. As discussed in Section III.C *supra*, Plaintiff agreed to PlushCare's Terms of Use and Privacy Policy, which explicitly contemplate the use of pixel trackers by third-parties to collect Plaintiff's information. Such consent is fatal to Plaintiff's CIPA claims. *See e.g., Lakes* 777 F.Supp.3d at 1058; *Flixbus, Inc.*, 2025 WL 1592961, at *5.

Importantly, Plaintiff has failed to plausibly allege that PlushCare's conduct constitutes a violation of either subsection of CIPA. Plaintiff does not allege that PlushCare directly wiretapped his communications with PlushCare in violation of § 631(a) nor does Plaintiff allege that PlushCare eavesdropped on his confidential communications with PlushCare in violation of §632(a). Indeed, to the extent that any communication occurred, such communications were directly between Plaintiff and PlushCare. Instead, Plaintiff alleges *derivative* liability, *i.e.* that PlushCare "aided,

agreed with, employed, permitted, and otherwise enabled Segment and Criteo" to violate these statutory provisions. CAC at ¶¶ 179, 193. Conclusory assertions aside, Plaintiff fails to plausibly allege any factual basis to support derivative liability. First, Plaintiff cannot establish derivative liability with respect to PlushCare without establishing that Segment and Criteo engaged in conduct that violates CIPA. *See Licea v. Old Navy*, 669 F.Supp.3d 941, 946 (C.D. Cal. 2023); *see also Talkiatry*, 2025 WL 3190813 at *4 (dismissing CIPA claim because "without requisite intent by [third-party tracker], there is no unlawful conduct for Defendant to aid and abet"). "[I]n order to establish such violations, Plaintiff must provide facts suggesting that the third party recorded Defendant's customers' information for some use or potential future use beyond simply supplying this information back to Defendant." *Licea,* 669 F. Supp. 3d at 946–47 (citing *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021); *and Williams v. What If Holdings, LLC*, No. C 22-03780, 2022 WL 17869275, at *4 (N.D. Cal. Dec. 22, 2022) ("[T]he fact that [defendant] used software rather than a physical recording device for the same function does not mean that it aided and abetted wiretapping.")). Ultimately, Plaintiff alleges that PlushCare utilized Segment and Criteo as tools to "generate profits and increase revenues by, *inter alia*, building marketing campaigns and improving advertisement targeting[.]" Plaintiff has not plausibly alleged any other use for this information "beyond simply supplying this information back to [PlushCare]"; accordingly, the use of Segment and Criteo cannot form the basis of derivative liability under CIPA.

Plaintiff alleges no factual support for his claim that "Segment and Criteo used or attempted to use the communications intercepted by its tracking technologies for their own purposes." CAC at ¶ 178. This deliberate wording is merely a conclusory assertion for the purposes of a formulaic recitation of the statutory requirements. This does not lend itself to a plausible allegation of derivative liability. Indeed, the totality of Plaintiff's allegations suggest that Segment and Criteo were working exclusively for PlushCare in collecting and processing data. *See, e.g.,* CAC at ¶¶ 2 ("Defendant procured . . .employs . . . and otherwise enables Segment and Criteo to intercept Plaintiff's . . . communications"); 68 ("Segment . . .collects the content of said conversations. That data is then analyzed by Segment before being provided to any entity that was a party to the conversations (like Defendant)."); 75 ("Criteo provides Defendant with the ability to further optimize and monetize its Website . . ."). Plaintiff makes no factual allegations suggesting that Segment and Criteo used the data collected from PlushCare for their own purposes. Rather, Segment and Criteo collected, processed and analyzed the data for PlushCare to use for PlushCare's own business decisions, including website optimization and monetization strategy. This is entirely permissible. *See Licea*, 669 F.Supp.3d at 946–47; *see also Williams v. What If Holdings, LLC*, No. C 22-03780-WHA, 2022 WL 1789275 (finding no derivative liability under CIPA for use of tracking pixel where tracking software company did not independently "use" the gathered data in some way.).

In *Graham v. Noom, Inc.*, the Northern District of California drew a distinction between entities like Facebook—that aggregate data for resale and their own business purposes—and a contracted-for software vendor like Segment and Criteo:

> By contrast, FullStory is a vendor that provides a software service that captures its clients' data, hosts it on FullStory's servers, and allows the clients to analyze their data. Unlike NaviStone's and Facebook's aggregation of data for resale, there are no allegations here that FullStory intercepted and used the data itself. Instead, as a service provider, FullStory is an extension of Noom. It provides a tool . . . that allows Noom to record and analyze its own data in aid of Noom's business. It is not a third-party eavesdropper.

*Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832–33 (N.D. Cal. 2021) (internal citations omitted). Accordingly, the Court found that Noom "is not liable for aiding and abetting FullStory's wrongdoing [under CIPA] because there is no wrongdoing." *Id.* at 833. So too here—Segment and Criteo's trackers are merely tools to allow PlushCare to record and analyze its own data in aid of its own business purposes. They are not third-party eavesdroppers and PlushCare cannot be liable for aiding and abetting Segment and Criteo because no wrongdoing has transpired. *See Noom*, 533 F. Supp. 3d at 833; *Yale v. ClickTale, Inc.*, Case No. 20-cv-07575-LB, 2021 WL 1428400 at *3 (N.D. Cal. April 15, 2021) (dismissing CIPA claim because "Clicktale is not a third-party eavesdropper. It is a vendor that provides a software service that allows its clients to monitor their website traffic."). Accordingly, Plaintiff's CIPA claim must be dismissed.

### F. Plaintiff has Failed to State a Claim for Violation of the CMIA

Plaintiff alleges PlushCare violated CMIA by disclosing his medical information to Segment and Criteo without authorization. CAC at ¶ 208. Plaintiff further alleges PlushCare violated the CMIA by allowing Segment and Criteo to use plaintiff's medical information for marketing and analytics purposes. *Id.* Plaintiff's CMIA claim fails on two counts: first, the information purportedly shared with Segment and Criteo does not constitute substantive medical information, and second, because PlushCare explicitly contracts with Segment and Criteo for data processing and administrative services and disclosures to them are not unlawful under the CMIA.

#### 1. The Information Purportedly Utilized by Segment and Criteo is Not Substantive Medical Information

The CMIA states "a provider of healthcare . . . shall not disclose medical information regarding a patient of the provider of health care[.]" Cal. Civ. Code § 56.10(a). Plaintiff alleges that the "medical information" at issue is "whether users seek to pay using insurance, the time of day patients wish to book an appointment, the location of the appointment, how users pay for their appointment, that users actually booked an appointment, and, in the case of the Website, the name of the doctor, the appointment price, the date and time that users seek to book an appointment, language preferences as a provider." CAC at ¶ 206. This information does not satisfy the requirements of the CMIA as a matter of law.

The CMIA defines medical information as "any individually identifiable information . . . . regarding a patient's medical history, mental or physical condition, or treatment." Cal. Civ. Code § 56.05. Indeed, California courts have recognized that even where information is individually identifiable, it cannot be identified as "medical information" as defined by the CMIA if it "does not reveal medical history, diagnosis, or care." *Eisenhower Medical Center v. Superior Court*, 226 Cal. Rptr. 3d 430, 434–35 (Cal. Ct. App., 4th Dist. 2014). A reading of the statute in its totality fairly leads to the conclusion that "the mere fact that a person is or was a patient is not accorded the same level of privacy as more specific information about his medical history." *Id.* at 436. This Court has reached similar conclusions. In *Gray v. Luxottica of America, Inc.*, the District Court reviewed similar circumstances and concluded that "[t]he mere fact that the purportedly disclosed data reveals 'the type of treatment sought . . . .does not mean it amounts to information about Plaintiff's treatment protected from disclosure under the CMIA." Case No. 8:24-cv-00160-MRA-DFM, 2024 WL 5689566 at *8–9 (C.D. Cal. Dec. 16, 2024). Similarly, the District Court for the Southern District of California has ruled that information about a medical appointment is not sufficient to state a claim for violation of the CMIA, reiterating the holding in *Eisenhower Medical Center. See Wilson v. Rater8, LLC*, Case No. 20-cv-1515-DMS-LL, 2021 WL 4865930 at *5 (S.D. Cal. Oct. 18, 2021) (quoting *Eisenhower Medical Center*, 226 Cal. App. 4th at 435–36).

The alleged "disclosures" are akin to those in *Eisenhower*, *Luxottica*, and *Rater8*—information related to the scheduling of an appointment or the presence at a

medical facility that does not disclose any substantive information about a patient's medical history or treatment. Plaintiff alleges that the use of Segment and Criteo captured basic administrative information related to the scheduling of an appointment. *See* CAC at ¶ 206. This does not include the type of substantive medical detail regulated by the statute. Accordingly, Plaintiff has not and cannot state a claim for violation of the CMIA.

**2. <u>Segment and Criteo Provide Administrative Services for PlushCare as Permitted by the CMIA</u>**

Plaintiff's claim further falls short as the alleged conduct falls squarely within an exception to the CMIA. In subsection (c) is § 56.10(c)(3), the CMIA provides that "the information may be disclosed to a person or entity that provides billing, claims management, *medical data processing, or other administrative services* for providers of health care . . .". Cal. Civ. Code § 56.10(c)(3) (emphasis added). Here, Segment and Criteo are entities that provide medical data processing and administrative services for PlushCare. As Plaintiff alleges, Segment collects data then "translates the content of [that data] into different formats." CAC at ¶ 62. Segment servers also "archive a copy of the data, and can send data to storage systems." *Id.* Segment provides medical data processing services that squarely fall within the exception of §56.10(c)(3). Similarly, Criteo "collect[s] information about user activity on a website" for "performance measurement" and provides PlushCare "with the ability to further optimize and monetize its Website, iOS App, and Android App." *See Id.* at ¶¶ 70, 75. As Plaintiff

admits, PlushCare is an online telehealth service. *Id* at ¶ 34. Optimizing PlushCare's website is an integral part of the healthcare services it provides to its patients. Criteo's data collection and analysis is an important administrative service for PlushCare to provide the best possible care.

Plaintiff alleges that PlushCare's disclosure to Segment and Criteo was nevertheless unlawful under § 56.10(d) which states that a provider of healthcare "shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient." Cal. Civ. Code § 56.10(d). Plaintiff argues that PlushCare's disclosures to Segment and Criteo was done "for analytics and marketing purposes" and therefore violates the CMIA. CAC at ¶¶ 200, 208. Plaintiff's interpretation of the statute extends too far. The CMIA specifically defines "Marketing" as "to make a communication about a product or service that encourages recipients of the communication to purchase or use the product or service." Cal. Civ. Code § 56.05(i). By defining "Marketing" in this way, the CMIA draws a distinction between entities that provide data processing and analytics—like Segment and Criteo—and entities that directly serve advertisements—like Google and Meta. Thus, where a plaintiff alleges that a healthcare provider provided his medical information to Google or Meta, who in turn used it to serve targeted advertisements and promote their own business activities, such allegations are sufficient to state a claim under the CMIA. *See, e.g., Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 841 (E.D. Cal. 2025) (finding plaintiffs stated claim under CMIA for defendant sharing

information with Meta which "allowed Meta to link [plaintiff's data] to their Facebook profile and target them with advertisements on Facebook relating to their specific medical conditions."); *R.C. v. Sussex Publishers, LLC*, No. 24-cv-02609-JSC, 2025 WL 948060 (N.D. Cal. March 28, 2025) (finding plaintiffs stated claim under CMIA for defendant sharing information with Google who in turn "used this information to improve its own business activities and provide 'marketing services and offerings,' including to other third parties.").

Unlike Facebook and Meta, Segment and Criteo do not serve advertisements or make communications "about a product or service that encourages recipients of the communication to purchase or use the product or service." As Plaintiff alleges, Segment and Criteo provide data processing and analytics that enable their clients, like PlushCare, to run targeted advertising strategies themselves. *See, e.g.* CAC at ¶66 ("Segment can help developers run advertising campaigns . . . by sending data to the Google Ads Remarketing Lists destination"); ¶75 ("Criteo provides Defendant with the ability to further optimize and monetize its Website, iOS App, and Android App."). Such services are not within the CMIA's definition of "Marketing." Rather, Segment and Criteo process data on PlushCare's behalf so that PlushCare can make business decisions regarding care for its patients, website optimization and self-marketing strategies. PlushCare sharing data with Segment and Criteo is not "for marketing" as that term is defined under the CMIA and therefore PlushCare is not violating the CMIA under §56.10(d). Rather, Segment and Criteo offer data processing and administrative

services that should be exempt from the CMIA pursuant to § 56.10(c)(3). *See, e.g.*, *Oddei v. Optum, Inc.*, No. 2:21-cv-03974-SB-MRW, 2021 WL 6333467, at *3 (C.D. Cal. Dec. 3, 2021) (finding plaintiff failed to state a CMIA claim against defendant for sharing information with third-party service provider that provided administrative services to defendant); *What If Holdings*, 2022 WL 17869275, at *3 (describing the use of a third-party software tracking pixel as "routine documentation and therefore clerical in nature."). Thus, Plaintiff's CMIA claim should be dismissed.

### G. Plaintiff has Failed to State a Claim for Invasion of Privacy Under California's Constitution and Common Law Intrusion on Seclusion.

To state a claim for invasion of privacy under California's Constitution, a plaintiff must show: (1) they possess a legally protected privacy interest; (2) they have maintained a reasonable expectation of privacy; and (3) the intrusion is so serious as to constitute an egregious breach of the social norms such that the breach is highly offensive. *See Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009). Similarly, to state a claim for intrusion on seclusion under California common law, a plaintiff must show: (1) a defendant intentionally intruded into a place, conversation or matter as to which the plaintiff has a highly reasonable expectation of privacy; and (2) that the intrusion occurred in a manner highly offensive to a reasonable person. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). Both claims fail because Plaintiff consented to the collection of his information.

As discussed in Section III.C *supra*, Plaintiff agreed to PlushCare's Terms of Use and Privacy Policy, which explicitly contemplate the use of pixel trackers by third-parties to collect Plaintiff's information. Such consent is fatal to Plaintiff's invasion of privacy claims under the California Constitution and intrusion on seclusion claims. *See e.g., Lakes* 777 F.Supp.3d at 1058; *Flixbus*, 2025 WL 1592961, at *5; *Smith v. Facebook, Inc.*, 262 F. Supp.3d 943, 955 (N.D. Cal. 2017) *aff'd*, 745 F. App'x 8 (9th Cir. 2018) ("Plaintiffs' consent also bars their common-law tort claims and their claim for invasion of privacy under the California Constitution.").

Even if Plaintiff could state a claim for invasion of privacy under California's Constitution, this claim should be dismissed to the extent Plaintiff seeks monetary damages. California's constitutional provision protecting the right of privacy "supports a cause of action for an injunction but it does not confer on a litigant a private right of action for damages." *Moore v. Rodriguez,* No. 20-cv-01481-BAS-BGS, 2021 WL 2222590, at *20 (S.D. Cal. June 2, 2021) (*citing Clausing v. San Francisco Unified Sch. Dist.,* 221 Cal. App. 3d 1224, 1237 (Ct. App. 1990)). Here, Plaintiff seeks "all relief available for invasion of privacy claims under California's Constitution." CAC at ¶ 219. To the extent this relief includes monetary damages, Plaintiff's claim to such damages should be dismissed.

## IV. CONCLUSION

Simply stated, the world looks different in a technological landscape. PlushCare, like other providers of web-based services, will naturally utilize technologies for

purposes of platform optimization, user satisfaction, and analytics. But contrary to Plaintiff's conclusory and unsupported assertions, the use of these devices is in no way surreptitious. The use of these technologies is repeatedly disclosed to and accepted by PlushCare users. PlushCare's actions meet the spirit and the letter of the law; thus, no wrongdoing, actionable or otherwise, has been plausibly alleged by Plaintiff's Complaint. Defendant Accolade, Inc. *d/b/a* PlushCare respectfully requests that this Court enter an Order dismissing Plaintiff's Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) with prejudice, as any amendment would be futile.

Dated: March 4, 2026

Respectfully Submitted,

**KJC LAW GROUP, A.P.C.**
By: *<u>/s/ Kevin J. Cole</u>*
Kevin J. Cole
*Attorney for Defendant*
*Accolade, Inc. d/b/a Plushcare*

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.1

The undersigned, counsel of record Defendant Accolade, Inc. d/b/a PlushCare, certifies that this brief contains 8,120 words. The Parties acknowledge that this brief exceeds 7,000 words; however, the Parties rely in good faith upon their Stipulation, ECF No. 12, in which the Parties set forth good cause for extension of this word limit to 8,500 words for both the Motion and Opposition thereto. The Parties have relied in

good faith on the assumption that this Honorable Court will grant the relief requested by the Parties and allow for the extended word limit.

Dated: March 4, 2026

**KJC LAW GROUP, A.P.C.**
By: /s/ *Kevin J. Cole*
Kevin J. Cole
*Attorney for Defendant*
*Accolade, Inc. d/b/a Plushcare*

**DECLARATION OF COMPLIANCE WITH L.R. 7-3**

I, Jill H. Fertel, state under penalty of perjury, that counsel for the Plaintiff and Defendant met an conferred regarding the substance of the underlying Motion to Dismiss and were unable to reach a resolution that eliminated the necessity for a hearing. Specifically, I submit as follows:

1. The conference took place on March 2, 2026;
2. The Parties discussed the following issues:
    a. Defendant's position that Plaintiff's claims were precluded by Plaintiff's consent to PlushCare's Terms and Conditions and Privacy Policy; Plaintiff disputes this position;
    b. Defendant's position that the party consent exception to ECPA applied; Plaintiff submits that party consent is nullified by the crime-tort exception;
    c. Defendant's position that PlushCare did not engage in conduct that constituted wiretapping or eavesdropping as defined by CIPA; Plaintiff opposes this position;
    d. Defendant's position that PlushCare did not violate the CMIA as (1) the information in question is not "medical information" as defined by the statute and (2) Segment and Criteo provide administrative services as permitted by the CMIA; Plaintiff disagrees and opposes these points;

e. Defendant's position that Plaintiff did not state a claim for invasion of privacy under California's Constitution or common law intrusion on seclusion due to Plaintiff's consent; Plaintiff disagrees and opposes this position;

f. The Parties further discussed that each were familiar with the issues specific to this type of litigation and recognized that each had significant experience in this area of law and had fundamentally different interpretations of the law as applied to the allegations in this Complaint.

3. Defense counsel attending the meet and conferral were Jill Fertel and Conor Hafertepe; Plaintiff's counsel was Phil Fraietta;

4. The conference lasted 11 minutes and 37 seconds;

5. The conference was held via Teams;

6. The issues discussed, as set forth in Paragraph 2, were the Parties' positions with respect to each of Plaintiff's causes of actions, the Parties familiarity with the arguments at issue, and the Parties' disagreement on the same.

Dated: March 4, 2026

By: *<u>/s/ Jill H. Fertel</u>*
Jill H. Fertel
*Attorney for Defendant*
*Accolade, Inc. d/b/a Plushcare*

**CERTIFICATE OF SERVICE**

I certify that on March 4, 2026, I electronically filed the foregoing document(s)with the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: */s/ Kevin J. Cole*
Kevin J. Cole, Esq.