**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane Highwood, IL 60040
Telephone: (312) 358-8225
Email: scott@drurylegal.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ROBERT PERKINS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ACCOLADE, INC. d/b/a PLUSHCARE,

Defendant.

Case No. 5:25-cv-03162-SSS-SP

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Judge: Hon. Sunshine Suzanne Sykes

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ..... 1
ARGUMENT ..... 2
I. THIS COURT SHOULD REFUSE TO CONVERT THE MOTION TO DISMISS INTO A PREMATURE MOTION FOR SUMMARY JUDGMENT ..... 2
II. PLAINTIFF DID NOT CONSENT TO THE THIRD PARTIES' WIRETAPPING ..... 4
A. PlushCare's Cookie Banner Cannot Establish Consent ..... 4
B. The Mobile App's "Consent Policy" Screen Only Asks Users to Accept Device Permissions—Not the Terms of Use or Privacy Policy ..... 11
C. CIPA § 631(a) Requires Prior Consent That PlushCare Never Obtained ..... 15
D. A Reasonable User Would Not Read PlushCare's Terms or Policies as Disclosing Its Conduct ..... 17
E. The Ninth Circuit Does Not Recognize Cumulative Notice ..... 20
III. PLUSHCARE'S DECLARATION DOES NOT CONTRADICT ANY OF PLAINTIFF'S FACTUAL ALLEGATIONS ..... 21
IV. PLAINTIFF SUFFICIENTLY ALLEGES HIS FEDERAL WIRETAP CLAIM ..... 23
V. PLAINTIFF SUFFICIENTLY ALLEGES A VIOLATION OF CIPA §§ 631 AND 632 ..... 30
A. CIPA Applies to Modern Technologies ..... 30
B. The Pleading Stage Question Is Capability, Not Actual Use ..... 31
C. The BAAs Can Neither Be Considered Nor Help PlushCare ..... 33
D. Plaintiff Adequately Alleges Derivative Liability ..... 35
E. PlushCare is liable under § 632 ..... 36
VI. PLAINTIFF SUFFICIENTLY ALLEGES HIS CMIA CLAIM ..... 37
VII. PLAINTIFF SUFFICIENTLY ALLEGES HIS INVASION OF PRIVACY AND INTRUSION UPON SECLUSION CLAIMS ..... 39
CONCLUSION ..... 40

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Augustine v. Lenovo (United States), Inc.*, 2023 WL 4938050 (S.D. Cal. Aug. 2, 2023) .......... 33

*B.N. v. Oregon Reprod. Med., LLC*, 2026 WL 915343 (D. Or. Apr. 3, 2026) .......... 37

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .......... 25

*Berman v. Freedom Fin. Network LLC*, 30 F.4th 849 (9th Cir. 2022) .......... 5, 8, 9, 10

*Boseovski v. McCloud Healthcare Clinic, Inc.*, 2020 WL 68578 (E.D. Cal. Jan. 7, 2020) .......... 24, 25

*Bradley v. Google, Inc.*, 2006 WL 3798134 (N.D. Cal. Dec. 22, 2006) .......... 30

*Byars v. Goodyear Tire & Rubber Co.*, 654 F. Supp. 3d 1020 (C.D. Cal. 2023) .......... 5, 6, 7

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560 (9th Cir. 2018) .......... 23

*Calhoun v. Google, LLC*, 113 F.4th 1141 (9th Cir. 2024) .......... 9, 18, 20

*Century Sur. Co. v. Master Design Drywall, Inc.*, 2009 WL 3425326 (S.D. Cal. Oct. 21, 2009) .......... 2

*Chabolla v. ClassPass Inc.*, 129 F.4th 1147 (9th Cir. 2025) .......... passim

*Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967 (S.D. Cal. 2023) .......... 37, 40

*Dawson v. Univ. of Phoenix*, 2026 WL 92248 (N.D. Ill. Jan. 13, 2026) .......... 24, 25

*Doe v. Kaiser Found. Health Plan, Inc.*,
2024 WL 1589982 (N.D. Cal. Apr. 11, 2024) .......... 33

*Doe v. Talkiatry Mgmt. Servs., LLC*,
2025 WL 3190813 (C.D. Cal. Oct. 1, 2025) .......... 28

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025) .......... 26

*Eisenhower Med. Ctr. v. Superior Ct.*,
226 Cal. App. 4th 430 (2014) .......... 38

*Fan v. NBA Properties Inc.*,
2024 WL 1297643 (N.D. Cal. Mar. 26, 2024) .......... 17

*Gaige v. Exer Holding Co., LLC*,
2025 WL 559719 (C.D. Cal. Jan. 30, 2025) .......... 28

*Gianne v. Accor Mgmt. US Inc.*,
2026 WL 925522 (C.D. Cal. Mar. 31, 2026) .......... 7, 11, 35

*Gilligan v. Experian Data Corp.*,
2026 WL 32259 (N.D. Cal. Jan. 6, 2026) .......... 27

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) .......... 32, 39

*Gray v. Luxottica of America, Inc.*,
2024 WL 5689566 (C.D. Cal. Dec. 16, 2024) .......... 38

*Gruber v. Yelp Inc.*,
55 Cal. App. 5th 591 (2020) .......... 36

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) .......... 31, 32

*In re BetterHelp, Inc. Data Disclosure Cases*,
2024 WL 3416511 (N.D. Cal. July 15, 2024) .......... 27

*In re DoubleClick Inc. Privacy Litigation*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) .......... 27

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 30

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... 37

*In re: Premera Blue Cross Customer Data Sec. Breach Litig.*,
2017 WL 539578 (D. Or. Feb. 9, 2017) .......... 26

*Inlandboatmens Union of Pac. v. Dutra Grp.*,
279 F.3d 1075 (9th Cir. 2002) .......... 3

*Jackson v. LinkedIn Corp.*,
744 F. Supp. 3d 986 (N.D. Cal. 2024) .......... 31

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) .......... 16, 30

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) .......... 32

*Jones v. Skullcandy, Inc.*,
2026 WL 699819 (S.D. Cal. Mar. 12, 2026) .......... 30

*K.L. v. Legacy Health*,
2024 WL 4794657 (D. Or. Nov. 14, 2024) .......... 26

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 27

*Kauders v. Uber Techs., Inc.*,
159 N.E.3d 1033 (Mass. 2021) .......... 4

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) .......... 36

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......... 5

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .......... 3

*Krzyzek v. OpenX Techs., Inc.*,
817 F. Supp. 3d 857 (N.D. Cal. 2026) .......... 29, 34

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) .......... 20

*Lee v. Intelius Inc.*,
737 F.3d 1254 (9th Cir.2013) .......... 12

*Lee v. Ticketmaster LLC*,
817 F. App'x 393 (9th Cir. 2020) .......... 14

*Lonegan v. Hasty*,
436 F. Supp. 2d 419 (E.D.N.Y. 2006) .......... 25

*Lynch v. Express Scripts Holding Company*,
2026 WL 1749550 (N.D. Cal. June 17, 2026) .......... 26

*Manier v. Triple Lift Inc*,
2026 WL 1295546 (C.D. Cal. Apr. 15, 2026) .......... 40

*Maree v. Deutsche Lufthansa AG*,
2021 WL 267853 (C.D. Cal. Jan. 26, 2021) .......... 6

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) .......... 30

*McClung v. AddShopper, Inc.*,
2024 WL 189006 (N.D. Cal. Jan. 17, 2024) .......... 16

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......... 17

*Michael v. La Jolla Learning Inst., Inc.*,
2019 WL 4747658 (S.D. Cal. Sept. 30, 2019) .......... 2, 3

*Mirmalek v. Los Angeles Times Commc'ns LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... 31

*Mitchell v. 1Force Gov't Sols., LLC*,
2018 WL 6977476 (C.D. Cal. Nov. 29, 2018) .......... 2, 4

*Moretti v. Hertz Corp.*,
2014 WL 1410432 (N.D. Cal. Apr. 11, 2014) .......... 15

*Morrison v. Yippee Ent., Inc.*,
2025 WL 3078835 (S.D. Cal. Nov. 4, 2025) .......... 13

*Negro v. Sup. Ct.*,
230 Cal. App. 4th 879 (2014) .......... 18

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014)....................9, 10

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023)....................4

*Oddei v. Optum, Inc.*,
2021 WL 6333467 (C.D. Cal. Dec. 3, 2021)....................39

*Peavy v. WFAA-TV, Inc.*,
221 F.3d 158 (5th Cir. 2000)....................24

*Q.J. v. PowerSchool Holdings LLC*,
2025 WL 2410472 (N.D. Ill. Aug. 20, 2025)....................24

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024)....................27, 29, 37

*R.S. v. Prime Healthcare Servs., Inc.*,
2025 WL 103488 (C.D. Cal. Jan. 13, 2025)....................26, 28, 29

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019)....................35

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025)....................27

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021)....................27

*Roe v. Amgen Inc.*,
2024 WL 2873482 (C.D. Cal. June 5, 2024)....................9

*Rose v. Variety Media, LLC*,
2025 WL 2794920 (Cal. Super. Sep. 24, 2025)....................31

*Rust v. Chino Prison Healthcare Providers*,
2018 WL 8733354 (C.D. Cal. Aug. 28, 2018)....................3

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021)....................5, 9

*Semien v. PubMatic Inc.*,
2026 WL 216333 (N.D. Cal. Jan. 27, 2026)....................27

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016)....................12

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021)....................14, 15

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 2210002 (N.D. Cal. Aug. 4, 2025)....................28

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002)....................5

*Strong v. LifeStance Health Grp. Inc.*,
2025 WL 317552 (D. Ariz. Jan. 28, 2025)....................39

*Tate v. VITAS Healthcare Corp.*,
762 F. Supp. 3d 949 (E.D. Cal. 2025)....................32, 33, 34

*Tavernetti v. Superior Ct.*,
22 Cal. 3d 187 (1978)....................31

*Turner v. Nuance Commc'ns, Inc.*,
735 F. Supp. 3d 1169 (N.D. Cal. 2024)....................17, 36

*Vaccaro v. Altais*,
2023 WL 7003211 (C.D. Cal. Oct. 23, 2023)....................36

*Valentine v. WideOpen West Finance, LLC*,
288 F.R.D. 407 (N.D. Ill. 2012)....................25

*Valenzuela v. Kroger Co.*,
2024 WL 1336959 (C.D. Cal. Mar. 28, 2024)....................20

*Valenzuela v. Nationwide Mut. Ins. Co.*,
686 F. Supp. 3d 969 (C.D. Cal. 2023)....................33, 35

*Vera v. O'Keefe*,
791 F. Supp. 2d 959 (S.D. Cal. 2011)....................36

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025)....................7

*Washington v. Flixbus, Inc.*,
2025 WL 1592961 (S.D. Cal. June 5, 2025)....................20

*Webb v. Smart Document Sols., LLC*,
499 F.3d 1078 (9th Cir. 2007) .......... 27

*Williams v. What If Holdings, LLC*,
2022 WL 17869275 (N.D. Cal. Dec. 22, 2022) .......... 39

*Xu v. Reuters News & Media, Inc.*,
2025 WL 3035016 (Cal. Super. Oct. 24, 2025) .......... 31

*Yockey v. Salesforce, Inc.*,
688 F. Supp. 3d 962 (N.D. Cal. 2023) .......... 32

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 33

**STATUTES**

18 U.S.C. § 2511 .......... 23, 24, 25, 26

18 U.S.C. § 2520 .......... 24, 25

42 U.S.C. § 1320d(6) .......... 21, 29

Cal. Civ. Code § 56.05(i) .......... 37

Cal. Pen. Code § 31 .......... 36

**RULES**

Fed. R. Civ. P. 56(d) .......... 4

**REGULATIONS**

45 C.F.R. § 160.103 .......... 35, 37

## INTRODUCTION

PlushCare, a telehealth company, embedded third-party code on its website and mobile applications that secretly intercepted users' confidential communications and personal health information ("PHI") and disclosed it to Criteo and Segment (the "Third Parties"). Plaintiff's First Amended Complaint, ECF No. 16 ("FAC"), is exhaustive, setting out—across 250 paragraphs, 88 pages, and screenshots evincing actual transmission data—precisely how PlushCare configured its platform to record and disclose that information before users ever consented.

Rather than confront these allegations, PlushCare asks the Court to convert its motion into one for summary judgment and to credit a self-serving declaration and two Business Associate Agreements found nowhere in the pleadings. The Court should decline that invitation (§ I). Further, PlushCare's central defense—consent—fails because none of its three mechanisms (a browsewrap cookie banner, a device-permissions screen, and an end-of-booking checkbox) obtained the unambiguous, prior consent the law demands (§ II). And PlushCare's declaration does not contradict the FAC; it simply skips the stage of the booking flow where the screenshots show interception occurring (§ III).

Plaintiff's claims are well-pleaded. The Federal Wiretap Act's one-party consent exemption does not apply to PlushCare's procurement of third parties to wiretap the communications at issue, and even if it did, the crime-tort exception to exemption applies because PlushCare intercepted communications for the purpose of violating HIPAA and invading privacy (§ IV). Plaintiff states a CIPA claim because Criteo and Segment had the capability to use the data at issue for their own purposes and PlushCare is liable for installing the trackers that enabled the wiretapping (§ V). The CMIA claim survives because PlushCare disclosed individually identifiable health information (§ VI). And because Plaintiff did not consent to this tracking, his invasion of privacy and intrusion upon seclusion claims survive (§ VII).

Defendant's motion to dismiss ("MTD") should be denied in full.

## ARGUMENT

### I. THIS COURT SHOULD REFUSE TO CONVERT THE MOTION TO DISMISS INTO A PREMATURE MOTION FOR SUMMARY JUDGMENT

PlushCare, "[p]erhaps recognizing that the Court cannot properly consider evidence outside the complaint on a motion to dismiss, ... asks the Court to treat its motion as one for summary judgment." *Mitchell v. 1Force Gov't Sols., LLC*, No. CV 18-7612 PSG (SKX), 2018 WL 6977476, at *5 (C.D. Cal. Nov. 29, 2018) (declining to convert where the defendant offered a declaration and an agreement to dispute the plaintiff's allegations). Specifically, PlushCare requests that the Court consider three documents (MTD at 4-5), all of which are extrinsic to the pleadings: (1) the agreement entered into between PlushCare and Criteo (the "Criteo BAA," attached to the Motion to Dismiss as Exhibit D); (2) the agreement entered between PlushCare and Segment (the "Segment BAA," attached as Exhibit E); and (3) the Declaration of Angela Niu (the "Niu Decl.," attached as Exhibit F). The Court should decline this invitation.

Based on its extrinsic evidence, PlushCare asserts that: (1) "PlushCare did not collect any PII or PHI prior to obtaining user consent" (MTD at 18); (2) Segment and Criteo use the data "exclusively" for PlushCare's benefit (MTD at 34); and (3) PlushCare's "sharing data with Segment and Criteo is not 'for marketing'" (MTD at 48). Plaintiff "has not been afforded a reasonable opportunity to respond to and present all material pertinent to [these] contentions." *Michael v. La Jolla Learning Inst., Inc.*, No. 17-CV-934 JLS (MDD), 2019 WL 4747658, at *5 (S.D. Cal. Sept. 30, 2019). Resolving them now would be improper. PlushCare "would have the Court, on the basis of a declaration ... and attached documents, grant summary judgment in its favor. That would be premature. No discovery has taken place in this case, and the Court [should] not make a summary judgment ruling on the thin evidentiary record before it." *Century Sur. Co. v. Master Design Drywall, Inc.*, No. 09CV0280-LAB

(AJB), 2009 WL 3425326, at *2 (S.D. Cal. Oct. 21, 2009). Thus, the Court should "refuse[] to convert the Motion to Dismiss into a motion for summary judgment." *Michael*, 2019 WL 4747658, at *5.

Alternatively, should the Court convert the motion to dismiss into a motion for summary judgment, Plaintiff is entitled to discovery into his claims because "[t]he danger noted by the Ninth Circuit … is present in this case." *Rust v. Chino Prison Healthcare Providers*, No. 517CV00556JAKKES, 2018 WL 8733354, at *2 (C.D. Cal. Aug. 28, 2018) (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)). Specifically, the Ninth Circuit has cautioned:

> Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint, but with a perverse added benefit: unless the district court converts the defendant's motion to dismiss into a motion for summary judgment, the plaintiff receives no opportunity to respond to the defendant's new version of the facts. Without that opportunity to respond, the defendant's newly-expanded version of the complaint—accepted as true at the pleading stage—can easily topple otherwise cognizable claims.

*Khoja*, 899 F.3d at 1003. Accordingly, "[w]hen a district court does consider such extraneous evidence, the general rule is that the motion is converted into a motion for summary judgment, and the non-moving party must be allowed to conduct discovery in order to oppose that motion." *Inlandboatmens Union of Pac. v. Dutra Grp.*, 279 F.3d 1075, 1083 (9th Cir. 2002), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014).

At minimum, Plaintiff should be given an opportunity to refute PlushCare's version of events with evidence. *Rust*, 2018 WL 8733354, at *2. This is especially so because, "assuming the Court can consider" them, a declaration from PlushCare's own manager and the attendant agreements are "not enough to render implausible"

Plaintiff's well-pleaded allegations. *Mitchell*, 2018 WL 6977476, at *5 (declaration from the defendant's CEO and a contract disputing the plaintiff's allegations "not enough to undercut Plaintiff's allegations"). Thus, should the Court decide to convert Defendant's motion to one for summary judgment, Plaintiff should be given the opportunity pursuant to Fed. R. Civ. P. 56(d) to conduct discovery.

## II. PLAINTIFF DID NOT CONSENT TO THE THIRD PARTIES' WIRETAPPING

PlushCare argues that "[i]nformed consent is obtained … repeatedly during the user experience[.]" MTD at 18. Specifically, PlushCare attempts to layer three separate mechanisms to establish consent: (1) a browsewrap cookie banner (MTD at 20); (2) an in-app device permissions screen (MTD at 23); and (3) clickwrap language at the end, rather than the beginning, of the booking process (MTD at 22). As explained below, none of these three mechanisms—alone or in combination—satisfy the unambiguous manifestation of assent that California and Ninth Circuit law require, which is required *prior to* the wiretapping.

### A. PlushCare's Cookie Banner Cannot Establish Consent

To form a binding agreement online, "there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (quoting *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023)). Against this authority, PlushCare argues that, "[u]pon first entering PlushCare's website, the user encounters a consent banner[,]" such that his mere "continued use … manifested his consent[.]" MTD at 20. This is wrong.

In the old days, consumers would manifest assent to terms by signing on the dotted line. But online, "[w]ithout an action comparable to the solemnity of physically signing a written contract … [courts] are concerned that such users may not be aware of the implications of their actions …." *Kauders v. Uber Techs., Inc.*, 159 N.E.3d

1033, 1051 (Mass. 2021). Since the early days of the internet, courts have therefore repeatedly stressed that the "unambiguous manifestation of assent to … terms by consumers [is] essential if electronic bargaining is to have integrity and credibility." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (Sotomayor, J.); *accord Berman v. Freedom Fin. Network LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (quoting same language).

Accordingly, "[r]easonable conspicuousness alone is not sufficient to bind a user—a user must agree to the terms, *not merely see them*." *Chabolla*, 129 F.4th at 1158 (emphasis added). Courts require two elements to establish a meeting of the minds online: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* at 1154-55 (cleaned up). PlushCare cannot show that here.

**1. PlushCare's Cookie Banner Fails to Establish Unambiguous Assent.**

PlushCare concedes its cookie banner at the bottom of the Website is "browse-wrap." MTD at 20-21 (citing Exhibit A-4). Under California law, "a browsewrap agreement … is not sufficient to bind the consumer." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 470 (2021). While the Ninth Circuit has not yet made this a *per se* rule, it has repeatedly said that "[c]ourts consistently decline to enforce browsewraps." *Chabolla*, 129 F.4th at 1154; *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) ("Courts have consistently held this type of agreement to be unenforceable.").

The court's decision in *Byars v. Goodyear Tire & Rubber Co.*, 654 F. Supp. 3d 1020, 1025 (C.D. Cal. 2023) (Sykes, J.) is instructive. There, the court considered how "'Terms of Use' were available if [the plaintiff] clicked the 'Privacy Policy' hyperlink in [a similar] pop-up banner." *Id.* at 1025. "[T]he Court [found] that

Goodyear's 'Terms of Use' is a browsewrap agreement" and held that the plaintiff was not on constructive notice of those terms. *Id.* at 1026.




***Byars v. Goodyear Tire & Rubber*, No. 5:22-cv-01358-SSS-DTB, ECF No. 14-2 at PDF 2 (Oct. 5, 2022).**

Because PlushCare's Privacy Policy is also a "browsewrap" agreement, "it can only be enforceable against [Plaintiff] if [he] had actual or constructive knowledge" of the Privacy Policy. *Id.* at 1026. Here, that is not the case. PlushCare's browsewrap notice is considerably worse than that at issue in *Byars*:




***Ex. A-4 (PlushCare's Cookie Banner)***

The text "is not highlighted, underlined, in all caps, or displayed in a clickable box. ... These features do not render [PlushCare]'s" Privacy Policy "sufficiently noticeable to put a reasonable user on inquiry notice of its provisions." *Maree v. Deutsche Lufthansa AG*, No. SACV20885MWFMRWX, 2021 WL 267853, at *3 (C.D. Cal. Jan. 26, 2021); *see also Chabolla*, 129 F.4th at 1154.

But even if Plushcare provided reasonably conspicuous notice of the Privacy Policy, the second condition required by the Ninth Circuit is not met: "the consumer [does not] take[] some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Chabolla*, 129 F.4th at 1154-55 (cleaned up). Nowhere does PlushCare contend that Plaintiff was required to interact with the cookie banner that was in place when Plaintiff booked an appointment or provide evidence that Plaintiff, in fact, interacted with the banner. *See generally* MTD.[1] In other words, the Website may have allowed browsing even if a cookie banner selection was not made. *Cf. Walsh v. Dollar Tree Stores, Inc.*, No. 25-CV-01601-SVK, 2025 WL 2939229, at *2 (N.D. Cal. Oct. 16, 2025) (where "the webpage is dark and does not allow browsing until a selection is made"); *Gianne v. Accor Mgmt. US Inc.*, No. CV 25-2425-DMG (EX), 2026 WL 925522, at *5 (C.D. Cal. Mar. 31, 2026) ("The website user must take action to proceed").

Assuming *arguendo* that Plaintiff interacted with the cookie banner at all, it still gave him no way to unambiguously manifest assent to PlushCare's Privacy Policy. Instead, the cookie banner that was on the Website "[a]t the time Plaintiff made his appointments" (MTD at 20) contains an "X" button, a "Manage Cookies" button, and an "Accept Cookies" button, and says that mere use of the site constitutes agreement. Exhibit A-4 ("By continuing to use this site, ...."). As discussed further below, this is not enough. The cookie banner "does not include an 'I Agree' box or any other means for website users to accept the" Privacy Policy. *Byars*, 654 F. Supp. 3d at 1025-26.

///

///

///

///

///

[1] PlushCare misleadingly submits a copy of its current cookie banner that it admits was not in place when Plaintiff used the Website. *See* MTD at 2 (citing Ex. A-2).




***Ex. A-4 (PlushCare's Cookie Banner, containing no 'I Agree to the Privacy Policy" button)***




***Ex. A-5 (Pop-up after clicking "Manage Cookies" in PlushCare's Cookie Banner. The pop-up also contains no "I Agree to the Privacy Policy" button)***

Moreover, as the Ninth Circuit notes, "merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything." *Berman*, 30 F.4th at 857. Instead, "[a] user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act

of clicking will constitute assent …." *Id.* Here, it does not. If anything, a user's click of the "X" button could more reasonably be understood to mean the consumer wishes to close the banner.

Regardless of what a given click might signify, PlushCare submits no evidence that Plaintiff clicked ***any*** of the cookie banner's buttons—the "X," "Manage Cookies," or "Accept Cookies." It's failure is dispositive. In CIPA cases, "consent is 'an affirmative defense for which *defendant* bears the burden of proof.'" *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (emphasis added) (internal cite omitted). At best, PlushCare's cookie banner raises a "factual dispute" that is prematurely raised here. *Roe v. Amgen Inc.*, No. 2:23-CV-07448-MCS-SSC, 2024 WL 2873482, at *4 (C.D. Cal. June 5, 2024), *reconsideration denied sub nom. Doe v. Amgen, Inc.*, No. 2:23-CV-07448-MCS-SSC, 2024 WL 3811251 (C.D. Cal. Aug. 13, 2024)(denying motion to dismiss where it was unclear whether plaintiffs "hit 'accept' or 'decline' upon being presented with the 'cookie banner[.]'"). Nor has PlushCare proffered that Plaintiff first made his appointment on the Website, as opposed to using the App. This is important because PlushCare concedes this banner consent mechanism only applies to the Website. *See* MTD at 20 ("Upon first entering PlushCare's *website*, ….").

PlushCare might attempt to argue that Plaintiff manifested assent because fine print in the cookie banner said: "By continuing to use this site, you agree to the use of these technologies as further described in our Privacy Policy." *See* Ex. A-4. But courts are reluctant to "assume[] assent is given by mere use of the website...." *Sellers*, 73 Cal. App. 5th at 470. Indeed, over a decade ago, in *Nguyen v. Barnes & Noble Inc.*, the Ninth Circuit refused to enforce a website's terms, even though they said: "By visiting any area in the Barnes & Noble.com Site, ... a User is deemed to have accepted the Terms of Use." 763 F.3d 1171, 1174 (9th Cir. 2014). "[K]eeping with courts' traditional reluctance to enforce browsewrap agreements against individual consumers," *Nguyen* declined to enforce the book store's terms, in part, because it did

"no[t] prompt[] [users] to take any *affirmative action* to demonstrate assent[.]" 763 F.3d at 1178-79 (emphasis added); *see also Chabolla*, 129 F.4th at 1154 ("Courts consistently decline to enforce browsewraps.") (citing *Nguyen*). Indeed, in discussing the "unambiguous manifestation of assent" prong, the Ninth Circuit in *Berman* envisioned a more affirmative "action, such as clicking a button or checking a box …." 30 F.4th at 856. It did not approve of manufacturing consent by mere use.

**2. PlushCare's Cookie Banner Presents an Illusion of Choice.**

Worse still, as of at least July 30, 2026, "[u]sers can navigate to the PlushCare Website, click the 'Decline' button on the cookie banner at the bottom of the page, and continue to be tracked by Segment." Hagerty Decl. ¶ 5. In other words, PlushCare's Cookie Banner is a sham—intended to give users the illusion of control over their privacy.


```
▾ {timestamp: "2026-07-30T12:33:43.366Z", integrations: {}, type: "page",…}
  anonymousId: "e82d36d8-d0ea-4dfe-bd6e-1ac9b61b2ec1"
 ▸ context: {personId: null, campaign: {source: "google", medium: "cpc", name: "", term: "", content: ""},…}
  integrations: {}
  messageId: "ajs-next-1785414823366-5643be36-ddc0-4758-8cee-cd82b2113b4e"
 ▾ properties: {path: "/booking/primary-care/method/",…}
   application_viewed: "web"
   clientId: "1287411071.1785414818"
   name: "Primary Care Booking - View - Method Page"
   path: "/booking/primary-care/method/"
  ▾ pc_campaign: {document_referrer: "plushcare.com", utm_term: "", utm_adgroup: "", utm_source: "google",…}
    document_referrer: "plushcare.com"
    gclid: "CjwKCAjw7KvTBhA6EiwAWnutYUABNaNZ07_mnOQw6UdeE_MHwOBptv81HsL0FdWgxCWHXnHm35CaxRoCP1UQAvD_BwE"
    google_ads_action_id: 0
    google_client_id: "1287411071.1785414818"
    irclickid: null
    msclkid: null
    rdt_cid: null
    utm_adgroup: ""
    utm_campaign: ""
    utm_content: ""
    utm_medium: "cpc"
    utm_source: "google"
    utm_term: ""
    _fbc: null
    _fbp: "fb.1.1783376670229.8903990524"
    _ga: "GA1.2.1287411071.1785414818"
   referrer: "https://plushcare.com/p/home?utm_source=google&utm_medium=cpc&utm_campaign=Brand-Core&utm_adgro
   search: ""
   title: "Talk to a doctor on your phone | PlushCare"
   url: "https://my.plushcare.com/booking/primary-care/method/"
  sentAt: "2026-07-30T12:33:43.391Z"
  timestamp: "2026-07-30T12:33:43.366Z"
  type: "page"
  userId: null
  writeKey: "dtQSsngweuqDOekSQfmCQiEmorrQh47k"
```


***Hagerty Decl. ¶ 7 Ex. 2. Segment continues to actively intercept URLs of pages viewed by Website users, paired with the "fbp" cookie. See infra, § III for detailed explanation of the "fbp" cookie.***

PlushCare does not explain what effect—if any—clicking "Manage Cookies" (Ex. A-4) and then "Reject All" (Ex. A-5) would have had on the Segment and/or Criteo tracking technologies that were present "[a]t the time" Plaintiff actually made an appointment (MTD at 20), nor whether Segment continued to track user communications regardless of a user's selection—as it does today. "Accordingly, accepting all factual allegations as true, and construing any conflicts in Plaintiff's favor, Plaintiff has sufficiently alleged that interception of h[is] communications occurred without h[is] consent." *Gianne*, 2026 WL 925522, at *5.

**B. The Mobile App's "Consent Policy" Screen Only Asks Users to Accept Device Permissions—Not the Terms of Use or Privacy Policy**

Next, PlushCare argues that Plaintiff consented to the Privacy Policy because, "[o]n the mobile app"—rather than the Website—"the very first step in th[e] process brings the user to a screen titled 'Consent Policy.'" MTD at 22 (citing Exhibit A-3). But this "Consent Policy" screen also fails to secure consent.

///

///

///

///

///

///

///

///

///

///

///

///

///







***Hagerty Decl. ¶ 8, Ex. 3 (screenshots from the Android App, with highlight)***

Critically, the "Consent Policy" screen asks users to "accept permissions to the **following** important device features" – *i.e.,* "Location," "Microphone & Camera," "Images & Files," and "Wi-fi & Bluetooth" – that are needed to communicate with a doctor. Ex. A-3 (emphasis added). Users are *not* asked to consent to the **preceding** Terms of Use, Privacy Policy, and Telehealth Consent Policy. *Id.* Those terms and policies are merely hyperlinked at the top of the screen. *Id.* "[W]here a website specifically states that clicking means one thing, that click does not bind users to something else." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) (citing *Lee v. Intelius Inc.*, 737 F.3d 1254 (9th Cir.2013)). Two cases are helpful in illustrating this point.

First, in *Chabolla*, the Ninth Circuit held that there was no unambiguous manifestation of assent where an advisal read "[b]y signing up you agree to our Terms of Use and Privacy Policy," and the only clickable button below it read "Continue[.]" 129 F.4th 1147, 1152, 1158.




Consent was lacking because "[i]t [wa]s up to the user to *assume* that entering a first and last name and clicking the 'Continue' button amounts to "signing up.'" *Id.* at 1158 (emphasis added).

The second case to illustrate this point is *Morrison v. Yippee Ent., Inc.*, No. 24-CV-00797-JO-KSC, 2025 WL 3078835 (S.D. Cal. Nov. 4, 2025). There, the court found it "cannot conclude there was unambiguous assent" due to a similar mismatch between the advisal language and the clickable buttons. *Id.*, at *1. In *Morrison*, the advisal language read: "By clicking below, you agree to our Terms of Service, Cookies Policy, Privacy Policy, and automatic renewal." *Id.* "Customers were required to infer that 'clicking below' referred to the action of clicking the 'Start subscription' button when there were also two other hyperlinks ... below the advisal, one entitled 'Privacy Policy' and the other, 'Terms of Service.'" *Id.*

///

///




***Morrison v. Yippee Ent., Inc., Pl.'s Declaration in Support of Plaintiff's Opposition to Defendant's Motion to Compel Arbitration, ECF No. 16-1, at PDF 4***

Here, even worse than *Chabolla* or *Morrison*, PlushCare does not merely require users to "assume" or "infer" but actually requires that users *disregard* its advisal language. A reasonable consumer would believe they are consenting to only the device permissions when clicking the "I agree" button, because the Terms of Use, Privacy Policy, and Telehealth Consent Policy all *precede* the advisal. The advisal states: "we will ask you to accept permissions to the *following*" features. Where "the language could have been clearer ... the resulting ambiguity is dispositive." *Chabolla*, 129 F.4th at 1158.

The cases PlushCare cites do not compel a different result. *See* MTD at 23. First, this case is unlike *Lee v. Ticketmaster LLC*, where "the website contain[ed] an explicit textual notice … of the user's intent to be bound." 817 F. App'x 393, 395 (9th Cir. 2020). Here, nothing indicates that by accepting "device features" users instead agree to be bound by PlushCare's terms or policies.

Second, in *Silver v. Stripe Inc.*, the advisal read: "By *placing your order*, you agree to be bound by the Instacart Terms of Service and Privacy Policy." *See* No. 4:20-CV-08196-YGR, 2021 WL 3191752 at *3 (N.D. Cal. July 28, 2021) (Figure 2 in ¶ 30 of the *Silver* plaintiff's amended complaint). Thus, there was no question that users "were told the consequences that would follow from clicking the button,

including their acceptance of the privacy policy." *Id.*, at *4. Here, users do not know how device permissions tie to the privacy policy, if at all.




***Silver v. Stripe Inc., No. 4:20-CV-08196-YGR, Pls. First Amended Complaint ¶ 30, ECF No. 47 (May 11, 2021)***

Finally, *Moretti v. Hertz Corp.*, No. C 13-02972 JSW, 2014 WL 1410432 (N.D. Cal. Apr. 11, 2014), concerns a different consent mechanism. There, a user affirmatively "check[ed] the Acceptance Box" before they clicked "Confirm booking." *Id.*, at *3. Here, there is no checkbox on the "Consent Policy" Screen. *See* Ex. A-3.




***Moretti v. Hertz Corp., No. C 13-02792-JSW, Exhibit 1 to the Declaration of Sarah Bernard in Support of Def.'s Motion to Dismiss or Transfer, ECF No. 16-1, at PDF 3***

### C. CIPA § 631(a) Requires Prior Consent That PlushCare Never Obtained

PlushCare argues that "Plaintiff further explicitly assented to the terms set forth in the Privacy Policy and Terms of Use when booking an appointment" (MTD at 21) because Plaintiff would have been asked to "check a box" towards the *end* of the appointment booking process. MTD at 21-22 (citing FAC ¶ 46, depicting "Screen 7A" of the Website). This argument fails because Plaintiff had already been wiretapped throughout the earlier stages of the booking process, long before PlushCare ever

sought his consent.

In *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1-2 (9th Cir. May 31, 2022), the Ninth Circuit held that, absent further word from the California Supreme Court, it "would interpret Section 631(a) to require the *prior* consent of all parties to a communication." (Emphasis added); *see also McClung v. AddShopper, Inc.*, No. 23-CV-01996-VC, 2024 WL 189006, at *3 (N.D. Cal. Jan. 17, 2024) ("the cookies … sync with the user's device the moment that they access the website—thus, by the time the user even sees the cookie banner, the initial visit has already been tracked").

Here, before Plaintiff was asked to "check a box" near the end of his bookings (MTD at 21-22), Segment and/or Criteo had already wiretapped the following communications on the Website:

- "[T]hat Website users clicked 'Pay without insurance'" (¶ 78);
- "[T]hat Website users have proceeded to the booking stage where users must select their visit location" (*id.*);
- "[T]he particular state users will be located for their appointment" (¶ 81);
- "[T]he particular date and time selected by a user" (¶ 83);
- "[T]hat users selected that they are looking for a Spanish speaking provider" (¶ 100);
- "[T]hat Website users click on the 'View by doctor' button" and "clicked on a doctor's profile" (¶ 85);
- That "users clicked and tapped on 'Book' to continue booking an appointment with a particular doctor" (¶ 87);
- "[T]hat users have proceeded to the stage of booking their appointment where they must create a profile" (¶ 101); and
- "[T]he biological sex selected by Website users" (¶ 88).

Further, Segment had already wiretapped the following communications on the iOS and/or Android apps:

- "[T]hat iOS App and Android App users tapped to open the mobile application" (¶ 79);
- "[T]hat users are seeking to book a visit" (¶ 79);
- "[W]ho the appointment is for" (*id.*);

- "[W]hether users are paying with or without insurance" (*id.*);
- "the fact that iOS App and Android App users are searching to book a therapy appointment, as distinguished from a regular doctor's appointment" (¶ 80);
- "[T]hat [Android App] users click to select a particular state" and "the fact that iOS App users have enabled their location" (¶ 82);
- "[T]hat users have proceeded to the screen where users view available appointments" (¶ 84);
- "[T]hat users tapped on the filter by time and/or date buttons … and the particular time of day selected (¶ 84);
- "[T]hat Android App users click on a doctor's profile" (¶ 86);
- "[T]hat users clicked and tapped on 'Book' to continue booking an appointment with a particular doctor" (¶ 87); and
- "[T]hat users click on various fields … in order to enter their first and last name, date of birth, email, and phone number" (¶ 88).

All the foregoing communications were wiretapped prior to Screen 7A on the Website or prior to Screen 21 on the App.

### D. A Reasonable User Would Not Read PlushCare's Terms or Policies as Disclosing Its Conduct

Even if Plaintiff had actual knowledge or inquiry notice of any of these terms and policies (he did not), PlushCare's consent defense still fails because its disclosures did not put Plaintiff or other reasonable consumers on notice of its conduct.

At minimum, what a reasonable consumer would believe if they were on notice of the (conflicting) privacy statements at issue cannot be determined at this stage. *See, e.g.*, *Fan v. NBA Properties Inc.*, No. 23-CV-05069-SI, 2024 WL 1297643, at *3 (N.D. Cal. Mar. 26, 2024) ("[w]hether reasonable consumers would understand, based on the … Terms of Use or … Privacy Policy, that by using the … website they were consenting to the disclosure of their personally identifiable information … is a question that should be resolved on a fuller factual record."); *Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169, 1181 (N.D. Cal. 2024); *McCoy v. Alphabet,*

*Inc.*, No. 20-CV-05427-SVK, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021). The question is instead "whether the circumstances, considered as a whole, demonstrate that a reasonable person understood that [the wiretapping] would be carried out[.]" *Calhoun*, 113 F.4th at 1147.

That inquiry is inescapably fact-bound. "In the wiretapping context, a finding of implied-in-fact consent requires 'circumstances indicating that the [party] knowingly agreed to the surveillance.'" *Negro v. Sup. Ct.*, 230 Cal. App. 4th 879, 892 (2014) (internal citation omitted). Those circumstances "will vary from case to case" but ordinarily "include language or acts which tend to prove … that a party knows of, or assents to, encroachments on the routine expectation that conversations are private." *Id.* (cleaned up). Here, PlushCare's language does the opposite.

PlushCare's Privacy Policy that was "effective at all times Plaintiff made his appointments" (ECF No. 30-1, at PDF 2) states:

> PlushCare is … committed to protecting the privacy of your protected health information ("Protected Health Information"). "Protected Health Information" is ... information about you, including demographic information, that may identify you and that relates to your past, present or future physical or mental health or condition; related health care services; or related to the past, present, or future payment for the provision of health care to you.
>
> ...
>
> *Any conflict between this Privacy Policy and the HIPAA Notice of Privacy Practices with respect to such submitted Protected Health Information shall be governed by the HIPAA Notice of Privacy Practices.*

ECF No. 30-3, at PDF 4 (emphasis added).

The HIPAA Notice in effect at the time stated:

> Marketing: *We must* obtain your written authorization to use and disclose your PHI [protected health information] for most marketing purposes.
>
> …

> California law provides that *we may not* intentionally share, sell, use for marketing, or otherwise use your medical information for a purpose not necessary to provide health care services to you, except to the extent expressly authorized by you.

Hagerty Decl., Ex. 4 (the "HIPAA Notice"), at PDF 4 (emphasis added).

PlushCare's documents thus did not merely fail to notify Plaintiff of the challenged conduct; they promised the opposite. The HIPAA Notice—which, by the Privacy Policy's own terms, governs any conflict—represents that: (1) PlushCare "must obtain your written authorization" before using PHI "for most marketing purposes"; and (2) under California law, PlushCare "may not intentionally share, sell, use for marketing, or otherwise use your medical information for a purpose not necessary to provide health care services." *Id.*

PlushCare proceeded to do exactly what it said it would not. Plaintiff alleges "[t]he intercepted communications included those that contained PII, PHI, and related confidential information. PlushCare procured and assisted with the interceptions without Plaintiff's knowledge, consent, or express written authorization." FAC ¶ 15; *see also id.* ¶ 103 ("Defendant nonetheless knowingly disclosed Plaintiff's PHI to Segment and Criteo."). Specifically, PlushCare procured the third parties to obtain users' medical information alongside their hashed emails, phone numbers, and names and assisted them with obtaining that information. *Id.* ¶¶ 92, 93, 128. That the identifiers are "hashed" does not make them anonymous: "the reality is … they are traceable to individuals." *Id.* ¶ 92 (citing Federal Trade Commission guidance that hashes "can still be used to identify users" and that companies "should not act or claim as if hashing personal information renders it anonymized").

PlushCare might argue that its conduct was "necessary" to provide health care services. Not so. Segment and Criteo are analytics, marketing, and advertising platforms, not tools for treating patients. *See* FAC ¶¶ 58-76 (providing a detailed overview of the Segment and Criteo tracking technologies, including how they profile

user behavior for commercial ends).

Unable to square its conduct with its representations, PlushCare attempts to cherry-pick isolated phrases from its Terms of Use and Privacy Policy. *See* MTD at 9-10 ("PlushCare's Privacy Policy stated …. PlushCare's Terms of Use states….”). But the fragments PlushCare highlights cannot bear the weight of consent when its disclosures, read as a whole, convey the opposite. "If th[e] user could have plausibly understood the disclosures 'as *not* disclosing that [the defendant] would engage in particular conduct,' then the disclosures are insufficient to establish consent." *Calhoun*, 113 F.4th at 1147 (emphasis in original); *Valenzuela v. Kroger Co.*, No. CV 22-6382-DMG (AGRX), 2024 WL 1336959, at *3 (C.D. Cal. Mar. 28, 2024) ("[E]ven if [Plaintiff] viewed the Policy, the Policy does not *explicitly state* that [PlushCare] intended to route [communications] to thud [sic] parties who would read, store, and harvest data from those [communications].") (emphasis added).

PlushCare cites *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1052 (N.D. Cal. 2025) and *Washington v. Flixbus, Inc.*, No. 3:25-CV-00212-H-MSB, 2025 WL 1592961, at *4 (S.D. Cal. June 5, 2025) for the proposition that "similar terms" to its own provide sufficient notice. MTD at 25. But neither *Lakes* nor *Washington* involved PHI, a HIPAA notice requiring written authorization for marketing uses, or a privacy policy that—by its own terms—subordinates itself to that HIPAA notice.

**E. The Ninth Circuit Does Not Recognize Cumulative Notice**

PlushCare failed to give proper notice through its cookie banner, device feature consent policy, after-the-fact checkbox, or the terms themselves. And "three faulty notices do not equal a proper one." *Chabolla*, 129 F.4th at 1159. PlushCare's consent defense should thus be rejected.

## III. PLUSHCARE'S DECLARATION DOES NOT CONTRADICT ANY OF PLAINTIFF'S FACTUAL ALLEGATIONS

In an effort to prove that no communications are intercepted prior to consent being obtained, PlushCare submits the Declaration of Angela Niu, Exhibit F (the "Niu Decl."). *See* MTD at 29. The declaration proves no such thing.

[redacted] The declaration's silence on everything outside that narrow subset of data in no way refutes Plaintiff's allegations; it simply seeks to define the problem away. But HIPAA sweeps far more broadly. "Individually identifiable health information" includes "*any* information, including *demographic information*," received by a provider that relates to the provision of or payment for health care and as to which "there is a *reasonable basis to believe* that the information *can be used* to identify the individual." 42 U.S.C. § 1320d(6) (emphasis added); *see also* FAC ¶ 190. The data screenshotted and described in the FAC fits that definition, and the declaration does not show otherwise. *See, e.g.*, FAC ¶¶ 78, 81, 83, 85, 87, 88, 107-129.

Second, [redacted] the FAC's screenshots show Segment and Criteo intercepting sensitive data, including:

- **Medical information.** That a user was seeking therapy or mental health services; the user's insurance status; the state where the appointment will take place; the date, and time of the appointment, and the fact that users viewed a doctor profile and selected an appointment. *See* FAC ¶¶ 40–46, 50–54 (showing the booking flow up to registration); *id.* ¶¶ 78–87 (showing Segment's interception before registration); *id.* ¶¶ 97–100 (same for Criteo).

- **Demographic information**. The "biological sex selected by Website users," captured on Screen 7A before the user engaged with the consent checkbox. FAC ¶¶ 46, 88.
- **Segment's unique identifiers, tying data to the user.** Before account creation, Segment assigns each App user an "anonymousId" and pairs that with the user's "medical information." FAC ¶¶ 78, 81, 107, 109. This identifier is designed to be unique and static. *Id.* ¶¶ 107-08. Segment also captures the Facebook browser ID in the "fbp browser cookie," which is "matched to Meta accounts" to let it "easily identify a specific user, as well as their appointment information." *Id.* ¶¶ 117, 119-20. Plaintiff was identifiable this way; he had a Facebook account (created before his Website visit), and he visited the Website on the same browser he used to access Facebook. Declaration of Robert Perkins ("Perkins Decl.") ¶¶ 4-5.


```
▾ 0: {channel: "mobile", type: "track", messageId: "2f92b7bd-9f04-41a5-8dbb-ff5e79a1492f",…}
  anonymousId: "d1f6444f-3a76-48dd-a576-291b8f002d7e"
  channel: "mobile"
  ▸ context: {,…}
  event: "Therapy Booking - Select Patient"
  ▸ integrations: {AppsFlyer: false}
  messageId: "2f92b7bd-9f04-41a5-8dbb-ff5e79a1492f"
  properties: {}
  timestamp: "2025-10-24T20:10:35.733Z"
```


***Segment pairing a user's "anonymousId" with the fact that the user is seeking to book therapy.* FAC ¶ 80.**


```
anonymousId: "b1bc7fd6-5907-4f60-9681-0b22e90d3f2b"
▸ context: {personId: null,…}
integrations: {}
messageId: "ajs-next-1759788244248-d6b69658-f1e7-4aa4-9929-dff1885d72d4"
▾ properties: {path: "/booking/primary-care/method/", referrer: "https://plushcare.
  application_viewed: "web"
  clientId: ""
  name: "Primary Care Booking - View - Method Page"
  path: "/booking/primary-care/method/"
  ▾ pc_campaign: {document_referrer: "plushcare.com", utm_term: "", utm_adgroup: "",
    document_referrer: "plushcare.com"
    gclid: "Cj0KCQjw0Y3HBhCxARIsAN7931WUmckEeXTiVFkZWFNs1h9E3bB-6X7Ap4BAcnO-LuGiCMq
    google_ads_action_id: 0
    google_client_id: ""
    irclickid: null
    msclkid: null
    utm_adgroup: ""
    utm_campaign: ""
    utm_content: ""
    utm_medium: "cpc"
    utm_source: "google"
    utm_term: ""
    _fbc: null
    _fbp: "fb.1.1758736277630.9823933035"
```


***Segment pairing a user's "fbp" cookie with the user's "anonymousId" and the fact that the user is seeking primary care.* FAC ¶ 120.**

- **Criteo's unique identifiers, tying data to the user.** Criteo likewise captures the "fbp" Facebook cookie before account creation. FAC ¶¶ 96-101. Criteo matches the _fbp cookie to the user's identity through its proprietary "Criteo Shopper Graph," and it can later link the pre-consent data to the name, email, and phone number entered at sign-up. *Id.* ¶¶ 128-29.

| | |
|---|---|
| p0 | e=ce&m=%5B%5D&h=sha256 |
| p1 | e=exd&site_type=d&ref=https%3A%2F%2Fplushcare.com |
| p2 | e=vp&p=plushcare_appointment |
| p3 | e=dis |
| bundle | MQtkOV96T0sIMkI2d1BVR1IWMUpDRE5JbjFzanFIZGkIMkJDSTk2amVWOVg3ejU1QVkyMVlxSlhJWkE0Z0RuY1M4UkRjeXY0d2V HUktuZU1yOFQIMkY4JTJGZERieGpLdWNicVVWOEJKbyUyRktuNDVzU3A5QWI4RjhZT0JCZ2MwcjdkS1IBbGwIMkZhbFB6RCUyQn FRZWRWREQ3ZXpHU05WZEImYjYzNGpoMCUyQkFHTkITSDNNTUJUZDhpNHNreWhyJTJGSFluTVRUeFBsbE9SRng5SSUyRjJMNz VuTzZLSnFQaHVET2pwVklibkEIM0QIM0Q |
| sc | {"fbc":"","fbp":"fb.1.1758736277630.9823933035"} |
| tld | plushcare.com |
| dy | 1 |
| fu | https%3A%2F%2Fmy.plushcare.com%2Fbooking%2Fprimary-care%2Fmethod%2F |
| pu | https%3A%2F%2Fplushcare.com%2F |
| ceid | d262b55f-6a0d-43c1-a794-b91ad8d3f304 |

***Criteo pairing a user's "fbp" Facebook cookie with the fact that the user is seeking primary care.* FAC ¶ 97.**

## IV. PLAINTIFF SUFFICIENTLY ALLEGES HIS FEDERAL WIRETAP CLAIM

PlushCare argues that Plaintiff's ECPA claim fails because PlushCare "is a party to the purported communications" and the "crime-tort exception does not apply[.]" MTD at 35, 36. As discussed further below, PlushCare ignores that Plaintiff pleads that PlushCare unlawfully procured Segment and Criteo to intercept the communications at issue, and that the Federal Wiretap Act's one-party consent exemption does not apply to procurement violations. Because PlushCare chose not to address this issue, it has waived any challenge thereto. *See Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) (inadequately briefed arguments are waived). Moreover, a party's interception is unlawful under the Federal Wiretap Act when made "for the purpose of committing any criminal or tortious act," 18 U.S.C. § 2511(2)(d), as is the case here.

**A. Defendant Unlawfully Procured Segment and Criteo to Intercept the Communications at Issue.**

Plaintiff alleges Defendant violated the Federal Wiretap Act by, *inter alia*, "intentionally procur[ing]third-parties Segment and Criteo, to intercept and endeavor to intercept the electronic communications of Plaintiff and Class Members, namely the transmissions of the confidential and sensitive PII and PHI of Plaintiff and Class Members via the Website, iOS App, and Android App." FAC ¶ 179; *see also id.* ¶¶ 15, 30, 37, 181-82.

The Federal Wiretap Act provides for liability against anyone who "intentionally intercepts, endeavors to intercept, or *procures any other person to intercept or endeavor to intercept*, any … electronic communication." 18 U.S.C. § 2511(1)(a) (emphasis added). The Federal Wiretap Act further provides that a person whose "electronic communication is intercepted, disclosed, or intentionally used" in violation of the Federal Wiretap Act may bring a civil action against the entity that engaged in the violation. *See* 18 U.S.C. § 2520.

Here, Plaintiff alleges PlushCare violated the Federal Wiretap Act by procuring and endeavoring to procure Segment and Criteo to intercept the electronic communications of Plaintiff and class members. FAC ¶¶ 15, 30, 37, 173, 177, 179, 181-82. Plaintiff's allegations are sufficient to state a Federal Wiretap Act violation.

Plaintiff recognizes that some courts have stated that the Federal Wiretap Act does not provide for civil liability against an entity that procures another to intercept communications. *See, e.g., Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 169 (5th Cir. 2000). However, courts that have more-closely examined the Federal Wiretap Act and its legislative history have held that the Act does, in fact, provide for such civil liability. *See Dawson v. Univ. of Phoenix*, No. 1:25-CV-03497, 2026 WL 92248, at *14 (N.D. Ill. Jan. 13, 2026); *Q.J. v. PowerSchool Holdings LLC*, No. 23 C 5689, 2025 WL 2410472, at *6 (N.D. Ill. Aug. 20, 2025); *Boseovski v. McCloud Healthcare Clinic, Inc.*, No. 2:16-CV-2491-DMC, 2020 WL 68578, at *5-6 (E.D. Cal. Jan. 7,

2020); *Valentine v. WideOpen West Finance, LLC*, 288 F.R.D. 407, 412, n.3 (N.D. Ill. 2012); *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 427-28 (E.D.N.Y. 2006).

As the court in *Valentine* held, 18 U.S.C. § 2520 sets forth who may bring an action (*i.e.*, a person whose electronic communications were intercepted, disclosed or used) without limiting who may be sued as a defendant (*i.e.*, both the interceptor and the procurer of the interception may be sued). 288 F.R.D. at 412, n.3. "The procurer of an interception has indeed engaged in a violation of § 2511(a), and may thus be sued by the person whose communication was intercepted." *Id.*; *see also Boseovski*, 2020 WL 68578, at *5-6 (discussing legislative history); *Dawson*, 2026 WL 92248, at *14 ("the victim of the wiretap may sue any person or entity who engaged in the violation, including procuring interception"); *Lonegan*, 436 F.Supp.2d at 427-28.

Importantly, the Federal Wiretap Act's exemption to liability for parties to a communication, *see* 18 U.S.C. § 2511(2)(d), does not apply to a party that procures a third party to intercept a communication. As shown below, the exemption only applies to the interception—not the procurement or use of relevant communications. *See* 18 U.S.C. § 2511(2)(d).

18 U.S.C. § 2511(2)(d) provides, in relevant part, that "[i]t shall not be unlawful … for a person … *to intercept* a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties has given prior consent to such interception …." 18 U.S.C. § 2511(2)(d) (emphasis added). The statute provides no exemption for an entity that procures another to intercept a communication. *See id.*

"[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (internal quotations and related citations omitted). Here, Congress: (a) expressly provided for liability for entities, like PlushCare, that procure or endeavor

to procure others to intercept communications, 18 U.S.C. § 2511(1)(a); but (b) omitted such entities from those exempted from liability under 18 U.S.C. § 2511(2)(d). It follows that Congress acted "intentionally and purposely."

**B. The Crime-Tort Exception to the Federal Wiretap Act's One-Party Consent Exemption Applies.**

Absent Plaintiff's procurement allegations, the crime-tort exception to the Federal Wiretap Act's one-party consent exemption applies here for two independent reasons, namely, PlushCare intercepted Plaintiff's communications with the purpose of violating HIPAA and, separately, to invade his privacy. Either suffices.

**A HIPAA violation is a valid crime-tort predicate.** Courts routinely hold that intercepting communications with the purpose of violating HIPAA triggers the crime-tort exception. *See, e.g.*, *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 848-50 (E.D. Cal. 2025) (plaintiffs plausibly alleged the defendants' interception of their information with the purpose of violating HIPAA and thus sufficiently alleged the ECPA's "crime-tort exception" applies); *R.S. v. Prime Healthcare Servs., Inc.*, No. 5:24-CV-00330-ODW (SPX), 2025 WL 103488, at *6 (C.D. Cal. Jan. 13, 2025) ("R.S. has plausibly raised that Prime Healthcare intercepted her Private Information with the purpose of violating HIPAA, sufficient to satisfy the crime-tort exception."); *Lynch v. Express Scripts Holding Company*, No. 23-CV-01170-AMO, 2026 WL 1749550, at *5 (N.D. Cal. June 17, 2026) (same).

PlushCare's contention that "HIPAA does not provide a private right of action" and so "cannot serve as a predicate" (MTD at 36) is unsupported and contrary to the law. "[T]hat a statute does not authorize a private right of action does not mean that it cannot be used as an external legal hook for a tort claim." *K.L. v. Legacy Health*, No. 3:23-CV-1886-SI, 2024 WL 4794657, at *4 (D. Or. Nov. 14, 2024); *see also id.*, at *6 (finding a HIPAA violation can constitute an independent crime under the ECPA); *see also In re: Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633-SI, 2017 WL 539578 (D. Or. Feb. 9, 2017), at *15 ("The fact that there

is no private right of action under HIPAA, however, does not preclude causes of action under state law, even if such a cause of action requires as an element that HIPAA was violated.") (citing *Webb v. Smart Document Sols., LLC*, 499 F.3d 1078 (9th Cir. 2007)); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 897 (C.D. Cal. 2024) ("The Court ... follows the published precedent of this District in concluding that a duty may arise from HIPAA and serve as the basis for a negligence claim under California law.").

**Plaintiff adequately pleads a tortious purpose.** PlushCare's two remaining objections—that its motive was merely monetary, rather than "to injure Plaintiff," and that any tortious act was not "independent from the recording itself" (MTD at 36)—fail.

*First*, a profit motive is no defense. "[A] monetary purpose does not insulate a party from liability under the ECPA." *Tenet Healthcare Corp.*, 789 F. Supp. at 850; *accord Gilligan v. Experian Data Corp.*, No. 25-CV-02873-RFL, 2026 WL 32259, at *3 (N.D. Cal. Jan. 6, 2026). PlushCare's cases, *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928 (N.D. Cal. 2023) and *Rodriguez v. Google LLC*, 2021 WL 2026726 (N.D. Cal. May 21, 2021), are inapposite. Neither involved HIPAA, a distinction courts have found dispositive. *See In re BetterHelp, Inc. Data Disclosure Cases*, No. 23-CV-01033-RS, 2024 WL 3416511, at *4 (N.D. Cal. July 15, 2024) (crime-tort exception applied where the defendant "arguably was committing the tort/crime of disclosing its customer's sensitive mental health-related information in violation of HIPAA[,]" a "distinction from *Katz-Lacabe*, which … is sufficient to permit the claim to go forward."). And both rest on the *DoubleClick* line of cases (*In re DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001)), which courts routinely reject. *See Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1090 (N.D. Cal. 2025) ("The Court has carefully reviewed the *DoubleClick* line of cases and respectfully disagrees with the reasoning contained in them"); *Semien v. PubMatic Inc.*, No. 25-CV-03164-SI, 2026 WL 216333, at *10 (N.D. Cal. Jan. 27, 2026) ("The

Court is not persuaded by the authorities PubMatic cites to argue financial motives cannot constitute tortious motive.").

*Second*, the tortious purpose is independent of the interception. "[C]ourts consistently find" that a HIPAA violation "constitutes an independent prohibited purpose." *Smith v. Rack Room Shoes, Inc.*, No. 24-CV-06709-RFL, 2025 WL 2210002, at *5 (N.D. Cal. Aug. 4, 2025); *see also Prime Healthcare*, 2025 WL 103488, at *5. PlushCare's reliance on this Court's decision in *Doe v. Talkiatry Mgmt. Servs., LLC*, 2025 WL 3190813 (C.D. Cal. Oct. 1, 2025), is misplaced. There, the plaintiffs alleged only the "illegal *interception* of … individually identifiable health information … in violation of HIPAA"; they did "not allege that this purpose constitutes independently illegal or actionable conduct." *Id.* at *5 (emphasis added). Plaintiff here does. In *Prime Healthcare*, the court distinguished the factual circumstances like those in *Talkiatry* from the facts before it, noting the violation at issue "stems from [the defendant's] intentional disclosure of the collected Private Information, which constitutes a 'further impropriety' independent and separate from [the] *interception*[,]" because "the intent to disclose private information predates and is distinct from the interception itself." *Prime Healthcare*, 2025 WL 103488, at *6 (emphasis in original). The timing of that disclosure is immaterial: "Whether the disclosure occurs simultaneously with or shortly after the interception, [the defendant's] purpose remained the same at the time of the interception: to disclose private information to third parties in violation of HIPAA." *Id.*; *see also Gaige v. Exer Holding Co., LLC*, No. 2:24-CV-06099-AH-(AJRX), 2025 WL 559719, at *5 n.5 (C.D. Cal. Jan. 30, 2025) ("Plaintiff alleges a knowing interception and disclosure by Defendant with an illegitimate purpose.").

As in *Prime Healthcare*, Plaintiff alleges PlushCare "disclosed, and endeavored to disclose," to Segment and Criteo "the contents of the electronic communications of Plaintiff and Class Members." FAC ¶ 181; *see also id.* ¶ 103 ("Defendant ... knowingly disclosed Plaintiff's PHI to Segment and Criteo"); *id.* ¶ 157 (PlushCare

"failed to disclose to users, ... that by scheduling a doctor's appointment, [their] personal information would be disclosed or released to Segment and Criteo").

PlushCare built the pipeline that carried out the disclosure before Plaintiff and Class Members interacted with its platform—and thus before any interception could occur. "The code for the [Segment and Criteo] tracking technologies ... was purposefully installed by Defendant into the documents and/or other libraries defining the contents of the Website, iOS App, and Android App." FAC ¶ 137; *see also id.* ¶¶ 138-42 (detailing how PlushCare added the code). Once installed, that code ensured that "when a user communicates with Defendant's Website, iOS App, or Android App, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties." *Id.* ¶ 59. PlushCare's intent to disclose therefore "predates and is distinct from the interception itself." *Prime Healthcare*, 2025 WL 103488, at *6.

What PlushCare designed its pipeline to Segment and Criteo to disclose was not anonymous data, but health information that is "individually identifiable." 42 U.S.C. § 1320d(6). As explained *supra* § III, the Website and Apps tag a user's health data with unique identifiers during the booking flow, then link that data to the user's name, email, and phone number at registration—delivering it to Segment and Criteo in fully identifiable form. Thus, PlushCare set out to "disclose private information to third parties in violation of HIPAA[,]" and "[that] purpose remained the same at the time of the interception[.]" *Prime Healthcare*, 2025 WL 103488, at *6.

Finally, even setting HIPAA aside, Plaintiff's invasion of privacy allegations independently satisfy the crime-tort exception. *See infra*, § VIII; *Krzyzek v. OpenX Techs., Inc.*, 817 F. Supp. 3d 857, 869 (N.D. Cal. 2026) ("Where, as here, plaintiffs adequately alleged invasion of privacy, the Court is not convinced that ECPA's crime-tort exception does not apply. Therefore, the Court declines to dismiss plaintiffs' ECPA claim."); *R.C.*, 733 F. Supp. 3d at 901-02 ("Here, the Court concludes that Plaintiffs have stated a claim for invasion of privacy. Accordingly, viewing the

allegations in the light most favorable to Plaintiffs, the Court concludes that the SAC pleads Defendant's tortious intent.").

## V. PLAINTIFF SUFFICIENTLY ALLEGES A VIOLATION OF CIPA §§ 631 AND 632

PlushCare raises four objections to Plaintiff's CIPA §§ 631 and 632 claims: (1) CIPA does not apply to modern technologies (MTD at 38 n.12); (2) Plaintiff alleges only that Segment and Criteo could use the data for their own purposes rather than that they did (*id.* at 4, 41); (3) the Segment and Criteo BAAs prove the data was used "exclusively for PlushCare's benefit" (*id.* at 33-34); and (4) Plaintiff has not alleged PlushCare "aided" any violation (*id.* at 39). Each of these arguments fails.

### A. CIPA Applies to Modern Technologies

PlushCare "does not concede the applicability of CIPA to technologies such as Segment and Criteo" and suggests that CIPA does not apply to modern technologies because "the California Consumer Privacy Act ("CCPA") and California Privacy Rights Act ('CPRA'), were enacted *after* the creation of pixel tracking technology." MTD at 38 n.12. This argument lacks merit.

"[C]ourts have extended [CIPA § 631's] reach to include 'new technologies,' including internet communications." *Jones v. Skullcandy, Inc.*, No. 25-CV-1759 JLS (BLM), 2026 WL 699819, at *2 (S.D. Cal. Mar. 12, 2026) (citing *Matera v. Google Inc.*, No. 15-CV-4062-LHK, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (considering the plain language of § 631, the legislative intent underlying CIPA to protect privacy, and the California Supreme Court's approach to applying statutes to new technologies and concluding that § 631 applies to new technologies like email); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.")); *see also Bradley v. Google, Inc.*, No. C 06-05289 WHA, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th

Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history); *Jackson v. LinkedIn Corp.*, 744 F. Supp. 3d 986, 993 (N.D. Cal. 2024) ("Section 631 applies to 'new technologies'").

Moreover, the "CCPA and CIPA are complementary." *Mirmalek v. Los Angeles Times Commc'ns LLC*, No. 24-CV-01797-CRB, 2024 WL 5102709, at *5 (N.D. Cal. Dec. 12, 2024); *Xu v. Reuters News & Media, Inc.*, No. 25CV459918, 2025 WL 3035016, at *3 (Cal. Super. Oct. 24, 2025) ("[I]t does not appear that CCPA and CIPA are in conflict with one another."); *Rose v. Variety Media, LLC*, No. 25STCV01865, 2025 WL 2794920, at *4 (Cal. Super. Sep. 24, 2025) ("The Court does not see any problem, at this stage, with the overlap, if any, between CCPA and CIPA."). PlushCare's lone footnote offers no reason for the Court to depart from this authority.

**B. The Pleading Stage Question Is Capability, Not Actual Use**

Despite conceding that Plaintiff alleges Segment and Criteo "have the theoretical 'capability'" to use PlushCare's data for their own purposes (MTD at 4), PlushCare contends that Plaintiff must also allege that "Segment or Criteo *actually* used PlushCare's data for their own purposes" and he has not done so. *Id.* at 4, 41. Defendant is mistaken.

Section 631(a) imposes liability for four "'distinct and mutually independent patterns of conduct.'" FAC ¶ 197 (quoting *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978)). Here, Plaintiff alleges that PlushCare violated prong four of CIPA § 631(a) by enabling Criteo's and Segment's wrongdoing. *See* FAC ¶ 203. The Third Parties' conduct itself is violative of prongs two ("… reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication …") and three ("uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained"). *See* CIPA § 631(a); FAC ¶¶ 201-202.

"[Only] the third prong of the statute … penalizes [actual] 'use.'" *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 860–61 (C.D. Cal. 2024). "As a

result, reading a use requirement into the second prong would add requirements that are not present (and swallow the third prong in the process)." *Id.* at 861 (cleaned up); *see also Tate v. VITAS Healthcare Corp.*, 762 F. Supp. 3d 949, 955 (E.D. Cal. 2025) ("This reading of the statute's plain text is [] in line with what the California Supreme Court has made clear[.]").

Thus, "a third party's intent with respect to the use of the collected information is irrelevant." *Heerde*, 741 F. Supp. 3d at 861. The inquiry turns on whether the third party "has the *capability* to use the information for any purpose other than to furnish the communications to the website owner[,]" not whether it has yet done so. *Id.* at 860 (emphasis in original); *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023) (software provider is a third party where it "can use that information for other purposes, even if [plaintiff] has not alleged that they have done so"); *Tate*, 762 F. Supp. 3d 949, 955 (E.D. Cal. 2025) (§ 631(a) violated where the software "independently analyzes that data, and the company reserves the capability to then use that data for its own purposes").

Plaintiff pleads exactly that. "Criteo has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, improving its services and products, and for measurement and analytics and creating audiences." FAC ¶ 136; *see also id.* ¶ 135 (quoting the Criteo Umbrella Terms of Service). Segment "has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, improving its services and for business analytics purposes." *Id.* ¶ 134; *see also id.* ¶ 133 (quoting the Twilio Terms of Service and Twilio Data Protection Addendum).

PlushCare's contrary authority, *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823 (N.D. Cal. 2021) and its progeny (MTD at 40, 42), are the discredited minority view. "*Graham* and its progeny are based on a misinterpretation of Section 631 and *Ribas*, both of which compel the conclusion that the third party's intentions with respect to the use of the collected information are irrelevant." *Yockey v. Salesforce, Inc.*, 688 F.

Supp. 3d 962, 972 (N.D. Cal. 2023); *accord Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 980 (C.D. Cal. 2023); *Tate*, 762 F. Supp. 3d at 955–56. And *Doe v. Kaiser Found. Health Plan, Inc.*, No. 23-CV-02865-EMC, 2024 WL 1589982 (N.D. Cal. Apr. 11, 2024), does not help PlushCare. S*ee* MTD at 33. The defect there was the absence of any allegation that the third parties acted "with the knowledge and/or approval of" the defendant. *Id.* at *7. Here, by contrast, Plaintiff alleges as much. *See infra* § V.D (discussing how PlushCare aided the wiretapping).

At a minimum, whether Segment and Criteo are independent eavesdroppers or merely passive tools is a "question of fact for a jury, best answered after discovery[.]" *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021); *see also Augustine v. Lenovo (United States), Inc.*, No. 22-CV-2027-L-AHG, 2023 WL 4938050, at *3 (S.D. Cal. Aug. 2, 2023) (allegation that the third party's "actions go beyond the ordinary function of a tape recorder is sufficient ... to survive Defendant's pleading challenge"). The Court need not resolve it now.

### C. The BAAs Can Neither Be Considered Nor Help PlushCare

PlushCare insists Plaintiff's allegations that the third parties use the wiretapped information for their own purposes are "demonstrably false" because the Segment and Criteo BAAs (MTD Exs. D, E) "superseded" their respective terms of service and show the data was used "exclusively for PlushCare's benefit." MTD at 33-34. That argument fails on three levels.

*First,* it asks the Court to weigh extrinsic evidence. The BAAs are not part of the FAC, and the Court is "precluded from relying on such factual assertions in resolving a motion to dismiss." *Tate*, 762 F. Supp. 3d at 956 (declining to consider a BAA offered to show the third party "cannot use the data for any other purposes"). *See supra* § I.

*Second,* even considered, the BAAs do not negate capability. As *Tate* held on analogous facts, "[r]egardless of any [BAA]," the vendor's "Terms of Service expressly reserve the ability to use 'Client Data[] ... [to] enhance its provision of

services,'" and "whether [the vendor] actually uses the contents of the [communications] for its own purposes is not legally relevant." *Tate*, 762 F. Supp. 3d at 956. So too here: Criteo's and Segment's terms allow them to use the data to improve their own services. FAC ¶¶ 133-136. That capability—not any promised restraint—is what states the claim. *See Krzyzek*, 817 F. Supp. 3d at 867 (that a third party "did not use any data for any reason other than … for its website partners, [] is not the question the third party analysis turns on"; what matters is the privacy intrusion "akin to having an unannounced second auditor listening in") (cleaned up).

*Third,* the BAAs support Plaintiff's allegations. Read in full, they corroborate that Criteo and Segment function as more than mere passive recorders:

- [redacted] Ex. D, ACCOLADE 0000012. [redacted] *Id.* [redacted] *Id.*, ACCOLADE 0000011. [redacted] Criteo's Umbrella Terms of Service describe: "'Criteo may use the Service Data to improve the Criteo Technology (including through machine learning), the Criteo Services, and other Criteo products, programs and/or services, fraud prevention, for measurement and analytics, [and] to create reports, audiences[.]'" *See* FAC ¶ 135 (quoting Criteo Umbrella Terms of Service). [redacted] (as summarized in FAC ¶ 136); [redacted]

- [redacted] Exhibit E at ACCOLADE 0000002. [redacted] *Id.* at ACCOLADE_0000001, which defines "Use" to include the "the sharing, employment, application, utilization, examination, or analysis" of individually identifiable health

information. 45 C.F.R. § 160.103. [redacted] FAC's allegation that Segment "processes" the collected information "to develop and improve new products and services ... [and] for business analytics, internal reporting, financial reporting, forecasting capacity and revenue planning, and product strategy." FAC ¶ 133.

### D. Plaintiff Adequately Alleges Derivative Liability

PlushCare's final argument—that Plaintiff pleads no "factual basis to support derivative liability" (MTD at 39)—fails as to both CIPA provisions.

*PlushCare is liable under § 631(a).* The fourth clause of § 631(a) reaches anyone who "aids, agrees with, employs, or conspires with" another to violate the statute—and requires no showing of common-law aiding-and-abetting intent. A defendant satisfies it simply by "enabling" the interception. *Revitch v. New Moosejaw, LLC*, No. 18-CV-06827-VC, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019). Thus, a website developer that enables a third-party to wiretap the communications of website visitors is itself liable for wiretapping. *See id.* at *2 ("the complaint adequately alleges that Moosejaw violated section 631 by enabling NaviStone's wrongdoing."); *Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 981 (C.D. Cal. 2023)("Section 631 makes clear that aiding a violation is also a violation. [Defendant] may be liable for its conduct to aid Akamai's alleged violation.") (cleaned up).

That is what the FAC alleges. PlushCare "purposefully installed" the Segment and Criteo tracking code into its Website and Apps. FAC ¶ 137; *see also id.* ¶¶ 58, 138-142. Thus, PlushCare "knowingly disclosed Plaintiff's PHI to Segment and Criteo." *Id.* ¶ 103; *see also id.* ¶ 203. Defendant did so without prior consent. *Id.* ¶ 204. Courts have found such allegations to be sufficient. *See, e.g.*, *Gianne*, 2026 WL 925522, at *6 (allegations that the defendant "purposefully installed" the trackers, knew they transmitted communications to third parties, and did so without adequately alerting users "give rise to a plausible inference that [it] ... assisted or encouraged the conduct").

**E. PlushCare is liable under § 632.**

PlushCare is additionally liable under CIPA § 632 and its argument to the contrary (MTD at 39) is wrong twice over.

First, PlushCare is directly liable under § 632, regardless of its party status, because "[s]ection 632 makes it illegal to either eavesdrop upon *or* record confidential communications." *Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169, 1182 n.4 (N.D. Cal. 2024) (emphasis in original). A party to a communication may therefore be liable under § 632 for *recording* it without consent, even though it cannot eavesdrop on its own conversation. *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 117 (2006) (§ 632 "prohibits … secretly or surreptitiously recording the conversation"); *Gruber v. Yelp Inc.*, 55 Cal. App. 5th 591, 608 (2020) ("[W]e hold that sections 632 and 632.7 prohibit recording a communication, in whole or part, without the consent of all parties, no matter the particular role or degree of participation that a party has in the communication."). Plaintiff alleges that PlushCare, through the Criteo and Segment trackers, secretly recorded users' confidential communications without their consent. FAC ¶ 104. That PlushCare was a party to the communications is therefore no bar to § 632 liability.

Second, an entity that aids a § 632 violation is itself liable. California Penal Code § 31 makes "[a]ll persons concerned in the commission of a crime ... or [who] aid and abet in its commission ... principals in any crime so committed." That principle applies to § 632: it renders a defendant liable "whether or not she actually physically recorded the confidential conversation." *Vera v. O'Keefe*, 791 F. Supp. 2d 959, 965 (S.D. Cal. 2011); *accord Vaccaro v. Altais*, No. 223CV04513ODWBFMX, 2023 WL 7003211, at *5 (C.D. Cal. Oct. 23, 2023). Here, Plaintiff alleges that PlushCare aided Criteo's and Segment's eavesdropping by installing their code, and that this enabled the third parties to capture Plaintiff's confidential communications. FAC ¶¶ 58-59, 137-142. Nothing more is required.

## VI. PLAINTIFF SUFFICIENTLY ALLEGES HIS CMIA CLAIM

PlushCare argues that the information shared with Segment and Criteo "does not constitute substantive medical information as defined by the CMIA." MTD at 43. It does.

PlushCare does not dispute that it is a health care provider that "facilitates a variety of health care services for its patients, such as online prescriptions, online urgent care, mental health, and weight loss." FAC ¶ 17. That matters, because the CMIA protects "any individually identifiable information, in electronic or physical form ... regarding a patient's medical history, … mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i). That definition "largely tracks HIPAA's definition of PHI," *Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 975 (S.D. Cal. 2023), which reaches "individually identifiable" information that "[r]elates to" a person's "physical or mental health or condition," "the provision of health care," or "the past, present, or future payment for" that care. 45 C.F.R. § 160.103.

Courts have found two categories of healthcare website data to be actionable: information tying a user to a private patient portal (because portal use itself reveals patient status), *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792–93 (N.D. Cal. 2022), and information tying a user to public webpages that reveal something private about their health or care, *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 891 (C.D. Cal. 2024). *See also id.* (rejecting "Defendant's attempt to paint a bright line barring privacy claims based on website browsing activity"); *B.N. v. Oregon Reprod. Med., LLC*, No. 3:25-CV-00202-IM, 2026 WL 915343, at *4 (D. Or. Apr. 3, 2026). PlushCare's booking flow implicates both categories. Across that flow, PlushCare discloses information going to each of the three things 45 C.F.R. § 160.103 protects: the user's condition, PlushCare's provision of care, and payment for it.

*Condition*. Before a user creates a profile, PlushCare discloses the substantive nature of the care sought—whether the appointment concerns physical or mental

health. *See* FAC ¶¶ 78, 98 ("primary-care"); ¶ 80 ("Therapy" or "Mental Health" services); *id.* ¶ 51 ("Book a doctor's visit" or "Book a therapy session").

*Provision.* PlushCare discloses that the patient will "[t]alk to a doctor on [their] phone" rather than in person (*id.* ¶ 78), the state where the visit will occur (*id.* ¶¶ 81, 99), and the exact date and time of the appointment slot selected (*id.* ¶¶ 83-84, 87). After the user registers, PlushCare further discloses "the fact that users clicked and/or tapped to book their appointment" (*id.* ¶ 91) and "the particular name of the provider" they booked (*id.* ¶ 89).

*Payment.* PlushCare discloses that users "are paying with or without insurance" (*id.* ¶ 79), and—after registration—that they reached "the payment stage" (*id.* ¶ 102), the "particular payment method" such as "credit card" (*id.* ¶ 90), the "price paid" (*id.* ¶ 94), whether users are "new or repeat" patients (*id.*), and that they enrolled in a "$19.99 per month" membership (*id.*).

This granular, tripartite disclosure is what distinguishes *Gray v. Luxottica of America, Inc.*, No. 8:24-CV-00160-MRA-DFM, 2024 WL 5689566 (C.D. Cal. Dec. 16, 2024), on which PlushCare relies. MTD at 44-45. The *Gray* plaintiff alleged only that the defendant disclosed he "*may* have been a patient of LensCrafters at some time." *Id.* at *9 (emphasis added). That is the kind of "demographic or numeric information that does not reveal medical ... care" that the CMIA does not reach. *Eisenhower Med. Ctr. v. Superior Ct.*, 226 Cal. App. 4th 430, 435 (2014). Here, by contrast, PlushCare disclosed the nature of the treatment, the treating doctor, and the payment terms: That a user is booking a video visit with a particular doctor for mental health care, while located in California, paying by credit card under a renewing membership. *Gray* addressed the bare fact that treatment "may" have occurred; it did not address disclosures like these.

PlushCare's fallback—that it "contracts with Segment and Criteo for data processing and administrative services," so the disclosures are lawful (MTD at 43)—fares no better. Plaintiff alleges that Segment and Criteo are not billing vendors but

advertising platforms that exploit the data for commercial ends. PlushCare's own records show Criteo providing "Commerce Growth Services" and its "Commerce Media Platform," which are advertising services. FAC ¶ 153; *supra* § V. Criteo "serve[s] ads" through "Predictive Bidding" and "[a]udience targeting." *Id.* ¶¶ 74, 150, 152. Segment "partner[s] with Criteo to 'help companies' like Defendant with advertising" and runs "advertising campaigns" using "native advertising identifiers." *Id.* ¶¶ 66, 154. Criteo's and Segment's terms of service confirm that each "has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant." *Id.* ¶¶ 133-136; *see supra* § V.

Given that Criteo and Segment use PlushCare's patient data for "commercial ends, *i.e.* marketing and advertising[,]" they "cannot plausibly be compared to a provider of administrative services like a billing company." *Strong v. LifeStance Health Grp. Inc.*, No. CV-23-00682-PHX-KML, 2025 WL 317552, at *11 (D. Ariz. Jan. 28, 2025) (cleaned up). This case is thus a far cry from *Oddei v. Optum, Inc.*, No. 2:21-CV-03974-SB-MRW, 2021 WL 6333467 (C.D. Cal. Dec. 3, 2021), *aff'd sub nom. Oddei v. ScanSTAT Techs., LLC*, 2022 WL 17538747 (9th Cir. Dec. 8, 2022), where the defendant did nothing more than "disclose [the plaintiff's] records to [the plaintiff's] counsel[.]" *Id.* at *1, *3. Here, Criteo and Segment exploit users' data for reasons users never approved, including advertising and improving their own commercial products. FAC ¶¶ 58-76; 131-36; 150-54.[2]

## VII. PLAINTIFF SUFFICIENTLY ALLEGES HIS INVASION OF PRIVACY AND INTRUSION UPON SECLUSION CLAIMS

PlushCare's argues that Plaintiff's invasion of privacy and intrusion on seclusion "claims fail because Plaintiff consented to the collection of his information."

---

[2] PlushCare's reliance on *Williams v. What If Holdings, LLC*, No. C 22-03780, 2022 WL 17869275 (N.D. Cal. Dec. 22, 2022), at MTD 48, is misplaced because *What if Holdings* rests on the flawed reasoning in *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021) as discussed in detail, *supra* § V.

MTD at 49. Not so. As explained in detail *supra*, § II, Plaintiff did *not* consent.

This Court has allowed intrusion upon seclusion and invasion of privacy claims to proceed in a case concerning pixels and trackers on websites that allegedly transmitted a plaintiff's "IP address, device information, browsing activity, and persistent user identifier." *Manier v. Triple Lift Inc*, No. 5:25-CV-03223-SSS-DTBX, 2026 WL 1295546, at *1 (C.D. Cal. Apr. 15, 2026).

Here, the invasion of privacy is even more "serious in nature, scope, and impact" than in *Manier* "because it relates to patients' private medical communications" (FAC ¶¶ 242, 249). Moreover, similar to how the *Manier* trackers collected "persistent user identifier[s]" (*Manier*, 2026 WL 1295546, at *1), here, Segment and Criteo collected "unique user identifiers, userIds and anonymousIds, hashed PII, Facebook browser IDs, and hashed UUID identifiers" along with users' medical information. FAC ¶ 234.

In any event, Plaintiff's claim cannot be resolved on a motion to dismiss. "Whether an alleged intrusion is highly offensive to a reasonable person is an issue not capable of resolution, on these facts, at the motion to dismiss stage." *Cousin*, 702 F. Supp. 3d at 974 (tracking pixel case on a healthcare website where "Plaintiffs have plausibly pleaded that the alleged invasion of privacy is highly offensive.").

**CONCLUSION**

For these reasons, Plaintiff asks this Court to deny Defendant's motion to dismiss the Complaint. Should the Court grant any part of Defendant's motion to dismiss, Plaintiff respectfully requests that he be granted leave to file an amended complaint.

Dated: July 31, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)

50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane Highwood, IL 60040
Telephone: (312) 358-8225
Email: scott@drurylegal.com

*Attorneys for Plaintiff*

**CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 11-6.2**

The undersigned, counsel of record for Plaintiff Robert Perkins certifies that this brief contains 11,656 words. Plaintiff acknowledges that this brief exceeds 7,000-word limit of L.R. 11-6.1; however, it is within the 13,000 word limit set by the Court's June 18, 2026 Order Extending Word Count for Defendant's Forthcoming Motion to Dismiss and Plaintiff's Response, ECF No. 29.

By: /s/ *Philip L. Fraietta*
Philip L. Fraietta